IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERH DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **BRITT ALLEN RIPKOWSKI** | § | |
| **Petitioner,** | § | |
| | § | |
| **-VS-** | § | **CIVIL ACTION NO:  4-07 cv 4097** |
| | § | |
| **NATHANIEL QUARTERMAN** | § | |
| **Director,** | § | |
| **Texas Dept. of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

_____

_____

**FIRST AMENDED PETITION
FOR A WRIT OF HABEAS CORPUS**
_____

**This is a Capital Case**

**Anthony S. Haughton**
**Attorney at Law**
**3013 Fountain View, Suite 145**
**Houston, TX 77057**
**Tel: (713) 995-7776**
**Fax: (713) 953-7482**
**ASHaughton@aol.com**

**Attorney for
BRITT ALLEN RIPKOWSKI**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERH DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **BRITT ALLEN RIPKOWSKI** | § | |
| **Petitioner,** | § | |
| | § | |
| **-VS-** | § | **CIVIL ACTION NO: 4-07 cv 4097** |
| | § | **Formerly (4-06-MC -00496)** |
| | § | |
| **NATHANIEL QUARTERMAN** | § | |
| **Director,** | § | |
| **Texas Dept. of Criminal Justice,** | § | |
| **Correctional Institutions Division,** | § | |
| | § | |
| **Respondent.** | § | |

**TO THE HONORABLE JUDGE ATLAS:**

Petitioner, BRITT ALLEN RIPKOWSKI, is currently confined on death row at the Polunsky Unit in Livingston, Texas. Mr. Ripkowski asks this Court to issue a Writ of Habeas Corpus pursuant to the U.S. Constitution and 28 U.S.C. § 2254 and to order his release from confinement or from the death penalty on the grounds that his custody or penalty violate the Constitution and laws of the United States.

## PRELIMINARY STATEMENT

Because some of the issues found in preparing Mr. Ripkowski's federal habeas have not been previously raised in state court, Mr. Ripkowski requests that the Court allow his case to be Stayed and Abeyed while he presents any exhausted issues to the state courts.  Mr. Ripkowski, specifically requests that the Court Stay and Abey and allow him to present any of his issues that the Court may find to be procedurally defective due to them not being presented to or ruled on in the state court.   Additionally, counsel is raising a competency to assist on habeas claim.  As Mr. Ripkowski is incompetent, counsel is requesting that the court stay the proceedings in this court until he regains competency as certain issues raised in preparation for this brief cannot be investigated and prepared due to client's inability to cooperate with counsel representing him.

### Statement Regarding Symbols

The symbols used in reference to transcripts and the record will appear in parentheses. The transcript volumes will be referred to as S.F. followed by the volume number and the page number, and the trial exhibits will be referred to as R followed by the volume number and page number.

### Statement Regarding Exhibits

Mr. Ripkowski incorporates all of his previously filed exhibits (from both his Original and Amended Petitions) herein word for word.

**Table of Contents**

|                                |  Page |
| ------------------------------ | ----- |
| Preliminary Statement          |  2    |
| Statement on Symbols           |  2    |
| Statement regarding Exhibits   |  2    |
| Table of Contents              |  3    |
| Table of Citations             |  4    |
| Jurisdiction                   |  8    |
| Procedural history             |  8    |
| Statement of Facts             |  10   |
| Argument                       |  14   |
| Prayer                         |  147  |
| Certificate of Service         |  148  |
| Verification                   |  149  |

## TABLE OF CITATIONS

| Cases | Page |
|---|---|
| *Addington v. Texas*, 441 U.S. 418, (1979) | 6 |
| *Alston v. Garrison*, 720 F.2d 812 (4th Cir. 1983) | 21 |
| *Anderson v. Sirmons*, 2007 U.S. App. Lexis 3753 (10th Cir. Feb. 21, 2007) | 20, 21 |
| *Apprendi v. New Jersey*, 530 U.S. 466 (2000) | 9, 10 |
| *Atkins v. Virginia*, 536 U.S. 304 (2002) | *passim* |
| *Cafeteria and Restaurant Workers Union, Local 473, AFL-CIO v. McElroy*, 367 U.5. 886, (1961) | 5 |
| *Chemical Specialties Sales Corp. Industrial Div. v. Basic Inc.*, 296 F. Supp. 1106, (D.C. Conn. 1968) | 12 |
| *Clark v. Quarteman* 457, F.3d 441 (5th Cir. 2006) | 1, 2 |
| *Colorado v. Connelly*, 479 U.S. 157, 164-67 (1986) | 13 |
| *Cooper v. Okla.*, 571 U.S. 348, 364 (1996) | 14 |
| *Collier v. Turpin*, 177 F.3d 1184, (11th Cir. 1999) | 21 |
| *Culombe v. Conn.*, 367 U.5. 568, 602 (1961) | 13 |
| *Davis v. N.C.*, 384 U.S. 737, 741-42 (1966) | 13 |
| *Drope v. Mo.*, 420 U.S. 167, 171-72 (1975) | 14 |
| *Dusky v. U.S.*, 362 U.S. 402 (1960) | 14 |
| *Enmund v. Fla.*, 458 U.S. 782 (1982) | 17 |
| *Ex Parte Briseno*, 135 S.W.3d 1, (Tex. Crim. App. 2004) | *passim* |
| *Ex Parte Campbell*, 226 S.W.3d 418 (Tex. Crim. App. Apr. 25, 2007) | 24 |

*Furman v. Ga.*, 408 U.S. 238 (1972)                                      *passim*

*Godinez v. Moran*, 509 U.S. 389, 398, 402 (1993)                         14

*Gregg v. Ga.*, 428 U.S. 153 (1976)                                       *passim*

*Halbert v. Michigan* 125 S. Ct. 2582, (2005)                            21

*Hitchcock v. Dugger*,  481 U.S. 393, 394, 399 (1987)                     16

*Holladay v. Campbell*, 463 F. Supp. 2d 1324, (N.D. Ala. 2006)            4

*In re Johnson*, 334 F.3d 403, (5th Cir. 2003)                            5

*In re Winship*, 397 U.S. 358, (1970)                                     7
*Jackson v. Denno*, 378 U.S. 368, 376 (1964)                             13

*Jennings v. Purkett,* 7 F.3d 779, (8th Cir. 1993)                        21

*Lockett v. Ohio*, 438 U.S. 586, 604 (1978)                              16

*McCarver v. N.C.*, 532 U.S. 941 (2001)                                   18

*Miller v. Fenton*, 474 U.S. 104, 110-12 (1985)                          13

*Miranda v. Ariz.*, 384 U.S. 436 (1966)                                  13

*Moorman v. Sheriro*, 426 F.3d 1044, 1059 (9th Cir. 2005)                21

*Morrissey v. Brewer,* 408 U.S. 471, (1972)                              5

*Nelson v. Washington*, 172 Fed. Appx. 748, (9th Cir. 2006)              21

*Penry v. Lynaugh,* 492 U.S. 302 (1989)                                  *passim*

*Ring v. Arizona*, 536 U.S. 584, (2002)                                  8, 10

*Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001)               8

*Romano v. Oklahoma*, 512 U.S. 1, (1994)                                 5

*Roper v. Simmons*, 543 U.S. 551, (2005)                                 10

*Ruiz v. Quarterman*, 2007 WL 2955723 (5th Cir. Oct. 11, 2007)      *passim*

*Sumner v. Shuman,* 483 U.S. 66, (1987)      7

*Santosky v. Kramer,* 455 U.S. 745, (1982)      8

*Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973)      13

*Stanford v. Ky.,* 492 U.S. 361, 370-71 (1989)      25, 27

*Stephens v. Kemp*, 846 F.2d 642, (11th Cir. 1988)      21

*Thompson v. Okla.,* 487 U.S. 815, 818-83 (1988)      *passim*

*Trop v. Dulles,* 356 U.S. 86, 100-101 (1958)      24

*Wilson v. Quarterman*, 6:06-CV-140 (E. D. Tx.) [Dkt. 28]      19

*Woodson v. North Carolina*, 428 U.S. 280, (1976)      6, 16

*Zant v. Stephens*, 462 U.S. 862, 878 (1983)      30

**Statutes**

28 U.S.C. § 2254      2, 7

U.S. Constitution      2

28 U.S.C. § 2241(d)      7

TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(g) (Vernon 2008)      30

## JURISDICTION

This court has personal jurisdiction pursuant to 28 U.S.C. § 2241(d) because Mr. Ripkowski was convicted in the 248th Criminal District Court in Harris County, Texas. Subject matter jurisdiction is conferred by 28 U.S.C. § 2254.

## PRIOR PROCEEDINGS

Mr. Ripkowski was indicted for the felony offense of capital murder in the death of Dominique (also referred to as "Nikki") Frome. The murder being charged as capital due to the age of the victim; Dominique Frome was less than six years of age. She was killed by asphyxiation. (SF vol 1 12). The case was assigned to Hon. Doug Shaver who presided as a visiting judge in the 248th Criminal District Court in Harris County, Texas.

Prior to trial, the Court heard various pretrial motions. (SF 2). Among the motions were motions to suppress the evidence, particularly the various statements made by Mr. Ripkowski. The trial came to be heard on August 2nd, 1999, with opening statements on the same day. Applicant pled not guilty but was found guilty by the jury on August 5th, and sentenced to death, after considering only one special issue on August 10th. (SF vols 15 - 21).

Prior to the beginning of the punishment phase defense counsel, Robert Morrow and Pat McCann, waived the mitigation special issue (SF vol 18 p 4), after their motion to limit victim impact evidence was denied (SF vol 18 p 3). Prior to accepting the waiver of the mitigation issue, Mr. Ripkowski was given a waiver admonishment by the trial court (id). The punishment phase was then continued without mitigating evidence being presented. At the close of the

presentation of evidence, the jury was presented with the "future dangerousness" special issue only.  The jury answered that special issue in the affirmative, and the court sentenced Mr. Ripkowski to death.  (SF vol 21, 40-42)

Mr. Ripkowski appealed to the Texas Court of Criminal Appeals who, in a split decision, ruled against him.  Three of the Judges criticized the majorities' analysis of Mr. Ripkowski's various mitigation claims.  The court's ruling was handed down on November 7, 2001. *Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001).

On August 29, 2001, Mr. Ripkowski, represented by Kurt Wentz, filed an Application for Post-Conviction Writ of Habeas Corpus in the 248th Criminal District Court in Harris County, Texas.  The trial court, under Judge Joan Campbell, entered findings of fact against Applicant on May 2nd, 2006, and the CCA denied his application thereafter.

Applicant's Original Petition to this court was filed timely on November 22, 2007.

## STATEMENT OF FACTS

Britt Allen Ripkowski is now and was at the time of trial and of the offense severely mentally ill.

Britt, the Applicant herein, was the second child born into the marriage of Mark Ripkowski and Cynthia Reisner.  (SF vol 19 p 19).  They lived in a moderate home in Baytown. The two were high school sweethearts, but the marriage proved not to be a happy one due to excessive drinking and violence by Britt's father.  The violence was directed not just against Britt's mother but also against the couple's two young children, Wade, the older sibling, and Britt.  As the violence increased, the marriage continued to break down, and eventually, Cynthia separated from Mark Ripkowski.  Both parents later remarried.  (*Id*).

After the divorce Britt's father's continued his violence towards his now estranged wife and their children. The violence continued even after both he and Cynthia married other people, and played a role in Cynthia moving her boys out of Texas. She took them to Salt Lake City, Utah. Britt was six years old when he got to Utah and spent the rest of his formative years there. For the next few years, it appeared that Britt was to live a normal, unremarkable life, but in his mid teens, his family noticed that he started developing extreme mood swings. The cause for these mood swings was found after a crisis developed in his life. The crisis was reached when Britt was apprehended by police while visiting an uncle in California at the age of 16. When caught by police, he was found to be intoxicated on drugs. His mother and stepfather, who previously had had no idea of his drug use, immediately placed him into an inpatient drug rehabilitation clinic. While at the clinic he was found to be severely drug addicted and to be severely mentally ill; he was diagnosed as being bi-polar. Britt, it was explained, had, prior to his diagnosis, been easing his psychological trauma through self medicating with illegal narcotics. At 16 when the problem was noticed, he was already thoroughly addicted. As part of the family's orientation with their son's drug rehab program, they were told by counselors to search Britt's room. When they searched his room, they found a virtual trove of illegal drugs - - reportedly, more drugs than had been found previously by any other entering patient.

Although Britt battled with his drug problem from then on until he was incarcerated in this case, his mental illness has continued to trouble him, even to this day.

Historically Britt had responded well to the available psychiatric medication. His disorder appears to have been manageable whenever he was taking his prescribed medications. He also responded well to his initial drug rehabilitation therapy, stopping his illicit drug usage

and getting back into school and later work.  Unfortunately when he stopped drug treatment and stopped taking his medication, his mental status again deteriorated. Detesting the side effects of lithium, Britt eventually fell back into trying to self medicate with other drugs, and found his problems and his ability to control his life spiraling out of limited control.

Undoubtedly affected by his mental impairments Britt found himself falling into a series of pathological relationships with women that seemed to only get worse with time.  As the relationships matured and fell apart, the stresses of the relationships exacerbated Britt's underlying mental problems.  His depressions and mania deepened, and in turn made his relationships even more unstable.  He found himself in a place where the pathology of his relationships and his mental illness fed off of each other.  Moreover, Britt appeared to mirror the relationship he had seen played out in his childhood between his mother and father, particularly in his relationship with Monica Allen, who was also reportedly bi-polar.  Britt and Monica went through a series of break-ups and reunions, culminating in a fall reunion in Texas in 1999.  Britt had earlier moved back to Texas after another of their break-ups.  Britt's maternal grandparents were still in Baytown and served as both a base and a resource for his move to Houston.

Britt and Monica agreed to reconcile again, and that Britt should travel to Utah in order to help move Monica and daughter Nikki back to Houston to live with him.  When he got to Utah the mood between him and Monica, changed, and they began to argue again.  During the following days, the situation deteriorated, and on December 22nd, 1997, a verbal argument escalated to a physical one, and Monica ended up dead at Britt's hands.

Britt then took Monica and her child to her van and started driving to Houston.  He stopped along the way and took Monica's body out of the van, and left it a few hundred yards

from the highway.  He got to Houston with Nikki two days after leaving.  Once in Houston he went on a drug binge, ingesting a huge amount of cocaine.  On Christmas morning, under the impact of these drugs and undergoing a manic episode, he killed Nikki then disposed of the body.  Days later he retrieved Nikki's body and buried her in a shallow grave.

Prior to trial, Britt's defense attorneys had him examined by Dr. Paula Lundberg-Love.  She reviewed, among other things, his medical records, educational records, employment records, his previously given videotaped statement, psychological tests, and a toxicology report (developed from a test done on the day after his arrest).  Dr. Lundberg-Love then interviewed Britt and administered a series of tests.  She confirmed that Britt was bipolar.  The initial determination as shown above had been made by Dr. Knapp in Utah (see Medical Records).  Dr. Lundberg-Love found that the disorder had biological origins and represented an organic brain disorder.  (SF vol 16 p 20).

Bipolar disorder is one that results in stark changes in mood from the elevated mania to severely depressed behavior.  (SF vol 16 p164).  Dr. Lundberg-Love also found that Britt had a dependent personality disorder, schizotypal personality disorder, and avoidance traits.  She also noted Britt's numerous head injuries and concussions.  The three main injuries were as follows: two in childhood from being hit and one as an adult from a car accident that smashed his orbital lobe and required extensive reconstructive surgery.

Britt's drug use, as shown above, was patchy.  At times he could go for months and months at a time without drugs, but when his mental illness kicked in, he would ingest huge quantities of drugs.  In the days during the killing at the center of this case, he was actively in the midst of a manic episode. Drug abuse is often linked to or comorbid with bi-polar disorder.  The

use of drugs may make the person feel better but generally exacerbates the persons underlying psychological problems.

In early January, the FBI began investigating the disappearance and possible kidnapping of Monica and Nikki. Their investigation led them to Britt Ripkowski. They met with him several times and orchestrated telephone conversations between him and other detectives, including a female detective from Salt Lake City that resulted in a series of statements by Britt. The statements were taken while Britt had drugs still active in his system and are fraught with weird, magical, and delusional thinking. His statements led to his arrest in this case. After his arrest he directed and then ultimately took police officers to find Nikki's body.

Bi-polar disorder often ends in suicide, and attempted suicides are often seen as a symptom of the disorder. Britt has tried to kill himself several times, and he repeated that behavior immediately after the murder of Nikki and later while incarcerated, before trial. The night before his arrest, Britt slashed his wrists, and the bandages can be seen during his questioning. He tried to kill himself again in jail waiting trial. Shortly after these attempted suicides, while still in this same frame of mind he made his purported waiver in this case.

**ARGUMENT**

1.    **MR. RIPKOWSKI'S CONVICTION AND SENTENCE TO DEATH WERE SECURED BY THE STATE THROUGH THE ADMISSION OF INVOLUNTARY AND COERCED CONFESSIONS IN VIOLATION OF HIS FIFTH, SIXTH AND FOURTEENTH AMENDMENT RIGHTS.**

Mr. Ripkowski's various statements implicating himself in the death of Monique Frome were the state's primary and most important pieces of evidence against him at trial. Without his confessions, the state would not have had enough evidence to prosecute him.

Mr. Ripkowski's pre-arrest confessions were taken at a time when his mental illness prevented him from making voluntary statements to law enforcement. His mental condition was worsened by his use of cocaine and other drugs. The law enforcement officers investigating the case against Mr. Ripkowski took advantage of his mental condition to obtain various statements from him.

Mr. Ripkowski's post-arrest statements were obtained in violation of his federal constitutional rights to counsel and to be presented to a magistrate. They were likewise obtained from him when he was in no mental condition to withstand any type of questions. As a result, the statements were neither knowing nor voluntary. Furthermore, where Mr. Ripkowski wanted to stop the questioning, the police told him he had to answer questions and provided him with false and contradictory information about whether he had to provide a statement. This is seen clearly on the video taped statement taken by Houston Police Department Detective King and Salt Lake City Officer Kent. Kent tells Ripkowski that he must tell them the story again.

Not one of the statements Ripkowski gave was legally obtained, and all should have been by suppressed by the trial court.

The state used the statement in its case in chief and during the punishment phase to convict Mr. Ripkowski and have him sentenced to death. The statement which amounted to a full confession was the key piece of evidence used by the state, and without it they would not

have had enough evidence to convict Mr. Ripkowski since there were no eyewitnesses and no other direct physical evidence to show Mr. Ripkowski was the person who harmed Monique Frome.

For the purposes of review here the state court's findings on the question of knowingness and voluntariness are legal questions requiring an independent federal determination. The exact question on the impact of Detective Kent not honoring Mr. Ripkowski's decision to terminate the interrogation has not been raised directly before this time.

In any event the CCA's findings are not binding on the Court here, as both issues, voluntariness and waiver, are "ultimate constitutional questions" not mere factual determinations. *See Miller v. Fenton*, 474 U.S. 104, 110-12 (1985); *Davis v. N.C.*, 384 U.S. 737, 741-42 (1966). The state has the burden of proving that any alleged statements or acts of the defendant which were the products of custodial interrogation meet the requisites of *Miranda v. Ariz.*, 384 U.S. 436 (1966), and the state also has the burden of proving that any statements given were voluntary. *Id.* at 475; *Schneckloth v. Bustamonte*, 412 U.S. 218, 226-27 (1973). Regarding whether the statements were made involuntarily in violation of Mr. Ripkowski's Fourteenth Amendment right to due process, the correct test for the trial court is that, to be admissible, a statement must be "the product of an essentially free and unconstrained choice by its maker." *Culombe v. Conn.*, 367 U.S. 568, 602 (1961). Mere threats of violence are sufficient to render a statement involuntary. *See e.g., Colo. v. Connelly*, 479 U.S. 157, 164-67 (1986). In determining the voluntariness of a statement, the Court may not consider the probable trustworthiness of the statement. *Jackson v. Denno*, 378 U.S. 368, 376 (1964).

The evidence of Mr. Ripkowski's mental condition was by and large unrefuted by the state, and his condition on the video tape, coupled with the state's not honoring his statement, show that the state failed to meet its burden in showing that Mr. Ripkowski's statements were knowing and voluntary. The state therefore failed to carry its burden on voluntariness, and this

Court must as a matter of law reverse and grant Mr. Ripkowski a new trial.  For the same reasons as set out below, Mr. Ripkowski's limited abilities were overcome in part due to his mental impairments.

Furthermore, and as detailed herein, it was ineffective assistance of counsel at trial and on direct appeal not to have raised the issue of the state overcoming Mr. Ripkowski's attempt to end the interrogation by Detective King telling him that it was mandatory for him to answer the officers' questions.   Both detectives on the video tape continued to force incriminating information from him after he had told them that he no longer wanted to answer questions.  They advised him that he must continue to answer questions, which proves that he was not answering questions knowingly or voluntarily.

Mr. Ripkowski was incompetent when he gave his statements to the police; therefore, his statements are inadmissible.

Based on his mental illness, the cocaine in his system, and his appearance at trial, it is clear that Mr. Ripkowski was incompetent when giving his various statements to law enforcement.  The trial and conviction of a defendant while mentally incompetent constitutes a denial of due process under the 5th, 6th, 8th and 14th Amendments.  *Cooper v. Okla.*, 571 U.S. 348, 364 (1996).  Mr. Ripkowski did not meet the minimum constitutional standards of competency as set out in *Dusky v. U.S.*, 362 U.S. 402 (1960) and *Drope v. Mo.*, 420 U.S. 167, 171-72 (1975).  These standards apply to both before, during, and after trial.  *Godinez v. Moran*, 509 U.S. 389, 398, 402 (1993).    Because he was incompetent when he gave his statements, they should have been suppressed.

2.     **MR. RIPKOWSKI SUFFERS FROM SERIOUS MENTAL IMPAIRMENTS THAT RENDER HIS DEATH PENALTY UNCONSTITUTIONAL UNDER THE FIFTH, SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS DUE TO ITS SIMILARITY IN TERMS OF MENS REA AND ULTIMATE CULPABILITY TO MENTAL RETARDATION.**

A.     **MR. RIPKOWSKI'S DEATH SENTENCE VIOLATES THE COURT'S RULE IN *ATKINS* AND *TENNARD*.**

Psychologist Dr. Paula Lundberg-Love, PhD., and more recently, Psychiatrist Dr. Rahn Bailey, M.D., find that there is no question that Dr. Knapp's diagnosis of serious mental impairment in Mr. Ripkowski is correct.  He is seriously mentally ill.  His primary diagnoses is bi-polar disorder, coupled with other psychotic problems that have genetic roots, and have been exacerbated over time by a series of serious head injuries, childhood trauma, early drug abuse, and genetic predisposition for mental illness.

Research on bipolar disorder and the other disorders that characterize Mr. Ripkowski's condition (which are hereby incorporated word for word as if set out herein) demonstrate that they all render Mr. Ripkowski's behaviors to be tantamount to the behavior of a retarded person. For example, bi-polar disorders may also have a genesis in genetic heritage but can also be triggered by serious life events like child abuse, which can permanently change the brain's functioning.  (See attachments on medical disorders).

Mr. Ripkowski's mental impairments cause him to engage in rapid, unplanned reactions to internal or external stimuli without regard to the negative consequences of these reactions to themselves or others. (Id). Just like retardation, they reduce the moral culpability of the individual suffering from them.

The United States Supreme Court has clearly established that during the sentencing phase of a capital case the sentencer may not refuse to consider any relevant mitigating evidence.[1] The consideration of mitigating factors in death penalty cases was characterized by the Court as constitutionally mandated when it stated:

> The Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.[2]

Underscoring the importance of mitigating factors, the Court in *Penry v. Lynaugh*[3] stated, "It is precisely because the punishment should be directly related to the personal culpability of the defendant that the jury must be allowed to consider and give effect to mitigating evidence relevant to a defendant's character or record or the circumstances of the offense."[4]

It is clear that the Supreme Court requires evidence of mitigating factors to be considered during the sentencing phase of certain cases and that these factors may include evidence of a defendant's background, character, or circumstances surrounding the crime.

In *Atkins v. Virginia*,[5] the U.S. Supreme Court voted six to three to bar further use of the death penalty for mentally retarded offenders. The Court offered three reasons for banning the execution of the retarded. First, citing a shift in public opinion over the thirteen years since *Penry*

---

[1] *See Hitchcock v. Dugger*,  481 U.S. 393, 394, 399 (1987); *see also Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion).
[2] *Lockett*, 438 U.S. at 604.
[3] 492 U.S. 302 (1989).
[4] *Id*. at 327-28. The *Penry* jury was not given instructions as to Penry's mental disability or the definition of 'deliberately.' The Supreme Court held that such deficiencies did not clearly direct the jury to fully consider Penry's mitigating evidence. *Id.* at 327; see *Lockett*, 438 U.S. at 604.
[5] 536 U.S. 304 (2002).

*v. Lynaugh*,[6] the Court in Atkins ruled that the execution of the mentally retarded is "cruel and unusual punishment" prohibited by the Eighth Amendment. Second, the Court concluded that retaining the death penalty for the mentally retarded would not serve the interest in retribution or deterrence that is essential to capital jurisprudence. *Atkins* held that mentally retarded people lacked a range of developmental capacities necessary to establish the higher threshold of culpability for the execution of murderers that the Court had established in *Furman,*[7] *Gregg,*[8] *Coker,*[9] *Woodson,*[10] *and Enmund.*[11] Third, the *Atkins* Court noted that the impairments of mental retardation lead to a "special risk of wrongful execution."[12]

The current diagnostic manual of the American Psychiatric Association (APA) describes mental retardation as significantly sub average general intellectual functioning accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety with onset before age 18 years.[13]

Referring to such criteria, Justice Stevens' opinion states that, "by definition," persons with mental retardation "have diminished capacities to understand and process information, to

---

[6] 492 U.S. 302 (1989).

[7] *Furman v. Ga.*, 408 U.S. 238 (1972).

[8] *Gregg v. Ga.*, 428 U.S. 153 (1976).

[9] *Coker v. Ga.*, 433 U.S. 584 (1977).

[10] *Woodson v. N.C.*, 428 U.S. 280 (1976).

[11] *Enmund v. Fla.*, 458 U.S. 782 (1982).

[12] *Atkins*, 536 U.S. at 350.

[13] American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders (4th ed., text revision 41, 2000) [hereinafter DSM-IV-TR]. This definition is quoted in Atkins, 536 U.S. at 309 n.3

communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."[14] Although retarded criminals may know right from wrong, their mental deficiencies "diminish their personal culpability. Thus, pursuant to our narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death, exclusion for the mentally retarded is appropriate."[15]

To diagnose a person as having mental retardation, professionals must find that "three necessary criteria are all present: significant limitations in intellectual functioning, significant limitations in practical or 'adaptive' functioning, and onset before adulthood"[16] Psychologists and psychiatrists can make "an objective determination" about whether an accused killer suffers from mental retardation using established tests of intelligence and adaptive functioning, so that clinicians "undertaking separate assessments should reach the same conclusion."[17] What is true of psychiatric diagnosis in general is especially true when it comes to mental retardation. The "by definition" language of the *Atkins* decision suggests that persons who receive the diagnosis

---

[14] *Atkins*, 536 U.S. at 318

[15] *Id*. at 319

[16] Brief Amici Curiae American Psychological Association, American Psychiatric Association, and American Academy of Psychiatry and the Law, *McCarver v. N.C.*, 532 U.S. 941 (2001) (00-8727) [hereinafter APoA/APaA/AAPL Brief]. In March 2001, the Supreme Court agreed to hear *McCarver*, a case brought by a North Carolina inmate who, like Atkins, was mentally retarded. *Id.* When North Carolina later passed a statute barring execution of persons with mental retardation, *McCarver* became moot, and the Supreme Court dismissed the case. *McCarver*, 533 U.S. at 975. The Court subsequently allowed amici curiae briefs submitted in *McCarver* to be considered in support of Daryl Atkins' appeal. *Atkins*, 536 U.S. at 316 n.21 (2002). Perusal of the amicus briefs filed by mental health organizations for *McCarver* suggests that these were highly influential in the majority's decision in *Atkins*.

[17] *Id.*

of mental retardation comprise a group of individuals whose constellation of deficits clearly distinguishes them from non-retarded persons.[18] Yet the diagnosis of mental retardation—despite its clinical usefulness—is an entirely artificial construct: the line that separates persons who receive this diagnosis from individuals whose mental capacities are only well below average is a changing and arbitrary one.

There is no better illustration of this last point than decisions of the AAMR to "update" its definition of mental retardation ten times over the past century.[19] The most recent changes were published five days before the *Atkins* decision, in the tenth edition of the AAMR's official classification manual. Diagnoses are often revised to reflect new understandings, scientific breakthroughs, or availability of new treatment approaches; sometimes social and political developments play a role.[20] The AAMR advertisements for Mental Retardation: Definition, Classification and Systems of Supports state (unabashedly) that the 2002 edition proposes a state-of-the-art method to define, classify, and support an individual with mental retardation. In view of the recent U.S. Supreme Court decision to ban execution of persons with mental

---

[18] *Atkins*, 536 U.S. at 310**.**

[19] *American Association on Mental Retardation, Definition of Mental Retardation*, at http://www.aamr.org/Policies/faq_mental_retardation.shtml (last updated July 29, 2002). The changes are summarized in AAMR 9, supra note 83, at ix. Between 1959 and 1973, persons with IQ's as high as 85 might have satisfied the then-current AAMR definition. *Id.* For a short historical summary of definitions and terms used to describe persons with mental retardation, see Edmund J. Sass, *Definitions of Mental Retardation: A Chronological List With Dates and References*, at http://www.cloudnet.com/~edrbsass/mrdefinitions2.htm (last updated Feb. 15, 2001).

[20] *See generally* Herb Kutchins & Stuart A. Kirk, Making Us Crazy: DSM: The Psychiatric Bible and the Creation of Mental Disorders (1997).

retardation, the 10th edition is a timely and critical resource to the states as they strive to come up with a current and fuller definition of mental retardation.[21]

The AAMR currently defines mental retardation as "a disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in conceptual, social, and practical adaptive skills. This disability originates before the age of 18."[22]

If persons with mental retardation were members of a homogeneous, discrete biological or psychological category of persons, readily distinguished from persons without mental retardation, professional organizations might have an easier time settling on clinical criteria for diagnosing the condition. Some retarded persons exhibit impairments that make them easily identifiable: they have severe academic problems during childhood, limited communication skills, and need, even as grown-ups, to be supervised at work or where they live. But such individuals make up only 15 percent of all retarded persons. Mildly retarded persons, who comprise about 85 percent of all retarded individuals, usually develop social and work skills that are "adequate for minimum self-support," though they need guidance in making complicated decisions. As preschoolers, they often are indistinguishable from non-retarded children. The medical conditions that can cause intellectual impairment are countless and include chromosomal defects, biochemical abnormalities, and infections that alter the brain's development before birth or during early childhood. Doctors often can find a distinct biological

---

[21] American Association on Mental Retardation, AAMR Home Page, Hot Off the Press, at http://www.aamr.org/ (last visited Apr. 12, 2003).

[22] American Association on Mental Retardation, *Mental Retardation: Definition, Classification, and Systems of Supports* (10th ed. 2002).

source of a child's retardation, although many things that can cause serious intellectual impairment do not always do so. In many cases of mild mental retardation, doctors can point to no specific medical reason for the person's limitations. Clinicians thus cannot use biological tests to decide whether a person is mentally retarded.

Former APA president Dr. Alan A. Stone, states that mental illness and mental retardation have similar causes, and that "the mentally ill suffer from many of the same limitations" that (in the Supreme Court's view) diminish the blameworthiness of retarded persons. Therefore, for all intents and purposes, Mr. Ripkowski deserves to have his case mitigation evidence of mental illness reviewed in the same light as that of evidence of mental retardation.

The *Atkins* Court instructs that mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others. There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan and, that in group settings, they are followers rather than leaders.[23]

The logic seems self-evident: because of a stall in mental and social development, these individuals are biologically more vulnerable to outside influence, to acting on impulse, and to not

---

[23] *Atkins*, 536 U.S. at 318

thinking through the consequences of their actions. Atkins specifically referenced characteristics common to both the mentally retarded and persons with low levels of the neurotransmitter serotonin: a susceptibility to influence, a diminished capacity to engage in logical reasoning, to control impulses, and to understand the reactions of others, and a lower degree of moral culpability. The Court concluded that these deficiencies may not exempt mentally retarded persons from criminal sanctions, but they do diminish the culpability well below the constitutional threshold for a death sentence.[24]

Further in *Atkins*, the Court stated two significant reasons for disallowing the execution of mentally retarded offenders. First, given the characteristics of their disability, mentally retarded people are not uniquely culpable under the law. While the Court in *Gregg* identified retribution and deterrence as the social purposes served by the death penalty,[25] there is substantial doubt about whether retribution in cases involving the mentally retarded is best served by executing them. In *Godfrey v. Ga.*, for example, the Court set aside a death penalty because the crimes did not reflect a consciousness materially more "depraved than that of any person guilty of murder."[26] Indeed, the *Atkins* Court similarly recognized that mentally retarded persons have diminished capacity to understand and process information, to communicate, to abstract from mistakes and learn from experience, and to control impulses.[27] Accordingly, the Court adopted a functionalist perspective, arguing that the application of capital punishment to mentally retarded offenders did not serve the retribution goal of matching the severity of the

---

[24] *Id.*
[25] *Gregg*, 428 U.S. at 183.
[26] *Godfrey*, 446 U.S. 420, 433 (1980)

punishment to the crime. This same argument and reasoning can be and should be extended to persons with low serotonin level because of the similarity between the two.

The *Atkins* Court also held that mentally retarded persons are unlikely to realize a deterrent effect of capital jurisprudence.[28] Explaining that the same cognitive impairments that classify individuals as mentally retarded also interfere with their ability to understand the law, the Court held that the deterrent effect of possible capital punishment is essentially lost on prospective mentally retarded offenders: It is the same cognitive and behavioral impairments that make these defendants less morally culpable-for example, the diminished ability to understand and process information, to learn from experience, to engage in logical reasoning, or to control impulses-that also make it less likely that they can process the information of the possibility of execution as a penalty and, as a result, control their conduct based upon that information. Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution. Thus, executing the mentally retarded will not measurably further the goal of deterrence. These same arguments hold true for persons with low serotonin level because both clinical and empirical evidence suggest, however, that many of the same deficits in various cognitive competencies that define "retardation" also are markers of person with low serotonin level. In *Atkins*, the Court found that persons with mental retardation have "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to

---

[27] *Atkins,* 536 U.S. at 318

engage in logical reasoning, to control impulses, and to understand the reactions of others."[29] Recent empirical and theoretical scholarship on brain dysfunction involving low levels of the neurotransmitter serotonin generally suggest that low serotonin level itself is characterized by a constellation of incapacities that closely align with the developmental incapacities of the mentally retarded. In fact, these characteristics may be so closely aligned as to establish their categorical similarity. The same can be said of the disorders from which Mr. Ripkowski suffers. (See testimony of Dr. Love).

### B. FOR THE SAME REASONS THE EXECUTION OF MR. RIPKOWSKI WOULD BE A VIOLATION OF ROPER.

As shown in the mental health expert affidavits, TYC records, and school records, Mr. Ripkowski is operating at several years below his state age. As he was only in his 20's at the time of the murder, his mental age would still have been that of a juvenile. As the Court extended *Atkins* to juveniles, the Court in *Roper v. Simmons*, 543 U.S. 551 (2005) held that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed." *Id.* at 578. The Eighth Amendment's prohibition against "cruel and unusual punishments" must be interpreted according to its text, by considering history, tradition, and precedent, and with due regard for its purpose and function in the constitutional design. To implement this framework this Court has established the propriety and affirmed the necessity of referring to "the evolving standards of decency that mark the progress of a maturing society" to determine which punishments are so

---

[28] *Atkins,* 536 U.S. at 318-19.
[29] *Atkins,* 536 U.S.at 318.

disproportionate as to be "cruel and unusual." *Trop v. Dulles,* 356 U.S. 86, 100-101 (1958). In

1988, in *Thompson v. Okla.,* 487 U.S. 815, 818-83 (1988), a plurality determined that national

standards of decency did not permit the execution of any offender under age 16 at the time of

the crime. The next year, in *Stanford v. Ky.,* 492 U.S. 361, 370-71 (1989),

> …a 5-to-4 Court referred to contemporary standards of decency, but concluded
> the Eighth and Fourteenth Amendments did not proscribe the execution of
> offenders over 15 but under 18 because 22 of 37 death penalty States permitted
> that penalty for 16-year-old offenders, and 25 permitted it for 17-year-olds,
> thereby indicating there was no national consensus.

*Roper*, 543 U.S. at 551 (Syllabus). A plurality also "'emphatically reject[ed]' the suggestion that

the Court should bring its own judgment to bear on the acceptability of the juvenile death

penalty." *Id.* at 562 (quoting *Stanford*, 492 U.S. at 377-78). That same day the Court held, in

*Penry v. Lynaugh*, 492 U.S. 302, 334 (1989), that the Eighth Amendment did not mandate a

categorical exemption from the death penalty for mentally retarded persons because only two

States had enacted laws banning such executions. In *Atkins,* however, the Court held that

standards of decency had evolved since *Penry* and now demonstrated that the execution of the

mentally retarded is cruel and unusual punishment. The *Atkins* Court noted that objective indicia

of society's standards, as expressed in pertinent legislative enactments and state practice,

demonstrated that such executions had become so truly unusual that it was fair to say that a

national consensus has developed against them. *Atkins*, 536 U.S. at 314-15. The Court also

returned to the rule, established in decisions predating *Stanford*, that the Constitution

contemplates that the Court's own judgment be brought to bear on the question of the

acceptability of the death penalty. *Atkins*, 536 U.S. at 312.

After observing that mental retardation diminishes personal culpability even if the offender can distinguish right from wrong, *Id.* at 318, and that mentally retarded offenders' impairments make it less defensible to impose the death penalty as retribution for past crimes or as a real deterrent to future crimes, *Id.* at 319-320, the Court ruled that the death penalty constitutes an excessive sanction for the entire category of mentally retarded offenders and that the Eighth Amendment places a substantive restriction on the State's power to take such an offender's life. *Id.* at 321. Just as the *Atkins* Court reconsidered the issue decided in *Penry,* the *Roper* Court reconsidered the issue decided in *Stanford. Roper*, 543 U.S. at 564.

> Both objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question, and the Court's own determination in the exercise of its independent judgment, demonstrate that the death penalty is a disproportionate punishment for juveniles. As in *Atkins,* the objective indicia of national consensus here—the rejection of the juvenile death penalty in the majority of States; the infrequency of its use even where it remains on the books; and the consistency in the trend toward abolition of the practice—provide sufficient evidence that today society views juveniles, in the words *Atkins* used respecting the mentally retarded, as "categorically less culpable than the average criminal." *Atkins*, 536 U.S. at 316. The evidence of such consensus is similar, and in some respects parallel, to the evidence in *Atkins:* 30 States prohibit the juvenile death penalty, including 12 that have rejected it altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach. Moreover, even in the 20 States without a formal prohibition, the execution of juveniles is infrequent. Although, by contrast to *Atkins,* the rate of change in reducing the incidence of the juvenile death penalty, or in taking specific steps to abolish it, has been less dramatic, the difference between this case and *Atkins* in that respect is counterbalanced by the consistent direction of the change toward abolition. Indeed, the slower pace here may be explained by the simple fact that the impropriety of executing juveniles between 16 and 18 years old gained wide recognition earlier than the impropriety of executing the mentally retarded.
>
> Rejection of the imposition of the death penalty on juvenile offenders under 18 is required by the Eighth Amendment. Capital punishment must be limited to those offenders who commit "a narrow category of the most serious crimes" and whose extreme culpability makes them "the most deserving of execution." *Atkins,* 536 U.S. at 319. Three general differences between juveniles

under 18 and adults demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders. Juveniles' susceptibility to immature and irresponsible behavior means "their irresponsible conduct is not as morally reprehensible as that of an adult." *Thompson*, 487 U.S. at 815, 835. Their own vulnerability and comparative lack of control over their immediate surroundings mean juveniles have a greater claim than adults to be forgiven for failing to escape negative influences in their whole environment. *See Stanford*, 492 U.S. at 395. The reality that juveniles still struggle to define their identity means it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character. The *Thompson* plurality recognized the import of these characteristics with respect to juveniles under 16. *Thompson*, 487 U.S. at 833-838. The same reasoning applies to all juvenile offenders under 18. Once juveniles' diminished culpability is recognized, it is evident that neither of the two penological justifications for the death penalty—retribution and deterrence of capital crimes by prospective offenders, *e.g., Atkins,* 536 U.S. at 319—provides adequate justification for imposing that penalty on juveniles.

*Roper*, 543 U.S. at 552-53 (Syllabus).

Considering the exception for the mentally retarded and juveniles, another logical category for exemption is persons with age equivalent skills of juveniles or of the mentally retarded and seriously mentally ill persons.

Similarly, heavy alcohol users and drug users can seriously offset their brain chemistry, resulting in a pattern of impulsive, antisocial behavior.[30] This may be because violence and intoxicant use both reflect a common source of poor impulse control-impaired CNS serotonin functioning.[31] People with strong aggressive and antisocial tendencies are especially prone to becoming aggressive when they drink.[32] Biology confirms what criminologists have long

---

[30] Matti Virkkunen et al., *CSF Biochemistries, Glucose Metabolism, and Diurnal Activity Rhythms in Alcoholic, Violent Offenders, Fire Setters, and Healthy Volunteers*, 51 Archives Gen. Psychiatry 20 (1994); Jaakko Lappalainen et al., *Linkage of Antisocial Alcoholism to the Serotonin 5-HT1B Receptor Gene in 2 Populations*, 55 Archives Gen. Psychiatry 989 (1998)
[31] Higley et al., *supra note 36*, at 17.
[32] *See* generally F. Gerard Moeller & Donald M. Dougherty, *Antisocial Personality Disorder, Alcohol, and Aggression*, 25 Alcohol Res. Health 5, 8-9 (2001)

known: many acts of criminal violence occur when perpetrators are intoxicated,[33] and a large number of criminals who end up on death row were intoxicated at the time of their offenses.[34]

Brain damage, schizophrenia, ADHD, and low brain serotonin are just a few of the psychiatric conditions that are associated with impairment of—as the key wording in *Atkins* put it—"capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others."[35]

For the same reasons, execution of Britt Ripkowski, whose adaptive social skills are only equivalent to those of a retarded person, would be nothing more than the needless imposition of pain and suffering and, therefore, an unconstitutional violation of the prohibition against cruel and unusual punishment. To borrow the thought of Justice Stevens, although persons with severe mental deficits know right from wrong, their reduced ability to control their actions, due to distinct physical criteria, renders them both less culpable than the average murderer and at the same time does nothing to further the goal of deterrence.  Since Mr. Ripkowski's problem is not that he cannot understand the wrong of his conduct but that he was unable to control his impulses based on his physical state, it would be a violation of the Eighth Amendment's prohibition against cruel and unusual punishment to execute him.

Other states are moving to bar the execution of seriously mentally ill persons.  It

---

[33] *See*, e.g., Susan E. Martin et al., *Self-Reported Alcohol Use and Abuse by Arrestees in the 1998 Arrestee Drug Abuse Monitoring Program*, 25 Alcohol Res. Health 72, 78 (2001).

[34] Mark D. Cunningham & Mark P. Vigen, *Death Row Inmate Characteristics, Adjustment, and Confinement: A Critical Review of the Literature*, 20 Behav. Sci. L. 191 (2002).

would be a violation of our expanding norms of civility to execute Mr. Ripkowski.

### C.    MR. RIPKOWSKI IS INNOCENT OF THE DEATH PENALTY.

Based on the mental health and mitigation life history facts presented above, Mr. Ripkowski is innocent of the death penalty. No reasonable jury would have sentenced him to death if provided with this information. In fact it is likely that his own jury would have given him a life-sentence based on how long they took to deliberate on this case, with the paucity of mitigation evidence actually presented.

Under *Atkins,* because Mr. Ripkowski is retarded, his execution is not permissible.

### 3.  THE COURT FAILED TO APPLY A CONSTITUTIONALLY LIMITING INSTRUCTION TO THE INHERENTLY VAGUE SPECIAL ISSUE QUESTION IN VIOLATION OF THE CONSTITUTIONAL PROHIBITION AGAINST ARBITRARY AND CAPRICIOUS IMPOSITION OF THE DEATH PENALTY.

The jury that sentenced Britt Ripkowski to die was deprived of instructions concerning the meaning of dispositive terms to the only special issue question presented. The failure to define the operative term violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty and reasonably justify the imposition of a more severe penalty. *Godfrey v. Ga.*, 466 U.S. 420 (1980). Because of the court's failure to charge the jury in a rationally reviewable manner, there was no rational process justifying the imposition of a death sentence upon Mr. Ripkowski in comparison to those cases in which a life sentence has been imposed. This failure to properly instruct the jury violated Mr. Ripkowski's rights under the Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

---

[35] *Atkins*, 536 U.S. at 318.

Due to trial counsel and judicial error, only one special issue was applied in Mr. Ripkowski's case.  That issue, as interpreted by the Court of Criminal Appeals, functions as applying to aggravating circumstances.  An aggravating circumstance is any finding by a capital sentencer that "circumscribes[s] the class of persons eligible for the death penalty."  *Zant v. Stephens*, 462 U.S. 862, 878 (1983).  Since an affirmative finding to the special issue was an absolute requirement before a death sentence may be imposed, *see* TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(g) (Vernon 2008), it functioned as an aggravating circumstance as defined by the Supreme Court in *Stephens*.

When an aggravating circumstance is vague, it cannot serve its constitutionally mandated narrowing function.  A sentence of death may not be imposed by a jury relying on such a vague aggravating factor unless the state court cures such vagueness by applying a valid limiting construction, thereby providing the sentencer specific and detailed guidance concerning its scope. *Maynard v. Cartwright*, 486 U.S. 356, 362-64 (1988); *Godfrey*, 446 U.S. at 420, 428; *see Proffitt v. Fla.*, 428 U.S. 242, 253 (1976).  The problem was exacerbated in Mr. Ripkowski's case because all of the evidence that was presented throughout the trial was ordered by the court to go through this one special issue, an issue that only allows for the aggravating implications of evidence to be able to be put to use by the jury.  Despite the court's admonition to the jury to look at all mitigating evidence, since it was not given any meaningful way to do this under the first special issue, the only way to use any evidence by the jury was to find the defendant worthy of death.

Indeed, as shown below, all of the Defendant's carefully proffered evidence of bi-polar disorder, traumatic life experiences, including witnessing and being subject to physical abuse,

and resultant drug use, admitted at the guilt stage, could only be given aggravating effect, given the nature of the special issue to make even this clearly mitigating evidence double edged. The jury simply had no vehicle with just the one special issue to give anything but aggravating value to this evidence.

Because the Texas special issue submitted to the jury contained terms which facially are unconstitutionally vague and to which neither the sentencing jury nor the reviewing court applied any limiting construction, the special issue was unconstitutional as applied to Mr. Ripkowski. Mr. Ripkowski's death sentence must therefore be reversed. *See Walton v. Ariz.*, 497 U.S. 639 (1990); *Lewis v. Jeffers*, 497 U.S. 764 (1990).

Choosing those who may be sentenced to death entails two processes: (1) the narrowing of a class of those eligible for the death penalty; and (2) a selection from that class of those who shall be sentenced to death. *Stephens*, 462 U.S. at 876-879. Aggravating circumstances perform the first of these functions by narrowing the class of death-eligible defendants. "[A]t the stage of legislative definition [an aggravating circumstance] circumscribe[s] the class of persons eligible for the death penalty." *Id.* at 878. The sentencer's consideration in a separate sentencing trial of mitigating factors about the character and background of the defendant performs the second function.

The manner in which a state statute narrows the class of death-eligible persons under the first process is purely a matter of state law. *Lowenfield v. Phelps*, 484 U.S. 231, 246 (1988) (state legislature defines the narrowing function performed by its capital sentencing statute); *Stephens*, 462 U.S. at 878. In Texas, the Court of Criminal Appeals has held that the special

issues provide this narrow function and are, therefore, aggravating circumstances under the Constitution:

> [T]he function of Article 37.071 [is] to further narrow the class of death eligible offenders to less than all those who have been found guilty of [capital murder] as defined under §19.03 [Texas' capital murder statute].

*Smith v. State*, 779 S.W.2d 417, 420 (Tex. Crim. App. 1989); *Roney v. State*, 632 S.W.2d 598, 603 (Tex. Crim. App. 1982) (facts of crime themselves do not provide death-eligibility; otherwise, every capital murder in the course of a robbery would warrant death and destroy the purpose of punishment stage in Texas capital cases, which is to provide a reasonable and controlled decision concerning imposition of death penalty and to prevent capricious and arbitrary imposition of sanctions).

However, the mere articulation of aggravating circumstances will not suffice as a framework for the imposition of the death penalty if the circumstance contains terms which are inherently vague and standardless. In such a case, it is imperative that the state apply a limiting construction. As the Supreme Court reaffirmed in *Walton*:

> When a jury is the final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.

*Id.*, 497 U.S. at 653. The Supreme Court also emphasized this principle in *Jeffers*:

> Our decision in *Walton* thus makes clear that if a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance, and if the State [court] has applied that construction to the facts of the particular case, then the "fundamental constitutional requirement" of "channeling and limiting ... the sentencer's discretion in imposing the death penalty," *Cartwright*, 486 U.S. at 362, has been satisfied.

*Id.*, 497 U.S at 779.

The flaw in the Texas statute is that, unlike Arizona or Georgia, but precisely as in Oklahoma, the Texas Court has refused to apply a limiting construction to the unconstitutionally vague terms in the special issues. Moreover, the jury that determines the sentence is by law not allowed to be given any guidance in interpreting otherwise impermissibly broad and vague special issue terms.[36] This flaw means that Texas's scheme, like that in Oklahoma, is unconstitutionally vague and standardless. The flaw is exacerbated here where only one special issue was given to the jury.

Mr. Ripkowski's case is unlike *Stephens*, in which the Supreme Court upheld the Georgia scheme despite the invalidation of one of the aggravating factors. *Id.* at 873-74, 880. In that case, the Georgia Supreme Court had ruled the aggravating factor concerning the defendant's record of prior "assaultive" conduct to be unconstitutionally vague but nevertheless upheld the sentence. The Supreme Court held the statutory aggravating factor was vague; however, under Georgia law, the information about prior "assaultive" conduct had been appropriately considered by the jury as "nonstatutory" aggravating information, which the jury could take into account in its sentencing deliberations. The Georgia jury was instructed to determine the sentence based on

---

[36]    In *Walton* and *Jeffers*, the Supreme Court held that Arizona's aggravating circumstances, though facially vague, were not unconstitutional because the state had adopted and applied a valid limiting construction. Specifically, the Supreme Court upheld the constitutionality of the construction given by the Arizona Supreme Court to the "cruelty" aspect of the aggravating circumstance of "especially heinous, atrocious or cruel." The trial court (which is the sentencer in Arizona capital cases) was presumed to apply the limiting instruction set forth by the Arizona Supreme Court that "a murder is committed in an especially cruel manner when 'the perpetrator inflicts mental anguish or physical abuse before the victim's death....'" *Walton*, 497 U.S. at 646 (quoting *Ariz. v. Walton*, 769 P.2d 1017, 1032 (Ariz. 1989)). The Court had defined the term "mental anguish" as well.

a consideration of all mitigating factors and both the statutory and non-statutory aggravating information presented by the state.

In Texas, by contrast, the special issues are the only vehicle by which the jury may assess aggravating information. There is no such thing as a "nonstatutory" aggravating factor, only special issue questions. This solitary channeling vehicle is rendered utterly arbitrary by the lack of any guidance as to the meaning of the terms. Thus, unlike Georgia, this state's aggravating information is not given a valid guided or limiting vehicle for jury consideration.

The Texas scheme also differs significantly from that in Louisiana, which was also approved by the Supreme Court. *Lowenfield*, 484 U.S. at 246. There, the Court determined that the aggravating consideration was completed during the guilt-innocence phase of trial by virtue of the elements of capital murder. *Id.* In Texas, however, both the legislature and the Court of Criminal Appeals have determined that the second phase serves an integral narrowing function with respect to the consideration of aggravating information. *See Smith*, 779 S.W.2d at 420; *Roney*, 632 S.W.2d at 603. Yet that function is articulated through the special issue questions, which employ terms that result in standardless capital sentencing determinations. Such a result runs directly counter to the Eighth Amendment's requirement that there be a rational process to determine who lives and who dies.

The terms in the second special issue are indisputably vague. The word "probability" has no common or uniform meaning. A reasonable juror is left to apply any of the many plausible definitions including: fifty percent plus one, a substantially greater than a fifty percent possibility and, technically, any chance, including one in a million. Similarly, there is no clear and objective meaning to the phrases "criminal acts of violence" or "continuing threat to society."

The various words and phrases in the second special issue, when viewed individually and considered as a whole, do not provide the sentencer "'clear and objective standards' that provide 'specific and detailed guidance' and that 'make rationally reviewable the process for imposing the sentence of death.'"  *Jeffers,* 497 U.S. at 774 (quoting *Godfrey*, 446 U.S. at 428).  They do not limit the sentencer's discretion because a person of ordinary sensibility could fairly characterize almost every person convicted of capital murder as having <u>some</u> "probability" of committing criminal acts of violence that would constitute a continuing threat to society.  *See Godfrey*, 446 U.S. at 428-429.

Given that the terms of the second special issue are unconstitutionally vague, the next inquiry under *Walton* and *Jeffers* is whether the Texas courts apply a valid limiting construction which could cure the lack of clear and objective standards in the second special issue.  They do not.  In fact, the Texas Court of Criminal Appeals has patently rejected any limiting construction on the terms in the second special issue.

In *Holland v. State*, 761 S.W.2d 307, 327 (Tex. Crim. App. 1988), *cert. denied*, 489 U.S. 1091 (1989), the Court of Criminal Appeals specifically acknowledged that its standard of review for sufficiency of the evidence under the second special issue is unbridled, with the Court simply considering the individual facts of each case without applying any limiting construction. The Court stated: "[We] observ[e] the rule stated in *Cannon v. State*, 691 S.W.2d 664 (Tex. Crim. App. 1985), *cert. denied*, 474 U.S. 1110 (1986) that each case must be decided on its own merit . . . [and] hold that the evidence adduced at trial supports the affirmative response to the second interrogatory."  *Holland*, 761 S.W.2d at 327.

*Cannon*, from which the Texas rule derives, is particularly instructive on the absence of a limiting construction of the second special issue.  In *Cannon*, the Court of Criminal Appeals merely recited the facts surrounding the crime, and then characterized them as showing on the part of the appellant, a total disregard for the ownership of property, sanctity of life and respect for the personal dignity of people who had attempted so vigorously to help him. 691 S.W.2d at 678.  The Court acknowledged in passing that Cannon was only 17-years-old and illiterate but then stated its conclusion concerning the sufficiency of the evidence: "There was sufficient evidence to support the jury's affirmative finding. . . . Each of these cases must be decided on its own merits."  *Id.* at 678-679.

Texas's construction of the second issue, as stated in *Holland* and *Cannon*, is no construction at all; the decision whether the evidence supports the second special issue in any given case is governed by no rational objective standard but instead rests upon the Court's independent judgment when it views the facts.  *See e.g., Pyles v. State*, 755 S.W.2d 98, 123 (Tex. Crim. App. 1988); *Williams v. State*, 773 S.W.2d 525, 538 (Tex. Crim. App. 1988), *cert. denied*, 493 U.S. 900 (1989) (reciting facts of case and then announcing evidence sufficient to support second special issue); *Livingston v. State*, 739 S.W.2d 311, 341 (Tex. Crim. App. 1987), *cert. denied*, 487 U.S. 1210 (1988); *Gardner v. State*, 730 S.W.2d 675, 679 (Tex. Crim. App. 1987), *cert. denied*, 484 U.S. 905 (1987); *Santana v. State*, 714 S.W.2d 1, 5-6 (Tex. Crim. App. 1986); *Earvin v. State*, 582 S.W.2d 794 (Tex. Crim. App. 1979), *cert. denied*, 444 U.S. 919 (1979).

Such standardless appellate consideration of vague aggravating circumstances was expressly condemned in both *Godfrey* and *Maynard*.  This condemnation was then reaffirmed in *Walton* and *Jeffers*.  The Supreme Court "plainly rejected that the submission that a particular set

of facts surrounding a murder . . . were enough themselves, and without some narrowing principle to apply to those facts, to warrant the imposition of the death penalty." *Maynard*, 486 U.S. at 363. A State court's conclusion that "on th[e] facts the jury's verdict that the [aggravating circumstance] was supportable [does] not cure the constitutional infirmity of the aggravating circumstance." *Id.* at 364; *see also Godfrey*, 446 U.S. at 432 (unconstitutional aggravating circumstance not cured by appellate court's assertion that the circumstance was "factually substantiated").[37]

Precisely as in *Godfrey* and *Maynard*, Texas's unconstitutionally vague second special issue has not been cured by the Texas courts. The Texas Court of Criminal Appeals, like the Georgia court in *Godfrey* and the Oklahoma court in *Maynard*, adheres to the standardless practice of simply considering the facts of a case to assess the propriety of an affirmative answer to the special issue. This is constitutionally unacceptable. *Cf. Walton*; *Jeffers*.

The lack of a limiting construction in Texas is highlighted by the consistent proffer that "[t]he circumstances of the offense itself can sustain a 'yes' answer if they are severe enough . . . or can fail to support it if they are not and are unsupplemented by other evidence." *Muniz v. State*, 573 S.W.2d 792, 795 (Tex. Crim. App. 1978), *cert. denied*, 442 U.S. 924 (1979) (citations omitted). By stating that an affirmative answer is justified if the circumstances are "severe enough," the Court has simply substituted one vague term for another, again impermissibly

---

[37]   *Maynard* itself acknowledged that "the conclusion of the Oklahoma court that the events recited by it 'adequately supported the jury's finding' [is] indistinguishable from the action of the Georgia court in *Godfrey*, which failed to cure the unfettered discretion of the jury to satisfy the commands of the Eighth Amendment." 486 U.S. at 364.

relying on the invalid principle that "a particular set of facts surrounding a murder" can themselves support the death penalty. *Maynard*, 486 U.S. at 363.

In fact, neither in *Muniz* nor in any other case has the Court employed any limiting construction for determining when the facts of a crime are "severe enough" to warrant an affirmative answer. The arbitrariness inherent in the Texas court's practice is evident from the fact that the "brutal" murder in *Muniz* supported an affirmative finding, while the "brutal" murder in *Garcia v. State*, 626 S.W.2d 46 (Tex. Crim. App. 1981) did not.[38]  Simply put, Muniz was "struck by lightning," while Garcia was not. *Furman,* 408 U.S. at 309 (Stewart, J., concurring).

The standardless review typified in *Muniz* and *Garcia* is repeated over and over again in cases involving the sufficiency of evidence supporting the second special issue.

For instance, the Court of Criminal Appeals held in *Smith v. State*, 779 S.W.2d 417 (Tex. Crim. App. 1989), that the evidence did not support an affirmative answer to the second special issue, even though Mr. Smith raped and killed a woman by entering her home and tying her to the headboard of her bed and then repeatedly stabbing her with scissors. The evidence also

---

[38]  The Court of Criminal Appeals has likewise stated that there are no limitations upon what can be considered in determining the sufficiency of evidence under the second issue. *See Keeton v. State*, 724 S.W.2d 58 (Tex. Crim. App. 1987) (providing nonexclusive list of factors underlying inquiry of sufficiency of evidence under special issue two). Indeed, in numerous cases, the Court has found sufficient evidence to support an affirmative answer to the second issue by upholding affirmatively answers based upon factors never mentioned in *Keeton*, including such amorphous factors as the "total lack of regard for the ownership of property." *Cannon v. State*, 691 S.W.2d 664, 678 (Tex. Crim. App. 1985). *See Crawford v. State*, 617 S.W.2d 925, 933 (Tex. Crim. App. 1980), *cert. denied*, 452 U.S. 931 (1981) (considering lack of remorse); *McMahon v. State*, 582 S.W.2d 786 (Tex. Crim. App. 1978), *cert. denied*, 444 U.S. 919 (1979) (considering fact that greed motivated the crime); *Duffy v. State*, 567 S.W.2d 197 (Tex. Crim. App. 1978), *cert. denied*, 439 U.S. 991 (1978) (considering fact that victim would not have been threat to defendant); *Smith v. State*, 540 S.W.2d 693 (Tex. Crim. App. 1976), *cert.*

suggested that, for several weeks, Smith had been plotting to commit a rape. The offense was described by the State's forensic pathologist as "overkill."

On the other hand, the Court of Criminal Appeals in *Hawkins v. State*, 660 S.W.2d 65, 82 (Tex. Crim. App. 1983), held that precisely such forethought is "probative of [a person's] propensity to commit future acts of violence." In *Hawkins*, the Court of Criminal Appeals found that Hawkins had been "looking around . . . 'for somebody to rape,'" and that eventually he walked into the victim's home, raped her, and stabbed her repeatedly. *Id.* Nearly identical evidence was sufficient to support an affirmative finding of future dangerousness in Hawkins' case, but not in Smith's.

In contrast to *Smith*, the Court of Criminal Appeals held in *Earvin v. State*, 582 S.W.2d 794 (Tex. Crim. App. 1979), *cert. denied*, 444 U.S. 919 (1979), that the evidence of the crime alone supported an affirmative answer to the second special issue. The Court so held despite the fact that Mr. Earvin shot a man at a gas station who made a sudden movement as if to reach for a gun. Mr. Earvin then threw down his gun in terror and fled. When he was arraigned he cried before the magistrate and admitted he shot the man but said he didn't intend to kill him. He was 18 at the time of the offense and had no prior criminal history.

Yet in *Huffman v. State*, 746 S.W.2d 212 (Tex. Crim. App. 1988), the appellant killed his neighbor by applying pressure to her heart, beating her about the face, kicking her repeatedly, and strangling her. After killing her, he stole her car and led the police on a high speed chase in which he rammed two police cars. He attacked two officers before being taken to court. At the

---

*denied*, 430 U.S. 922 (1977)(considering fact that defendant made no effort to rehabilitate himself).

hospital, he became uncontrollable and had to be restrained by leather cuffs.  He had two prior convictions for burglary, the latter while on parole for the former.  He had repeatedly beaten his girlfriend and had bragged to both his girlfriend and a neighbor that he knew how to kill a person by pushing the nose bone up into the brain or hitting them hard enough in the chest to flood the heart.  Remarkably—particularly when weighed against the evidence in Mr. Earvin's case—the court found this evidence insufficient to support an affirmative answer to the second special issue.

In *Green v. State*, 682 S.W.2d 271 (Tex. Crim. App. 1984), *cert. denied*, 470 U.S. 1034 (1985), the Court of Criminal Appeals found the evidence sufficient to support an affirmative answer to the second special issue even though appellant was not the triggerman.  There was no evidence that Green helped plan the burglary which led to the killing, there was no evidence that any of the perpetrators expected a murder to be committed, and the State produced no evidence of either prior felony convictions or prior unadjudicated violent conduct on the appellant's part.  In addition, appellant introduced the testimony of four work associates, each of whom testified he had known the appellant many years, had never heard of him being in trouble, and each of whom stated that he was a professional, reliable cement mason.  Two witnesses testified that, notwithstanding his conviction for capital murder, they would rehire the appellant if he were released.

If any distinguishing principle exists to explain these cases, it would be that the evidence in *Green* and *Earvin* does not appear to support an affirmative answer to the second special issue and that the evidence in *Huffman* and *Smith* does.  Yet the Court of Criminal Appeals decided them in exactly the opposite fashion.  Further, the Court of Criminal Appeals has stated that

precisely the same evidence—i.e., forethought and planning in connection with a rape/murder—
supported a finding of future dangerousness in *Hawkins*, but not in *Smith*.

In *Jurek v. Tex.*, 428 U.S. 262 (1976), a plurality of the Supreme Court conditionally
upheld the Texas capital punishment statute, while specifically acknowledging that the Texas
Court of Criminal Appeals had not yet "define[d] precisely the meanings of such terms as
'criminal acts of violence' or 'continuing threat to society'" in the second special issue. *Id.* at 272
(Stevens, Stewart, Powell, JJ.). At this point, the Texas Court of Criminal Appeals has still not
defined the vague terms in the second special issue ("probability," "criminal acts of violence,"
and "a continuing threat to society"). Such failure has rendered the second special issue a
meaningless ball of confusion. In Texas, there is simply no rational way to determine the
definition of the terms in the question by comparing the cases determined to be deserving of
death with those deserving of life.

Mr. Ripkowski's jury was instructed in the bare terms of this vague special issue and,
thus, did not receive the constitutionally required "specific and detailed guidance" concerning the
meaning and application of the aggravating second special issue. *See Godfrey*, 446 U.S. at 428.
Moreover, as in *Godfrey* and *Maynard*, the Texas Court of Criminal Appeals has provided
absolutely no limiting construction to save the second special issue from its constitutional
infirmity. Mr. Ripkowski's death sentence is therefore unconstitutional. *See Walton*; *Jeffers*.

**4.     APPLICANT'S DEATH SENTENCE WAS ARBITRARILY IMPOSED AND, THUS, IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS, WHEN VIEWED IN LIGHT OF ALL THE VARIOUS CAPITAL SENTENCING SCHEMES IN TEXAS,     IN AND AROUND THE TIME OF HIS CONVICTION.[39]**

"Excessive bail shall not be required, nor excessive fines imposed, nor cruel and *unusual* punishments inflicted."   U.S. Const. Amend. VIII

No matter whether viewed as trial counsel induced, or trail court allowed, the sentencing scheme under which Mr. Ripkowski's jury was allowed to answer the punishment phase of his trial was bizarre.  Even in light of the many sentencing formats available up to and around the time of his trial, the format of his sentencing is unique.  Mr. Ripkowski was convicted in 1999 for a crime that occurred in December of 1997.  He was apparently tried under the amended 1991 version of 37.071(b), even though his jury received only the second of the pre-1991 special issues.[40]  Although Mr. Ripkowski's Court additionally instructed the jury that it should not ignore the mitigation evidence, it provided them with no vehicle or guidance on how to take any of his mitigation evidence into account.  The anomaly in Texas law that allowed his trial to go to a jury with only one special issue no longer exists.  That anomaly was based on trial counsel's perceived need to alleviate the possible victim impact evidence, such a trade-off had been unthought of prior to *Mosely v. State*, 983 S.W.2d 249 (Tex. Crim. App. 1998) and was forbidden shortly thereafter.  As a result, Mr. Ripkowski's case is unique in the widely varying range of instructions given during this time.  The very uniqueness of his sentencing scheme and

[39] The most recent change in Texas' capital sentencing scheme which allows of imposition of a life without parole, and will be addressed separately below.

[40] See e.g., At the beginning of trial (during voir dire) the defense, attorneys, and Judge did not know what special issues were going to be used.  They discussed deliberateness, future

its basis on the sole use of the first special issues leads to the very definition of arbitrariness in sentencing.

There has been a large number of different capital sentencing schemes in operation in Texas capital cases since the early 1970s, when the modern, "post-*Furman*" death penalty statutes were enacted.[41]

Of the many hundreds of persons sentenced to death in Texas since the "modern" capital sentencing statute was enacted,[42] the vast majority were sentenced under jury instructions that simply tracked the unadorned "special issues" contained in Article 37.071(b) verbatim.  *See generally* P.M. McClung, Jury Charges for Texas Criminal Practice 75-78 (rev. ed. 1981) (1964).

After the landmark decision in *Penry v. Lynaugh*, 492 U.S. 302 (1989), however, the consistency in Texas capital sentencing instructions disappeared quickly, both as a result of legislative action and unsupervised judicial improvising by trial courts.  *See generally* Peggy M.

---

dangerousness, reasonable provocation, and mitigation instructions with the jury, (See e.g. S.F. vol. 12, pp. 1613-1618).  In the end, only the first two issues were given to the jury.

[41]   *See* Michael Kuhn, Note, *House Bill 200: The Legislative Attempt to Reinstate Capital Punishment in Texas*, 11 HOUSTON L. REV. 410 (1974); *see also* David Crump, *Capital Murder: The Issues in Texas*, 14 HOUSTON L. REV. 531, 532-33 & pp.7-8 (1977); Stephen W. MacNoll, Note, *A Constitutional Analysis of the Texas Death Statute*, 15 AMER. J. CRIM. L. 69, 79-81 (1988).

[42]   Applicant is aware of no source that collects all of the capital trials that have occurred in Texas since the post-*Furman* statute was enacted.  An informed estimate of that number is approximately 750.  *See* James M. Marquart et al., *Gazing Into the Crystal Ball: Can Jurors Accurately Predict Dangerousness in Capital Cases?*, 23 LAW & SOC. REV. 449 (1989) (as of end of 1988, approximately 600 capital murder trials in Texas at which the State sought the death penalty); Sean Fitzgerald, Note, *Walking a Constitutional Tightrope: Discretion, Guidance, and the Texas Capital Sentencing Scheme*, 28 HOUSTON L. REV. 663 (1991); *see also* NAACP Legal Defense Fund, *Death Row U.S.A. Reporter, 1976-93* (Texas' death row has grown by approximately 20-50 inmates per year since 1973).

Tobolowsky, *What Hath Penry Wrought?: Mitigating Circumstances and the Texas Death Penalty*, 19 AMER. J. CRIM. L. 345 (1992).

Roughly speaking, the various types of Texas capital sentencing instructions in the post-*Furman* era can be broken down into seven different categories, although at least two categories contain sub-categories:

> (i) The unadorned "special issues" in the pre-1991 version of Article 37.071(b). That statute was in effect for all capital murder trials from January 1, 1974 until the date on which *Penry* was decided on June 26, 1989. For capital murders committed before September 1, 1991, it also was in effect for many cases tried from June 26, 1989 until August 30, 1993, when Art. 37.071 was amended (discussed *supra*).[43]

---

[43]   That statute, in pertinent part, reads as follows:

(b) On conclusion of the presentation of the evidence, [at the sentencing phase of a capital murder trial] the court shall submit the following three issues to the jury:

> (1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;
>
> (2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society; and
>
> (3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.
>
> . . . .

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. . . . .

There have been countless trials at which such instructions were submitted, both before and after *Penry*. *See, e.g., Stewart v. State*, 686 S.W.2d 118, 121-124 (Tex.Crim.App. 1984); *see also State v. McPherson*, 851 S.W.2d 846, 849 & n. 8 (Tex.Crim.App. 1992) (collecting cases).

(ii) The 1991 version of the statute.  This version of the sentencing instructions has been applied in all capital murder trials for murders committed on or after September 1, 1991.[44]

(iii) The pre-1991 statute with an extra-statutory "*Quinones*"-type instruction.[45] This version of the sentencing instructions was applied at a number of Texas capital murder trials both before and after *Penry* was decided.  There have been several versions of this extra-statutory charge, each containing material differences.[46]

---

[44]  Simply put, that amended statute eliminated the "deliberateness" and "provocation" special issues and added two new special issues, one of which was directly in response to *Penry*.

The first new special issue asked:

> [I]n cases in which the jury charge at the guilt or innocence stage permitted the jury to find the defendant guilty as a party under Sections 7.01 and 7.02, Penal Code, whether the defendant actually caused the death of the deceased or did not actually cause the death of the deceased but intended to kill the deceased or another or anticipated that a human life would be taken.

See Art. 37.071(b)(2) (Vernon 1992).

 The new "*Penry is*sue" asks:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than  a death sentence should be imposed.

See Art. 37.071(e) (Vernon 1992).

[45]  In *Quinones v. State*, 592 S.W.2d 933, 947 (Tex. Crim. App. 1980), this Court held that it was not error for the trial court to have refused to submit the following extra-statutory instruction to the capital defendant's sentencing jury: "Evidence presented in mitigation of the penalty may be considered should the jury desire, in determining the answer to any of the special issues."

[46] *Compare* the instruction in the instant case, *supra note, with Boggess v. State*, 855 S.W.2d 645, 647 (Tex. Crim. App. 1991); *Fuller (Tyrone) v. State*, 827 S.W.2d 919, 937 (Tex. Crim. App. 1992); *Rios v. State*, 846 S.W.2d 310, 315-16 (Tex. Crim. App. 1992); *Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993).

(iv) The pre-1991 statute with an extra-statutory "*Penry*"-type "fourth special issue."[47]

(v) The pre-1991 statute with a "nullification" instruction.[48]  This version of the sentencing instructions has been applied at a large number of trials after *Penry* for capital murders committed before September 1, 1991.  There have been several different versions of this extra-statutory instruction, each containing material differences.[49]

---

[47] *See, e.g., State v. McPherson*, 851 S.W.2d 846 (Tex. Crim. App. 1992).

[48] *See, e.g., San Miguel v. State*, ___ S.W.2d ___, 1993 Tex. Crim. App. LEXIS 110 at *7 (Tex. Crim. App. May 26, 1993); *Fuller (Aaron) v. State*, 829 S.W.2d 191, 209 n.5 (Tex. Crim. App. 1992).  The proto-typical "nullification" instruction was in *Fuller*, which read as follows:

> When you deliberate about the questions posed in the Special Issues, you are to consider any mitigating circumstances supported by the evidence presented at both phases of the trial.  A mitigating circumstance may be any aspect of the defendant's character and record or circumstances of the crime which you believe makes a sentence of death inappropriate in this case.  If you find there are any mitigating circumstances, you must decide how much weight they deserve and give them effect when you answer the Special Issues.  If you determine, in consideration of this evidence, that a life sentence, rather than a death sentence, is an appropriate response to the personal moral culpability of the defendant, you are instructed to answer at least one of the Special Issues under consideration "No".

*Fuller*, 829 S.W.2d at 209 n.5.

[49] *Compare the instruction in supra* note, *with Blue v. State*, No. 72,912, unpublished slip op. at 9 (Tex. Crim. App. September 23, 1992).  The instruction in *Blue* read as follows:

> In answering the Special Issues you shall consider: (1) all evidence offered by either party at the guilt/innocence phase of the trial regarding the defendant's individual participation in the commission of the Capital Murder; and (2) all evidence offered by wither party at the punishment phase of the trial, whether it be aggravating or mitigating evidence.  If the mitigating evidence persuades you that the defendant should not be sentenced to death, then you shall answer one or more of the Special Issues "No".

*See Blue v. State*, *supra*, at 9.

(vi) The pre-1991 statute in which "deliberately" is broadly defined.[50]   This version of the sentencing instructions has been applied in at least two trials since *Penry* was decided for capital murders committed before September 1, 1991, as well as in Mr. Ripkowski's pre-*Penry* trial.[51]

(vii) The 1993 version of the statute as applied to all crimes committed on or before August 30, 1991.[52]   This version of the statute will apply to any trial or re-trial that commences after August 29, 1993, for capital murders committed on or before August 30, 1991.

In numerous cases, the Supreme Court has stated, in keeping with our Nation's federalism, that "we are unwilling to say that there is any one right way for a State to set up its capital sentencing scheme." *Spaziano v. Fla.*, 468 U.S. 447, 464 (1984) (citing cases).

The Court has stated, however, that *within* a single state, there must be consistency in the treatment of capital defendants who are subject to the death penalty.  *Id.* at 460 ("If a State has determined that death should be an available for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not.") (citing cases).  Thus, "'each distinct [state] system must be examined on an individual basis.'" *See Pulley v. Harris*, 465 U.S. 37, 45 (1984) (quoting *Gregg*, 428 U.S. at 195 (1976) (joint opinion of Stewart, Powell & Stevens, JJ.)).

---

[50] *See, e.g., Martinez v. State*, ___ S.W.2d ___, 1993 Tex. Crim. App. LEXIS 119 at *15-*18 (Tex. Crim. App. 1993).

[51] *See* Tr. at 236.

[52] *See* Art. 37.0711 (Vernon 1993).  This version of the statute contains all three of the "old" special issues.  *See id*. (b)(1)-(b)(3).  It further provides that, if the jury returns affirmative answers to all three special issues, then the trial court should further submit to jurors the new, *Penry*-type special issue enacted in the 1991 amendment.  This version of the statute instructs jurors that "[i]f a defendant is convicted of an offense under Section 19.03(a)(6), Penal Code, the court shall submit the [special] issues ... only with regard to the conduct of the defendant in murdering the deceased individual first named in the indictment."

In *Furman v. Ga.*, 408 U.S. 238 (1972), the chief constitutional infirmity that the controlling Members of the Court pointed to in their respective concurring opinions was arbitrariness. *Id.* at 274 (Brennan, J., concurring) ("In determining whether a punishment comports with human dignity, we are aided ... by ... [a] second principle inherent in [the Eighth Amendment Cruel and Unusual Punishments] Clause -- that the State must not arbitrarily inflict punishment."); *Id.* at 309 (Stewart, J., concurring) ("These death sentences are cruel and unusual in the same way that being struck by lightning is cruel and unusual."); *See also Spaziano*, 468 U.S. at 460.

The above discussion of the various sentencing schemes concurrently[53] in operation in Texas, "a distinct system," *Gregg*, 428 U.S. at 195, amply demonstrate that the present Texas death penalty system is being implemented in an "arbitrary" manner. At least seven categories of similarly situated capital defendants have been treated disparately. Put another way, it is certainly conceivable that, *ceteris paribus*, a single hypothetical Texas capital defendant would be given a different sentence[54] depending on which of the seven different sentencing schemes was in operation at his trial. This is quintessential arbitrariness—the very type condemned in *Furma*n.

Applicant recognizes that the Texas Legislature was certainly justified in amending Art. 37.071(b) as it did in 1991; indeed, *Penry* certainly appeared to require such. *See* Shelley Clarke,

---

[53] Although after August 29, 1993, all trials will be tried under either Art. 37.071 and Art. 37.0711, the pre-1991 version of Art. 37.071 was still in operation in many cases up until August 30, 1993. Moreover, *on appeal*, the pre-1991 version of Art. 37.071 will still be in operation in the foreseeable future in this Court's sufficiency-of-the-evidence analyses regarding juries' affirmative answers to the special issues.

[54] Of course, in a Texas capital case, where a defendant has been found guilty of capital murder, the only sentencing options are a life sentence and a death sentence.

Note, *A Reasoned Moral Response: Rethinking Texas' Capital Sentencing Statute After* Penry v. Lynaugh, 69 TEX. L. REV. 407 (1990).  If that were the only other scheme concurrently in operation with the pre-1991 version of Art. 37.071, in all likelihood Applicant would never have brought this claim.  But that is not what happened in the wake of *Penry*.

Rather, numerous trial courts throughout this state and the Texas Legislature have haphazardly created, in addition to the prevailing pre-1991 capital sentencing scheme, a total of at least six new, distinct capital sentencing schemes that have governed similarly or identically situated Texas capital defendants.  Particularly noteworthy is this Court's failure to impose uniformity among the practices adopted by the trial courts.

The Legislature is not free from its share of the blame either.  By waiting until August 30, 1993 to amend Art. 37.071 as it applies to trials or retrials of capital defendants who committed their crimes before September 1, 1991, the Legislature has sowed the seeds of arbitrariness and inconsistency.  Under both identical and analogous circumstances, other States have not dealt with seemingly sweeping invalidations of their post-*Furman* death penalty statutes in such a chaotic manner.  *See* OR. REVISED STATUTES, § 163.150 (as amended July 24, 1989); *State v. Wagner*, 786 P.2d 93, 99-100 (Ore. 1990); *cf*. OHIO REVISED CODE §§ 2929.02-06 (as amended 1981); *State v. Melchior*, 381 N.E.2d 195, 200 (Ohio 1978); David J. Benson, *Constitutionality of Ohio's New Death Penalty Statute*, 14 U. TOL. L. REV. 77 (1982).

In *Godfrey v. Ga.*, 446 U.S. 420 (1980), the Supreme Court held that states can impose the death penalty for certain crimes without running afoul of our Constitutional prohibition against cruel and unusual punishment, but only if the manner in which the penalty is selected "provide[s] a meaningful basis for distinguishing the few cases in which [the penalty] imposed

from the many cases in which it is not." *Id.* at 427.  As pointed out by Justice Stevens, "this Court's decisions have made clear that States may impose this ultimate sentence *only if they follow procedures* that are designed to assure reliability in sentencing determinations.  *Barclay v. Fla.*, 463 U.S. 939, 958-59 (1983) (Stevens, J., concurring) (emphasis added).  Part of the requirement of reliability is "'that the [aggravating and mitigating] reasons present in one case will reach a similar result to that reached under similar circumstances in another case.'"  *Id.* at 954 (quoting *Proffitt v. Fla.*, 428 U.S. 242, 251 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)) (internal quotations omitted).

The Texas courts and the state Legislature, without any discernible rational basis, have haphazardly turned Texas's capital sentencing scheme into a patch-work quilt.  Because similarly situated Texas capital defendants—including Applicant—have been unjustifiably sentenced to death under radically different sentencing schemes, this Court must vacate Applicant's death sentence.[55]

---

[55] Another notable inconsistency in Texas capital sentencing instructions concerns an extra-statutory instruction given by a large number of trial courts in the last decade or so, in response to a statutory anomaly created by the collective operation of TEX. CODE CRIM. PRO. Art. 37.071(d), (e) & (g) (Vernon 1989).  Since 1981, subsection (e) (or its equivalent in the 1991 and 1993 amended statutes) has provided that a single holdout juror in favor of a negative answer to one or more special issues results in an automatic life sentence; however, subsection (g) has provided that the trial court or counsel cannot inform jurors of that fact.  Subsection (d) has required trial courts to instruct jurors that at least ten jurors must agree to vote negatively on any special issue before the jury can return a negative verdict.  The only other option jurors are given is to vote unanimously to return affirmative answers to the special issues.  *See generally* Robert Clary, *Voting for Death: Some Lingering Doubts About the Constitutionality of Texas' Capital Sentencing Procedure*, 19 ST. MARY'S L.J. 353 (1987).

Many (but by no means all) courts have submitted an extra-statutory instruction, suggested by P.M. McClung, JURY CHARGES FOR TEXAS CRIMINAL PRACTICE 74 (rev. ed. 1985), that offers jurors the third option of returning a "blank" verdict if at least ten jurors cannot agree to return a negative answer to one or more special issues, but jurors are neither not unanimous in returning

A.   **THE TRIAL COURT FAILED TO PROVIDE THE JURY WITH A WAY TO EFFECT A FINDING ON MITIGATION.**

The trial court recognized that there was a need to allow the jury someway to express a reaction to the mitigation evidence presented in both the guilt-innocence and punishment phase of the trial and admonished the jury that it should not ignore such evidence but gave them no way to express any findings of a lack of death worthiness based on mitigation or a reasoned moral response to the evidence.   At the very least the court should have given the following (earlier identified as the "New *Penry* issue") *Penry* special issue:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient mitigating or circumstances to warrant that a sentence of life imprisonment rather than  a death sentence should be imposed.

The court's failure to do so rendered the punishment phase arbitrary and meaningless. Moreover, because the court gave no way for the jury to express its evaluation of the mitigation evidence it insured that all of the mitigation evidence presented at trial be given only aggravating weight.  This problem is reflected in the court's decision in *Penry* that found problems with the Texas sentencing scheme, producing a double-edged effect to any mitigation evidence presented so that mitigation evidence could also be viewed as aggravating evidence under the Texas scheme.  So, for example, evidence of mental impairment, can logically be viewed as weighing for a "yes" answer on the future dangerousness issue.  The additional issue was supposed to move to remedy the double-edged problem of using mitigating evidence in Texas under its sentencing issues.  In Ripkowski's case the problem is made all the worse because of the two

---

affirmative answers to all of the special issues. *See, e.g., Hicks v. State*, ___ S.W.2d ___, No. 70,803 (Tex. Crim. App. Mar. 31, 1993).

sentencing questions. The one most likely to result in mitigating evidence being given aggravating weight is the second special issue, the only one presented in this case. That special issue on its own forecloses any expression of mitigating value for any evidence presented, making it wholly aggravating.

As a result, Mr. Ripkowski's mitigating evidence put on in both the guilt-innocence and sentencing stage of the trial, which directly related to his mental illness, child abuse, and drug abuse, was stripped of its mitigating value and transformed into aggravating evidence only. This is a clearly predictable problem that the trial court should have foreseen. It also resulted in Mr. Ripkowski's punishment phase becoming a meaningless charade. He had no chance of not being sentenced to death under the sentencing structure with which he was provided. This is clearly in contravention of his trial and constitutional rights, and, as a resul, he should be given a new trial or at the very least a new sentencing hearing.

### B. FOR THE SAME REASONS THE USE OF ONE SPECIAL ISSUE TO DECIDE MR. RIPKOWSKI'S PUNISHMENT VIOLATES TENETS OF 8TH AMENDMENT CAPITAL PRECEDENT.

The prior argument and authority is incorporated herein word for word. The failure to provide a way for Mr. Ripkowski's jury to give a reasoned morale response to the mitigation evidence presented at his trial rendered his trial fundamentally flawed. It is not enough to say that he and his counsel waived the second special issue at the time of his trial. It was well known in Texas that the jury must have some way to express its opinion on mitigation evidence that was not afforded with the two special issues.

### C. FOR THE SAME REASONS IT WAS INEFFECTIVE ASSISTANCE OF COUNSEL TO ALLOW MR. RIPKOWSKI'S JURY TO DECIDE HIS FATE WITH ONLY ONE SENTENCING ISSUE.

As will be discussed more fully below, trial counsel's hope that the jury would give mitigating value to the evidence produced at the guilt stage, in the same manner as they would at punishment, demonstrates a fundamental misunderstanding of capital jurisprudence.   The Supreme Court's purpose for its insistence on at least a bifurcated trial in capital cases is to allow the jury to decide the separate issue of guilt for a crime apart from the issue of whether the individual deserves to die for that crime.  When the defense team front loaded the most important mitigating evidence in this case to the guilt stage, they put it in a place where its use was limited to whether Mr. Ripkowski's mental status affected the evidence against him, that is, rendered his confession unknowing or involuntary and thus inadmissible or reduced the level of crime he committed.

Though similar in some ways, this purpose is fundamentally different than the purpose of presenting evidence at the punishment phase, which allows the jury to give a reasoned moral response to evidence that militates against a death sentence.  Trial counsel's hope that the jury would give mitigating value to the evidence during the guilt-innocence phase, and counsel's decision that its presentation and rejection at the guilt-innocence phase implicated its usefulness at the punishment stage, shows a basic misunderstanding of the purposes of the punishment stage.  As such it shows they were ineffective and that their decision to forego mitigation was based on a flawed understanding of the punishment process.

 No minimally competent Texas capital litigator would have allowed the jury to decide the punishment stage of this case without some avenue for the jury to give mitigating effect to the evidence that was presented to them in some manner.

Moreover, the decision effected by defense counsel to waive the mitigation issue also effected their decision not to put on readily available relevant mitigating evidence, which is and was in itself ineffective.

### D.   IT VIOLATES THEN EXISTING AND NOW EVOLVING STANDARDS OF DECENCY TO EXECUTE AN INDIVIDUAL WHERE HIS JURY HAD NO MEANS OF EXPRESSING A REASONED MORAL RESPONSE TO HIS MITIGATING EVIDENCE.

Mr. Ripkowski incorporates herein the same facts and argument laid out above and avers that it violates common standards of decency to execute him given the lack of any way for his jury to provide a response to the mitigating evidence presented at his trial. It is impossible for the jury to have given any mitigating weight to his mitigation evidence under the special issue they answered. For this reason, Mr. Ripkowski deserves a new trial. This is particularly true given the seriousness of the loss here when valued against the reason for the loss. Here, whatever counsel's initial motivation, it is now abundantly clear that they were mistaken in attempting to waive the first mitigation issue, indeed, such conduct is now expressly forbidden in Texas. Furthermore, no other state allows for the dismissal of mitigating issues.

Trial counsel's mistake then, even if not accepted as ineffective assistance of counsel, as outlined below, so fundamentally infected Mr. Ripkowski's rights to a fair and meaningful punishment phase as to render it abhorrent to current standards. In light of then present and now current standards of decency that the death penalty be restricted to persons who not only commit a capital offense but further limited to the smaller group of individuals who deserve to die. Certainly the mistake on the part of defense counsel should not and cannot prevent this Court from granting a new punishment phase or, at the very least, a hearing to determine the weight of the mitigation evidence discarded in this case.

**E.     BECAUSE OF THE FLAWS IN MR. RIPKOWSKI'S PUNISHMENT PHASE THIS COURT CAN HAVE NO CONFIDENCE THAT HE ACTUALLY MEETS THE RESTRICTED GROUP OF CAPITAL MURDERERS WHO DESERVE TO DIE.**

Mr. Ripkowski incorporates all of the foregoing argument and authorities in this section on arbitrariness of the scheme used to execute him and adds, as a result of the foregoing, that this court can have no confidence that he is among the limited group of capitally convicted persons who deserve to be executed rather than given a life sentence.  This is particularly true given his background.  Despite having a serious mental impairment, drug abuse as a result of childhood trauma, and multiple head injuries, apart from the conduct at issue from the case at hand—the circumstances surrounding the death of Nikki Frome and her mother Monica—he has only extremely limited contact with the criminal justice system and that for stalking an ex-girl friend.  When viewed in the totality of the circumstances of his life, the court can see that it is quite probable that he is not a member of the group that can be executed in conformity with the Constitution's requirements of limiting death to the worst crimes and the worst offenders.

Since Mr. Ripkowski does not fall into this class, as evidenced by his exemplary conduct in prison, in spite of his deteriorating mental condition, this Court can actually see that he is not part of the group to which the Supreme Court requires that the death penalty be limited.  As such this court should order a new sentencing hearing.

5.      **MR. RIPKOWSKI'S JURY WAS NOT GIVEN THE OPTION OF SENTENCING HIM TO LIFE WITHOUT PAROLE; THEREFORE, HIS SENTENCING PHASE HEARING VIOLATED THE EIGHTH AMENDMENT AND THE DUE PROCESS AND EQUAL PROTECTION CLAUSES OF AND FOURTEENTH AMENDMENT.**

All of the following claims relating to the life parole option are claims based on the State's September 2005 introduction of a life without parole option in sentencing in a capital case. This is therefore not a claim that could have been raised previously. This claim also incorporates and follows onto the claims in the previous section dealing with the arbitrary and capricious nature of the death penalty as practiced in Texas.

A.      **SINCE THE INTRODUCTION OF A LIFE WITHOUT PAROLE SENTENCING OPTION MR. RIPKOWSKI'S DEATH SENTENCE HAS BEEN RENDERED ARBITRARY AND CAPRICIOUS.**

Ironically, despite making the situation worse by waiving any opportunity for Mr. Ripkowski's jury to give mitigating effect to the mitigating testimony they presented, his trial counsel and all of his subsequent counsel have directed the CCA's attention to the core problems of the then existing Texas Statute that would result in this issue coming to the fore now. The initial complaints took place more than ten years ago as trial counsel complained of the state's attempt to fix the many problems with the death penalty statute as written. The state's response was to deny counsel at every step of the way.

Unlike considerations in other areas of the law, the Eighth Amendment's concern extends beyond ensuring that the procedures under which a sentence was imposed in the past comported with constitutional requirements as understood at the time of sentencing. Where a human life is at stake, the Eighth Amendment requires an analysis of whether the execution of the sentence of death comports with constitutional requirements as understood at the time of execution.

Anything less would fail to reflect the dignity of man and the evolving moral standards of our community.  As repeatedly emphasized by the Supreme Court, death is different, and the Eighth Amendment will not countenance the execution of a human being out of deference to good faith reliance on the laws of the past.

The history of the Texas death penalty scheme is marred by gross arbitrariness.  When Mr. Ripkowski was tried, the general rule on sentencing was that the issue of parole could not be discussed in capital cases, though it could be discussed in non-capital cases.  In his case, the Court allowed testimony of what parole actually meant but then allowed the prosecution to argue that the jury ignore the realities of the law on parole in closing argument.  At the time of Mr. Ripkowski's trial, a person who received a life sentence would have to serve a minimum of 40 years before they would be eligible for parole (SF XXI, 10).  During the five weeks of voir dire in Mr. Ripkowski's trial, it was common among the people questioned that they believed that the Texas prison system was a revolving door and that people in fact served a very short period of time, some as little as four or five years.  This misimpression was bolstered, at the end of the trial, by the prosecutor's closing arguing, over objection, that parole could be shortened and convicted capital murderers be let loose within a few years of conviction unless given the death penalty.  Shortly after Mr. Ripkowski's trial, the number of years a capital-convicted, non-death sentenced individual would serve was raised in September of 2005, to life without parole.

The new sentencing scheme under which Texas operates changed not only the amount of time a convicted person would serve but also the mitigation analysis to be applied on a case-by-case basis.  For persons who can be safely maintained in a prison environment, like Mr. Ripkowski, the death penalty is no longer an option.  There is no judicial significance about the

September 1, 2005 date and no way to meaningfully say that a defendant convicted on August 1, 2005 is more death worthy than a defendant convicted on October 1, 2005; everything else about their cases and their mitigation evidence being the same. As such, to allow the execution of Mr. Ripkowski under these circumstances is the very height of arbitrariness.

The fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. *Woodson*, 428 U.S. at 304. If allowed to proceed, Mr. Ripkowski's execution would be "cruel and unusual in the same way that being struck by lightning is cruel and unusual." *Furman*, 408 US at 309. Mr. Ripkowski is among a "capriciously selected random handful upon whom the sentence of death will be carried out" because his offense was committed before September 2005. To complete the quote from Justice Stewart, "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." *Furman*, 408 US at 310 (Stewart J., concurring); *Gregg*, 428 US at 188. The Eighth Amendment requires the rational narrowing of death eligibility so that only the most deserving of execution are put to death." *Atkins*, 536 US at 319. Changing the lines of where the most deserving convicted persons stand based simply on an arbitrary date cannot pass constitutional muster.

Furthermore, the execution of an offender who would not be eligible for the death penalty under the law today makes no measurable contribution to deterrence or retribution. Under *Gregg*, a punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless

and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. *Gregg*, 428 U.S. at 173. It makes no sense to say that a punishment carried out under a law that is no longer in operation can have any effect on future behavior designed to avoid that punishment, since that punishment is no longer available. *See also Schriro v. Summerlin*, 542 U.S. 348, 351-52 (2004).

The legislative efforts to limit the new act as prospective only should, therefore, be struck down as not consistent with the due process provisions of the Eighth and Fourteenth Amendments.

In addition, Texas has now determined that the death penalty is never appropriate for a prisoner who can be safely confined for the rest of his life. The Eighth Amendment and Fourteenth Amendments require that before Mr. Ripkowski can be executed, he must have an opportunity to prove that he is one of those people for whom the death penalty is now no longer appropriate.

This argument is identical to the ones being currently made and respected in the federal courts by persons who are retarded or were children at the time they committed their offenses. The question of whether death sentences are imposed under procedures that violate constitutional standards has been at the heart of Eighth Amendment jurisprudence in the modern era of the death penalty. *Gregg v. Georgia*, 428 U.S. 153 (1976) (Georgia capital sentencing scheme passed muster where it focused the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant, permitted consideration of any aggravating or mitigating circumstance, and required a finding of at least one statutory aggravating circumstance before the imposition of a death penalty verdict); *Woodson*, 428 U.S.

at 303 (mandatory death penalty scheme unconstitutional because it failed to provide for the "particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death").

### B. SINCE THE INTRODUCTION OF A LIFE WITHOUT PAROLE SENTENCING OPTION MR. RIPKOWSKI'S EXECUTION UNDER THE OLD LAW WOULD BE A VIOLATION OF HIS DUE PROCESS AND EQUAL PROTECTION RIGHTS.

The continued use of the death penalty implicates the fundamental right to life. The fundamental right to life has been acknowledged by the Supreme Court in a variety of contexts. In finding that the police had no right to kill a fleeing felon, the Court matter-of-factly stated: "The suspect's fundamental interest in his own life need not be elaborated upon." *Tenn. v. Garner*, 471 U.S. 1, 9 (1985); *see also County of Sacramento v. Lewis*, 523 U.S. 833, 836-37, 848-49, 855 (1998) (acknowledging a substantive due process claim where police killed a motorcycle passenger in the course of a high speed chase, but finding no violation in the absence of deliberate conduct). "[T]here can be no question that an interest protected by the text of the Constitution is implicated: The actions of the State ... resulted in the undoubted loss of life.... We have no definitional problem, then, in determining whether there is an interest sufficient to invoke due process." *Id.* at 856 (Kennedy, J., concurring). In the very different situation involving a family's desire to end the life of a relative who was in a persistent vegetative state, the Court also recognized the State's "unqualified interest in the preservation of human life" regardless of the quality of the life being saved. *Cruzan v. Dir., Mo. Dep't of Health*, 497 U.S. 261, 280, 282 (1990); *see also Wash. v. Glucksberg*, 521 U.S. 702, 728-29 (1997) (finding a state's unqualified interest in the preservation of life justifies ban on physician-assisted suicide); *see also Roe v. Wade*, 410 U.S. 113 (1973) (noting that if a fetus were a "person," the "right to

life would then be guaranteed specifically by the [Fourteenth] Amendment"); *Mattis v. Schnarr*, 547 F.2d 1007, 1017-18 (8th Cir. 1976), *vacated on other grounds*; *Ashcroft v. Mattis*, 431 U.S. 171, 173 (1977) (per curiam) (discerning from *Yick Wo v. Hopkins*, 118 U.S. 356 (1886); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Screws v. U.S.*, 325 U.S. 91 (1945); and *Roe v. Wade*, 410 U.S. 113 (1973), *vacated on other grounds* (designating the right to life as fundamental). Thus, both early and modern judicial decisions reveal implicit and explicit regard for the right to life as a fundamental constitutional right.

Most significantly, for the issue being considered here, the Court has explicitly recognized even a death row inmate's interest in continuing to live. The Court described a person whom the state planned to execute when he had become insane as being "stripped of his fundamental right to life." *Ford v. Wainwright*, 477 U.S. 399, 409 (1986). In addition, in addressing the question of what process is due a capital defendant in the clemency context, a majority of the Court acknowledged that a condemned inmate continues to have an interest in his life. See *Ohio Adult Parole Auth. v. Woodard*, 523 U.S. 272, 281 (1998) (plurality opinion) ("We agree that respondent maintains a residual life interest."). The concurring opinion of Justice O'Connor, joined by Justices Souter, Ginsburg, and Breyer, was necessary to uphold the judgment, *Id.* at 288-89 (O'Connor, J., concurring in part and concurring in the judgment), and Justice Stevens's dissenting opinion would have given the defendant even greater protection. *Id.* at 290-95 (Stevens, J., concurring in part and dissenting in part). To comply with substantive due process standards, that protection requires the government to show that extinguishing the life of any person is necessary to serve a compelling interest. *See* Sherry F. Colb, *Freedom from Incarceration: Why Is This Right Different from All Other Rights?*, 69 N.Y.U. L. REV. 781, 785-

94 (1994) (arguing that the right to liberty should require strict scrutiny of laws authorizing confinement). In this context it also requires showing that the decision to make the ameliorative effects of the legislative changes prospective only was necessary to serve a compelling state interest. The state cannot meet this burden.

In *Jackson v. Ala.*, 530 F.2d 1231 (5th Cir. 1976), the Fifth Circuit considered the constitutionality of Alabama legislation requiring that in the future the sentence of any persons convicted of any felony or misdemeanor be credited with time spent incarcerated pending trial. The legislation was specifically made prospective and Jackson claimed that the Act must be applied retrospectively since otherwise it would establish an irrational classification of persons sentenced before and after its effective date, and thus, invidiously discriminate against those persons in the former class in contravention of the Fourteenth Amendment.

The Fifth Circuit first noted that there is no per se bar on prospective legislation. *Id.* at 1238. It went on to consider whether in this instance the solely prospective application of the act violated the Fourteenth Amendment and determined that it did not do so, stating:

> We find in the circumstances here present that the "factors of reliance and burden on the administration of justice", *Stovall v. Denno*, 1967, 388 U.S. 293, 300, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1205, outweigh the apparent inequity in determining a fixed cutoff date, and we hold also that the Alabama legislature's conferring only prospectively the benefits of Act No. 58 violated no constitutional guarantee. See *Jones v. Cupp*, 9 Cir. 1971, 452 F.2d 1091; *Williams v. United States*, 1964, 118 U.S. App. D.C. 255, 335 F.2d 290; *Graham v. Thompson*, 10 Cir. 1957, 246 F.2d 805; *Comerford v. Commonwealth*, 1 Cir. 1956, 233 F.2d 294, cert. denied 352 U.S. 899, 77 S. Ct. 141, 1 L. Ed. 2d 90.

*Id.* at 1238.

Importantly, the Fifth Circuit accepted, as it must, that the Equal Protection challenge stated a valid constitutional claim. Equally as important, the Fifth Circuit acknowledged the

inequity in the arbitrary effective date of the legislation but adopted the reasoning of the Court in *Stovall* to balance that inequity against the reliance on the previous law and the burden a change would put on the administration of justice.

In considering the balancing interests in the prospective application of ameliorative legislation that narrows the scope of an offense (penalty) and lowers the bar for mitigating evidence, it is difficult not to be drawn into comparisons with the analysis in *Teague v. Lane,* 489 U.S. 288, 311 (1989) (plurality opinion).

The first point to be made out of *Summerlin* is that made by Justice Scalia writing for the Court, and that is that substantive rules are not *Teague* exceptions; they do not come within the rule of *Teague* at all and will ordinarily apply retroactively

> New substantive rules generally apply retroactively. This includes decisions that …narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States*, 523 U.S. 614, 620-621, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks*, 494 U.S. 484, 494-495, 108 L. Ed. 2d 415, 110 S. Ct. 1257 (1990); *Teague v. Lane*, 489 U.S. 288, 311, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989) (plurality opinion). n4 Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley*, supra, at 620, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (quoting *Davis v. United States*, 417 U.S. 333, 346, 41 L. Ed. 2d 109, 94 S. Ct. 2298 (1974)).

*Summerlin*, 542 U.S. at 351-52.   The rationale for retroactive operation of the substantive changes to the Texas capital sentencing scheme are particularly strong here.  Texas has narrowed the scope of a criminal statute by narrowing the scope of the future dangerousness special issue and by redefining the mitigation special issue in a way that lowers the bar for mitigating evidence capable of tilting a sentence away from death.

Added to these considerations are the cogently expressed reasons of the dissent, explaining why death is different and the normal considerations against retroactivity are weak—the number of cases likely to be affected is small, considerations of finality are less acute, and the reliance argument less weighty. *Summerlin*, 542 U.S. at 361-66 (Breyer, J., dissenting).

The point should also be made that in *Summerlin* the Court was considering the possible retroactive effect of *Ring v. Ariz.*, 536 U.S. 584 (2002). *Summerlin*, 542 U.S. at 349. Here, there has been both a de facto and a literal change in the phrasing and content of the sentencing elements. There can be no doubt that these are substantive changes.

In considering whether there is a rational basis for prospective-only operation and whether the *Stovall* factors should control, it is appropriate to have regard to some additional considerations. The general savings clause in Texas ordinarily provides for retrospective effect to ameliorative legislation in respect of punishment. TEXAS GOV'T CODE ANN. art. 311.031(b) (Vernon 2008). The expectation of the international community is that as a matter of fundamental fairness prisoners will gain the benefit of any subsequent reduction in the penalty for their offense. International Covenant on Civil and Political Rights art. 15, Dec. 16, 1966, 999 U.N.T.S. 171; *American Declaration on the Rights of Man*, Art. 9; Charter of Fundamental Rights of the European Union art. 49, Dec. 7, 2000, 2000 O.J. (C 364) 1.

**C.   THE LACK OF A LIFE WITHOUT PAROLE OPTION RESULTED IN A "DEATH BY DEFAULT" VERDICT AGAINST MR. RIPKOWSKI IN VIOLATION OF *BECK V. ALABAMA*.**

The jury on voir-dire demonstrated a belief that a life sentence for Mr. Ripkowski could be as little as four or five years. Although the trial court admitted evidence as to what a life sentence actually meant in 1999, that is 40 calendar years, day for day, before consideration for

parole, it allowed the prosecutor to undercut the law and leave the jury with the impression that Mr. Ripkowski could be eligible for parole at any time after he was given a life sentence.

Mr. Ripkowski's evidence in support of this claim shows that the lack of a life without parole option resulted in all of jury defaulting to a death sentence that they would otherwise not have imposed. "Such a death sentence cannot be imposed constitutionally." Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?*, 79 TUL. L. REV. 401, 413 (2004). In *Beck v. Ala.*, 447 U.S. 625, 634 (1980), the Court rejected on Eighth and Fourteenth Amendment grounds a death penalty scheme that required a jury to either acquit the defendant or sentence him to death, finding that a jury might be unconstitutionally coerced into sentencing a defendant to death whom it might otherwise have convicted but not sentenced to death had a life sentence without parole been available. *See also* William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 TEX. L. REV. 605, 645-49 (1999) (empirical evidence [Table 1] suggests that jurors will generally underestimate the length of time non-death sentenced convicted murderers will spend in prison; jurors typically suspect that such offenders are back on the streets "far too soon"). "[T]he absence of a life without parole option causes the death penalty to be imposed as an expedient rather than as the product of a reasoned judgment that death is the appropriate punishment."[56]

---

[56]  Citing *inter alia* William J. Bowers, *Capital Punishment and Contemporary Values: People's Misgiving and the Court's Misperceptions*, 27 LAW & SOC'Y REV. 157, 169-70 (1993) (finding that capital jurors in California, Florida, and South Carolina believe murderers sentenced to death will be released from prison sooner than the law permits and that this mistaken impression is associated with voting for death); Theodore Eisenberg & Martin T. Wells, *Deathly Confusion: Juror Instructions in Capital Cases*, 79 CORNELL L. REV. 1, 15 (1993) (finding that South Carolina jurors vote for death "because of false impressions about parole eligibility"); Anthony

The constitutional error and resultant prejudice to Mr. Ripkowski's right to a fair sentence is as simple and dramatic as life and death. Mr. Ripkowski's jury believed that it had the option of giving him a choice of death or a certain term of years that could run at the whim of the legislature or some other individual and result in his being freed in four or five years. Apparently, not one of his jury wanted to take that chance.

### D. THE LACK OF A LIFE WITHOUT PAROLE OPTION ALSO DEPRIVED DEFENDANT OF CRUCIAL MITIGATING EVIDENCE.

The fact that the defendant portends no harm to society while in custody is critical mitigating evidence. *See Skipper v. S.C.*, 476 U.S. 1, 5 (1986); *see also Simmons v. S.C.*, 512 U.S. 154, 177 (1994) (O'Connor J., concurring) (noting "the fact that he will never be released from prison will often be the only way that a violent criminal can successfully rebut the State's case."). State courts have recognized that removing the life without parole option deprives a defendant like Mr. Ripkowski of what may be the only mitigating evidence he has to offer: "that he need not be killed because he is of no danger to society while in custody." *See e.g.*, *Tate v. State*, 896 P.2d 1182, 1193 (Okla. 1995) (death sentence imposed by a jury that has not been informed that one of its sentencing options is life without possibility of parole "renders the sentencing stage fundamentally unfair"); *Russell v. State*, 607 So. 2d 1107, 1118 (Miss. 1992). The lack of a life without possibility of parole sentence also deprives a defendant of profound mitigating evidence.

---

Paduano & Clive A. Smith, *Deadly Errors: Juror Misperception Concerning Parole in the Imposition of the Death Penalty*, 18 COLUM. HUM. RTS. L. REV. 211, 222-25 (1987) (drawing on case studies and other data to conclude that jurors' misperceptions regarding parole eligibility of capital defendants constrain them to vote for death).

A capital defendant's ineligibility for parole would itself have been a mitigating factor. *E.g., State v. Henderson*, 789 P.2d 603, 606-07, 614 (N.M. 1990) (Ransom, J., concurring in pertinent part) ("Length of incarceration is a mitigating factor."); *Turner v. State*, 645 So.2d 444, 448 (Fla. 1994) (reversing death sentence where jury could have found ample mitigation, including that "the alternative to the death penalty was two life sentences").

As mentally ill as Mr. Ripkowski is, he has proved he is not a danger in his present incarceration. (*See also* Quijano testimony).  Mr. Ripkowski's jury could not give any mitigating weight to his drug addiction under the one special issue they had to answer; it could only be seen as aggravating, as making him more dangerous, in need of being kept out of the community, because if released back into the community he would fall prey to drugs again and become dangerous again.  Therefore, any mitigating value that the jury may have seen from being in the diseased state of being drug addicted is diminished by its aggravating value on possible release. Under the new sentencing scheme the jury could still see drug addiction as an aggravating factor but would not have to discount all of its mitigating value; rather, they could give value to both its mitigating and aggravating value.  They could say it mitigated for a sentence less than death but aggravated against any sentence that would allow release during Mr. Ripkowski's life time.

Furthermore, under the new sentencing scheme, Mr. Ripkowski's lawyers would not have decided to waive the mitigation issue they did, as they believed the jury would have been likely to have given him a life without parole sentence if they could despite the victim impact evidence.

E.   **ALLOWING MR. RIPKOWSKI'S EXECUTION UNDER THE OLD SENTENCING SCHEME WOULD VIOLATE EVOLVING STANDARDS OF DECENCY**.

The evolving standards of decency apply to procedural as well as substantive components of death penalty sentencing schemes.   In recent years, this Court has made a series of rulings assessing the propriety of the death penalty under a variety of circumstances.[57] While at first blush, these cases might seem to suggest that the Eighth Amendment's evolving standards of decency are only concerned with substantive rather than procedural matters; however, it is very clear from this Court's jurisprudence—even where the sentence of death is constitutional—that the procedures by which a death sentence is imposed must meet the evolving standards of decency.  Indeed, *Furman* itself did not hold the imposition of the death penalty unconstitutional; rather, based upon the evolving standards of decency, held that the "procedures ... [used by] sentencing authorities" to decide whether to impose a death sentence rendered the sentence unconstitutional.  *Furman*, 408 U.S. at 239-40.

Similarly, when this Court upheld the procedures enacted in Georgia in *Gregg*[58]*,* on the very same day, in *Woodson*, this Court held that the procedures then in effect, which were similar to those at the adoption of the Constitution, were rendered unconstitutional based upon the evolving standards of decency.  *Woodson*, 428 U.S. at 293 ("The two crucial indicators of evolving standards of decency respecting the imposition of punishment in our society—jury

---

[57] See e.g. *Simmons*, 543 U.S. at 578 (finding evolving standards of decency prohibited the execution of juveniles); *Atkins*, 536 U.S. at 321 (finding evolving standards of decency prohibiting the execution of mentally retarded defendants); *Tison v. Ariz.*, 481 U.S. 137, 156-58 (1987) (prohibiting execution of offender who did not intend to kill or recklessly disregard human life); *Ford*, 477 U.S. at 409 (prohibiting execution of criminally incompetent defendant).
[58] *Gregg*, 428 U.S. at 206-07.

determinations and legislative enactments—both point conclusively to the repudiation of automatic death sentences").

The evolving standards of decency prohibit imposition of the death penalty when the life without the possibility of parole option is not an option provided to the jury. Legislative enactments now require the option of life without parole in all but one American jurisdiction (Alaska). The commentaries of legal organizations and academics and public opinion establish a national consensus concerning the need to offer juries the option to permanently incapacitate a defendant without execution. In *Atkins v. Va.,* 536 U.S. 304 (2002) and *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court assessed the evolving standards of decency to determine whether to re-visit the rulings made twelve years earlier concerning the constitutionality of executing the mentally retarded[59] and children.[60] In both cases, this Court noted that the "beginning point is a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question. This data gives us essential instruction." *Simmons*, 543 U.S. at 564; *Atkins*, 536 U.S. at 313-17. The *Simmons* Court also noted that polling data, and the positions of interested organizations, as well as in some instances international law, *Id.*, 543 U.S. at 604-07 (O'Connor J., dissenting); all might influence "the exercise of [the Court's] own independent judgment." *Id.*, 543 U.S. at 564, 573, 576-77, 579-87.

**F.     LEGISLATIVE ENACTMENTS REFLECT A CLEAR NATIONAL CONSENSUS THAT LIFE WITHOUT THE POSSIBILITY OF PAROLE SHOULD BE AN AVAILABLE SENTENCING OPTION.**

---

[59] In *Atkins,* the Court reconsidered the ruling previously made in *Penry v. Lynaugh*, 492 U.S. 302 (1989)

[60] In *Simmons*, the Court reconsidered the ruling previously made in *Stanford v. Ky.*, 492 U.S. 361 (1989).

In *Atkins* and in *Simmons*, this Court dealt with instances wherein thirty states prohibited the execution of juveniles and mentally retarded offenders (twelve preventing the death penalty altogether and an additional eighteen preventing the death penalty for the class of individuals).[61] There is a far wider national consensus that life without parole should be an available sentencing option than there was in *Atkins* or *Simmons;* indeed, the number is akin to that suggested as constituting a national consensus by the dissent in *Simmons*.[62]

In addition to the twelve states that prohibit the death penalty,[63] thirty-seven of the thirty-eight death penalty states, as well as the civilian and military federal death penalty statutes, mandate provision of an option to sentence the defendant to life without parole.[64]   Moreover,

---

[61]  This Court noted:

> When *Atkins* was decided, 30 States prohibited the death penalty for the mentally retarded. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the mentally retarded from its reach. 536 U.S. at 313-315. By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach.

*Simmons* at 564.

[62]  In dissent, Justice Scalia noted that a national consensus was reached in instances such as "*Coker v. Ga.*, 433 U.S. 584, 595-596, 53 L. Ed. 2d 982, 97 S. Ct. 2861 (1977), a plurality concluded the Eighth Amendment prohibited capital punishment for rape of an adult woman where only one jurisdiction authorized such punishment." *Simmons*, 543 U.S. at 609 (Scalia J., dissenting).

[63]  Alaska; Hawaii; Iowa; Maine; Massachusetts; Michigan; Minnesota; North Dakota; Rhode Island; Vermont; West Virginia; Wisconsin.

[64] Twelve states require that a sentencing jury is instructed on all three options including life with parole, life without parole, and death: Ga. Code Ann. 17-10-30.1;  S.B. 422, 2004 Leg., Reg. Sess. (Kan. 2004) (amending Kan. Stat. Ann. 21-4622 to -4624, -4635, 22-3717); Ky. Rev. Stat. Ann. 532.030(4); Md. Code Ann., Crim. Law 2-201; Miss. Code Ann. 99-19-103; Mont. Code Ann. 46-18-202(2); Nev. Rev. Stat. 175.554(4); N.Y. Crim. Proc. Law 400-27; Okla. Stat. Ann. tit. 21, 701.9(A); Utah Code Ann. 76-3-206; Wash. Rev. Code 9A.32.040.  Twenty-five states

this has been a significant and consistent trend since the 1970's.   Each decade, eight or more states have adopted a life without parole option, and no state has gone in the other direction.

Social, legal, and religious organizations as well as academicians have endorsed the principal that juries must be offered the opportunity to incapacitate without executing.  Not only has the movement been overwhelming in the legislature; but social, religious and legal organizations have endorsed the principal that juries must be offered the option of life without the possibility of parole.   As Pope John Paul, II, said:

> … Unfortunately it happens that the need to render the aggressor incapable of causing harm sometimes involves taking his life.  In this case, the fatal outcome is attributable to the aggressor whose action brought it about …
>
> This is the context in which to place the problem of the *death penalty*. (Emphasis in original).  On this matter there is a growing tendency, both in the Church and in civil society, to demand that it be applied in a very limited way or even that it be abolished completely.  The problem must be viewed in the context of a system of penal justice ever more in line with human dignity and thus, in the end, with God's plan for man and society.  The primary purpose of the punishment which society inflicts is to "redress the disorder caused by the offense.  (Citation omitted)  Public authority must redress the violation of personal and social rights by imposing on the offender an adequate punishment for the crime, as a condition for the offender to regain the exercise of his or her freedom.  In this way authority also fulfils the purpose of defending public order and ensuring people's safety, while at the same time offering the offender an incentive and help to change his or her behaviour and be rehabilitated. (Citation omitted)
>
> It is clear that, for these purposes to be achieved, *the nature and extent of the punishment* (emphasis in original) must be carefully evaluated and decided upon,

---

offer only death and LWOP. See Ala. Code 13A-5-46(e); Ariz. Rev. Stat. Ann. 13-703(A); Ark. Code Ann. 5-4-601(b)(1); Cal. Penal Code 190.3; Colo. Rev. Stat. Ann. 18-1.3-1201; Conn. Gen. Stat. Ann. 53a-35b, -46a(f); Del. Code Ann. tit. 11, 4209(a); Fla. Stat. Ann. 775.082(1); Idaho Code 18-4004; 730 Ill. Comp. Stat. Ann. 5/5-8-1; Ind. Code Ann. 35-50-2-3(a); La. Code Crim. Proc. Ann. art. 905.6; Mo. Rev. Stat. 565.020.2; Neb. Rev. Stat. 28-105, -303, 29-2520 to -2524; N.H. Rev. Stat. Ann. 630:5(V); N.J. Stat. Ann. 2C:11-3(b); N.C. Gen. Stat. 15A-1371(a1); Ohio Rev. Code Ann. 2929.03(A); Or. Rev. Stat. 163.105; 61 Pa. Cons. Stat. 331.21; S.C. Code Ann. 16-3-20(A); S.D. Codified Laws 24-15-4; Tenn. Code Ann. 39-2-202(b); Va. Code Ann. 53.1-151(B1); Wyo. Stat. Ann. 6-2-101(b).

and ought not go to the extreme of executing the offender except in cases of absolute necessity: in other words, when it would not be possible otherwise to defend society.  Today however s the result of steady improvements in the organization of the penal system, such cases are very rare, if not practically non-existent.

In any event, the principle set forth in the new Catechism remains valid:  "if bloodless means are sufficient to defend human lives against an aggressor and to protect public order, public authority must limit itself to such means, because they better correspond to the concreted conditions of the common good and are more in conformity to the dignity of the human person. (citation omitted).

Pope John Paul II, The Gospel of Life [Evangelium Vitae] 98-100 (Random House 1995).

### G. TO EXECUTE MR. RIPKOWSKI WHERE HIS SENTENCING QUESTIONS HAVE SINCE BEEN ABOLISHED VIOLATES THE EIGHTH AND FOURTEENTH AMENDMENTS.

It violates the Eighth and Fourteenth Amendments to execute a man when the future dangerousness sentencing element by which he became eligible for the death penalty has since been de facto abolished.

The probable future violence special issue, which is usually less accurately[65] described as the "future dangerousness" special issue asks:  "Whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(b)(1) (Vernon 2008).  The state bears the burden of proving a likelihood of future violence constituting a threat to society beyond a reasonable

---

[65] Under this special issue, the state must prove more than that the defendant is a dangerous person, it must prove *beyond a reasonable doubt* that the defendant is *more likely than not* going to commit acts of future violence that would constitute a continuing threat to society.  This asks a very specific question about the likelihood of the defendant committing future acts of violence, and in answering it, the jury is to have specific regard to the circumstances in which the defendant finds himself or herself, i.e., in prison.  The concept of future danger describes a vague connotation of risk that is far below the bar the state must meet.  A campfire is dangerous unless properly managed but if managed is not likely to cause anyone any harm.

doubt. TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(b)(2)(c) (Vernon 2008).  Probability in this context means that the defendant will more likely than not commit violent criminal acts in the future so as to constitute a continuing threat to society. *Muniz v. State*, 851 S.W.2d 238, 250 (Tex. Crim. App. 1991).

The legislature acted on September 1, 1999 and amended the special issue to require that for the portion of a sentence that a prisoner is not eligible for parole, "the jury must decide the probability he will pose a threat to the prison population for at least that long, and then, the probability he will threaten the general public after that." *Smith v. State*, 898 S.W.2d 838, 864 (Tex. Crim. App. 1995) (Clinton, J. dissent) adopted by *Blue v. State*, 125 S.W.3d 491 n.5 (Tex. Crim. App. 2003).  The state may not argue the possibility of early release, as this is contrary to the terms of the statutorily mandated instruction on the meaning of life imprisonment.[66]

The system under which Mr. Ripkowski has been convicted has, in essence, been abolished just as the death penalty for rape has been abolished; therefore, this Court should order Mr. Ripkowski's sentence of death be commuted.

**6.   APPLICANT WAS DENIED HIS RIGHT TO RECEIVE A FAIR TRIAL BY THE PROSECUTOR'S MISCONDUCT BEFORE AND DURING HIS TRIAL, RESULTING IN A DUE PROCESS VIOLATION AND A VIOLATION OF HIS RIGHT TO A FAIR TRIAL UNDER THE FIFTH AND FOURTEENTH AMENDMENTS OF THE UNITED STATES CONSTITUTION.**

As the United States Supreme Court recognizes in *Berger v. U.S.*, 295 U.S. 78, 88 (1935), a prosecutor is:

---

[66] *Burton v. State*, No. 73,204, slip op. at 1 (Tex. Crim. App. Mar. 7, 2001) (not designated for publication) (improper for state to suggest that a prisoner may possibly be released earlier than forty years due to future legislative action and ineffective assistance of defense counsel to fail to object).

> [T]he representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a Criminal prosecution is not that it shall win a case, but that justice shall be done.  As such, he is in a peculiar and very definite sense the servant of the law.  The twofold aim of which is that guilt shall not escape or innocence suffer.  He may prosecute with earnestness and vigor -- indeed, he should do so.  But, while he may strike hard blows, he is not at liberty to strike foul ones.

In *U.S. v. Rocha*, 916 F.2d 219, 234 (5th Cir. 1990), the court noted, "The prosecutor's role in criminal prosecutions is subject to careful scrutiny.  As a representative of the Government, the prosecutor has a power of influence over the jury that he might not otherwise have.  For this reason, the obligation of fair play by the prosecutor is accentuated."

### A.      PROSECUTORIAL MISCONDUCT IN CLOSING ARGUMENT.

The prosecution's closing arguments were replete with name calling, misstatement of facts, misstatements of the law, outlandish accusations of further crimes, ridiculing of the defense, invocations to justice, and equating Mr. Ripkowski with evil incarnate, much of it without objection.  A non-exhaustive list of the improper closing comments follows:

> He's a terrorist (23) a killer (23), evil  (24) that he had threatened the child months before (27)  no conscience (27) he's the most dangerous violent person, (29) how many bodies does it take, he's the kind of nightmare that strikes at the core of every citizen (32) comparing value of life of victim and defendant (33) you decide who gets the death penalty defendant or next victim (33) there lies the grave of an unknown child (i.e. alleged unknown victims).

(S.F. Vol 21).

The barrage of prosecutorial misconduct against the defendant appears almost vindictive. Although the death of a child is always heart breaking, the manner of death in this case was not heinous and did not involve further crimes against the child or its body.  Perhaps sensing the lack of aggravating evidence to inspire a death sentence, the prosecutor repeatedly and continuously

made highly inflammatory statements, regardless of their truth or relevance, with the sole aim of igniting the jury's passions against Mr. Ripkowski.

Reversal due to these outrageous comments is required under both applicable state and federal law.    Proper jury argument is that which assists the jury in analyzing, evaluating, and applying the evidence. *U.S. v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978).  In habeas proceedings, improper jury argument by the prosecution presents a claim of constitutional magnitude when such argument "so infected the trial with unfairness as to make the resulting conviction [or sentence] a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)).  The Fifth Circuit's test for determining whether a trial error makes a trial fundamentally unfair is "whether there is a reasonable probability that the verdict might have been different had the trial been properly conducted." *Rogers v. Lynaugh*, 848 F.2d 606, 609 (5th Cir. 1988) (quoting *Kirkpatrick v. Blackburn*, 777 F.2d 272, 278-79 (5th Cir. 1985) (per curiam)).

To establish that a prosecutor's improper argument rendered the trial fundamentally unfair within the meaning of the Due Process Clause of the Fourteenth Amendment, the defendant must establish "either persistent and pronounced misconduct or that the evidence was so insubstantial that (in probability) but for the remarks no conviction would have occurred." *Fulford v. Maggio*, 692 F.2d 354, 359 (5th Cir. 1982), *rev'd on other grounds*, *Maggio v. Fulford*, 462 U.S. 111 (1983).  In other words, prosecutorial comments are not evaluated in isolation but are considered in the context of the entire proceedings. *See Guidroz v. Lynaugh*, 852 F.2d 832, 835 (5th Cir. 1988);   *Cobb v. Wainwright*, 609 F.2d 754, 755 n.1 (5th Cir. 1980), *cert. denied*, 447 U.S. 907 (1980); *Kirkpatrick*, 777 F.2d at 281.

Because the context of the remark is vital to assessing its effect on the fairness of the trial, it is important to consider whether the defense was able to counter the improper statements through rebuttal and whether defense counsel invited the improper remarks.  Courts have long held that prosecutorial remarks which make reference to facts that are neither in evidence nor inferable from the evidence are improper and can constitute reversible error. *See Handford v. U.S.*, 249 F.2d 295, 296-98 (5th Cir. 1958); *Morris*, 568 F.2d 396, 401 (5th Cir. 1978); *Dunn v. U.S.*, 307 F.2d 883, 885-86 (5th Cir. 1962); *U.S. v. Schwartz*, 325 F.2d 355, 358 (3d Cir. 1963). The court in *Berryhill v. State*, 501 S.W.2d 86 (Tex. Crim. App. 1973), succinctly stated why prosecutorial arguments outside of the record are so strongly condemned:

> Argument injecting matters not in the record is clearly improper; but argument inviting speculation is even more dangerous because it leaves to the imagination of each juror whatever extraneous 'fact' may be needed to support a conviction. Logical deductions from evidence do not permit within the rule logical deductions from non-evidence.

*Id*. at 87.

A noted commentator echoed these sentiments:

> Arguments outside the record can be one of the worst kinds of forensic misconduct.  It poses a serious threat to the fairness of a criminal trial because it injects into the jury's deliberations what is in effect unsworn, untested, and often entirely credible testimony of the prosecutor in evasion of evidentiary rules that have been elaborately designed to ensure reliability.

David Crump, *The Function and Limits of Prosecution Jury Argument*, 28 Sw. L.J. 505, 517-518 (1974) (describing the effects of particular trial arguments that circumvent the rules of evidence).

A prosecutor's repeated and conscious indifference to the basic principles of proper jury argument cannot be cured by a one-sentence instruction to disregard.  *See U.S. v. Friedman*, 909 F.2d 705, 709 (2d Cir. 1990) (prosecutor's repeated misconduct in rebuttal, including statement that defense counsel "will make any argument he can to get that guy off," held reversible error).

In some cases, prosecutorial comments are too clearly prejudicial for a curative instruction from the trial court to mitigate their effect. *Schwartz*, 325 F. 2d at 358 (citing *Robinson v. U.S.,* 32 F.2d 505, 508 (8th Cir. 1929)). The remarks in the instant case are of such character. *See Hall v. U.S.*, 419 F.2d 582, 585 (5th Cir. 1969) (reversing conviction for improper and prejudicial prosecutorial comments, which prosecutor "pursued and re-pursued after objection and admonition from the court"); *U.S. v. Achtenberg*, 459 F.2d 91, 98-99 (8th Cir.1972) (finding that the court's admonitions to the jury did not cure the prejudicial effect of the prosecutor's improper comments).

The court should, upon review of this panoply of state misconduct, grant a new sentencing hearing.

### B.        PROSECUTORIAL MISCONDUCT DURING TRIAL.

When a due process violation claim is based upon prosecutorial misconduct in the presentation of false and misleading testimony, to obtain relief under the United State's Supreme Court's interpretation of due process, the applicant need only show that the specific evidence complained of was important to the prosecution's case in chief. *DeChristoforo,* 416 U.S. at 647. Further, where there is a reasonable likelihood that the evidence could have affected the jury's verdict, relief must be granted. *Westley v. Johnson*, 83 F.3d 714, 726 (5th Cir. 1996), *cert denied*, 519 U.S. 1094 (1997).

The prosecutor improperly used information gained in plea negotiations to impeach Mr. Ripkowski's expert witness and deliberately misled the jury on questioning of Mr. Ripkowski's stepmother Ginger to leave the impression that Mr. Ripkowski had threatened the child previously. The prosecutor knew that what he was implying with Ginger Ripkowski was

absolutely false, and taken out of context, but despite that raised it in trial and argued it in closing.  Clearly the prosecutor had no regard for the truth.

This prosecutorial misconduct also took advantage of the unconstitutional phrasing of the Texas statute (*see infra* discussion on the vagueness of the special issue presented in this case), which asked the jury to answer a special issue on whether the accused is likely to be a future danger.  The future dangerousness question, when used the way the prosecutor used it, is unconstitutional since it turns what should clearly be only used as mitigating evidence into aggravating evidence.  So Mr. Ripkowski's years of mental illness and dealing with an equally unstable Monica Allen became nothing more than manipulative conduct for him to have his own way.

Although a prosecutor should be allowed to make fair inferences from the evidence, this prosecutor took what had happened in this case and implied that there may be bodies of other little children lying around as victims of Mr. Ripkowski, of which he had absolutely no support. The inference that there were other child victims of Mr. Ripkowski is completely implausible under the facts of the case and Mr. Ripkowski's life.  The prosecutor could not have believed such a statement and can only have made it to inflame the jury.

### C.    PROSECUTORIAL MISCONDUCT BEFORE TRIAL.

The prosecution failed to turn over any *Brady* material, on its intended witnesses, particularly the criminal records associated with its victim impact witnesses.  Such information would have allowed the defense to see that it had less to fear from the use of victim impact evidence than would ordinarily be the case and what they believed.  The prosecution gained a tactical advantage in this case which they exploited to the maximum, exchanging what was likely

to be a "flawed" presentation of victim impact evidence for the defendant's sole chance of a sentence less than death, or more specifically, for the jury to be able to answer the first special issue. The failure of the state to turn over this impeachment evidence on its victim impact evidence was a violation of its *Brady* obligations. *See Brady v. Md.*, 373 U.S. 83, 86-88 (1963).

These several acts of prosecutorial misconduct, if taken alone or in combination, deprived Mr. Ripkowski of his rights to a fair trial, a trial where his attorney client privilege was protected, where the facts of his case were not intentionally misstated, distorted, and fabricated, and where the prosecution respected not only its obligation to seek conviction but also honored its obligation to seek justice. *Fulford*, 692 F.2d at 359; *Guidroz*, 852 F.2d at 835; *Cobb*, 609 F.2d at 755 n.1; *Kirkpatrick*, 777 F.2d at 281; *see Handford,* 249 F.2d at 296-98; *Morris*, 568 F.2d at 401-02; *Dunn*, 307 F.2d at 885-86.

## 7.   THE STATE FAILED TO DISCLOSE FAVORABLE EVIDENCE TO THE DEFENSE IN VIOLATION OF THE PRINCIPLES IN *BRADY* AND THE SIXTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Although Mr. Ripkowski's attorneys requested that the State produce all evidence favorable to the defense, the state failed to disclose substantial exculpatory evidence. The state failed to disclose the information that its victim impact evidence witnesses had criminal records and that they had engaged in criminal acts against Mr. Ripkowski and his family. This evidence was clearly admissible as impeachment evidence and/or bias evidence against those witnesses.

The state violates the Due Process Clause of the United States Constitution where it fails to disclose evidence that is favorable to the defendant and the evidence is material to the defense, materiality being seen in the state's failure to disclose creating a probability sufficient to undermine the confidence in the outcome of the trial. *See Banks v. Dretke*, 540 U.S. 668, 691,

698-99 (204); *see generally, Brady*, 373 U.S. at 86-88.  To establish a *Brady* claim, a defendant must satisfy the following three part test: (1) that the state failed to disclose evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material.  *U.S. v. Bagley*, 473 U.S. 667, 682 (1985).  Mr. Ripkowski has presented sufficient evidence to establish that he has met all three parts of this test.

The record reflects that the state withheld the exculpatory evidence and it was favorable to the defense.  The evidence was likewise material.  The evidence withheld is evidence that shows bias of the witnesses against Mr. Ripkowski and his family that could have been used to impeach their testimony.  Any determination that this evidence was not improperly withheld is contrary to the clearly established Federal law set out in *Brady* and its progeny.

## 8.   THE COURT'S MANY ERRORS VIOLATED MR. RIPKOWSKI'S CONTSTITUTIONAL RIGHTS.

### A.   THE TRIAL COURT ERRED IN JURY INSTRUCTIONS.

The court failed to give several requested instructions by the defense.  In regards to the death of Monica Allen, which occurred as the result of a vicious verbal altercation between two lovers, the decedent and the defendant, the court refused to give a sudden passion charge.  There was substantial evidence that the altercation and death of Ms. Allen was the result of sudden passion, and the Court's refusal to give the instruction prejudiced Mr. Ripkowski and made it more likely that the judge would answer the only special issue they had before them against Mr. Ripkowski.  As a result, a new sentencing hearing should be granted.

### B.   THE TRIAL COURT ERRED IN WAIVER ADMONISHMENT.

The trial court erred in several different ways in regards to the waiver of Mr. Ripkowski's first punishment issue.  As an initial matter, the court should not have allowed the waiver of a

mandatory special issue, see below.  But the first error in regards to the waiver was in not insuring that Mr. Ripkowski was competent to waive the issue.  The court was on notice that Mr. Ripkowski was bi-polar and actively suicidal; therefore, it should have insured that he was competent to make the waiver. At the very least, the court should have made sure that he was not attempting to commit suicide in agreeing to the waiver while under the influence of his mental disorder.

Moreover, the actual admonishment was insufficient. The area of law dealing with special issues is particularly complex, and in Texas, with its special issues and the way evidence is allowed to carry a double edged meaning, this is particularly true.  The court did not insure that Mr. Ripkowski knew, in waiving the second special issue, that all of his previously submitted mitigation evidence from the guilt stage of trial would be given aggravating weight only.  As this was the only result possible after the waiver of the first special issue, the judge should have insured that Mr. Ripkowski was aware of this.  Furthermore, the court should have informed Mr. Ripkowski, as with waiver of the guilt issue in a plea hearing, that barring exceptional circumstances he would not be able to appeal on the issues waived, that is conceded to the prosecution.

### C.   THE TRIAL COURT ERRED IN ALLOWING CROSS EXAMINATION WITH PLEA NEGOTIATION MATERIAL.

The trial court, over multiple objections by the defense, allowed the cross examination of and impeachment of witnesses with information that had been supplied to the state in plea negotiations. The material exchanged in regards to attempted settlement of a case are not useable in the trial for any purpose and especially not with witnesses who were not the author of those

statements.  This destroyed crucial evidence for Mr. Ripkowski and resulted in his trial being unfair due to violation of his constitutional trial rights.  This Court should order a new trial.

### D.     THE TRIAL COURT ERRED IN ALLOWING THE CASE TO PROCEED WITHOUT AN AVENUE FOR USE OF MITIGATION.

After *Penry v. Johnson*, 532 U.S. 782, 800-04 (2001) (*Penry II*), the court recognized its mandatory obligation to allow any mitigation evidence produced at trial to be given a reasoned moral response by the jury.  The court sought to do that with one special issue, only ordering the jury to take all mitigation evidence into account.  However, the court should have also seen on its own that such an order was impossible from its utterance, not only because of the double edged problem of the statute and the one particular issue submitted to the jury, but also because that issue does not allow consideration of mitigation evidence in its answer.

In the same regard, the trial court erred in denying Mr. Ripkowski's pretrial motions and forcing his counsel to the Hobson's choice of choosing between the admission of victim impact evidence and retaining the mitigation issue.   Moreover, the court should not have allowed the waiver of the mitigation issue under any circumstances.

### E.     TRIAL COURT ERRED IN ADMISSION OF EXTRANEOUS OFFENSES.

The trial court allowed into evidence several purported extraneous offenses of Mr. Ripkowski that it should not have allowed.  The trial court denied his pre-trial motions for such evidence to be proved beyond a reasonable doubt and allowed in all such evidence without any finding as to its reliability.   Mr. Ripkowski was prejudiced by the admission of this improper evidence and as such deserves a new sentencing hearing.

The trial court also failed to grant a new trial on its own accord based on impermissible jury argument by the prosecution that Mr. Ripkowski may have killed other children that had yet

to be discovered and failed to take any corrective steps with the prosecution's argument to the jury that they could ignore the law on parole, which would require Mr. Ripkowski to be imprisoned for at least forty years prior to consideration of parole. These errors could only have been corrected by a sua sponte grant of a new trial. The court failed to do so, and Mr. Ripkowski should be given a new sentencing hearing.

9.   **TEXAS'S CAPITAL SENTENCING SCHEME DEPRIVED MR. RIPKOWSKI OF HIS SIXTH, EIGHTH, AND FOURTEENTH AMENDMENT RIGHTS BY PERMITTING A JURY TO FIND FACTS BY A STANDARD OF LESS THAN BEYOND A REASONABLE DOUBT.**

During the punishment phase of Mr. Ripkowski's trial, there was no burden of proof placed on either the State of Texas or on Mr. Ripkowski. Accordingly, the punishment phase at Mr. Ripkowski's trial occurred in violation of *Ring v. Ariz.*, 536 U.S. 584 (2002), and, therefore, he is entitled to relief. Interestingly the amendment to the most recent amendment to Texas's sentencing statute is a tacit admission of the former statute's error in this area.

A.   ***Ring V. Arizona* Makes Clear That Fact-Findings Required To Justify Imposition Of The Death Penalty Must Be Made: (1) By A Jury And 2) Subject To The Beyond A Reasonable Doubt Standard.**

In *Apprendi v. N.J.*, 530 U.S. 466 (2000), the Supreme Court considered a New Jersey statute which permitted a judge to add a "hate crime" enhancement to the ordinary sentence for a defendant's crime upon finding, by a preponderance of the evidence, that the crime was motivated by racial animus. *Id*. at 469-470. The Court held New Jersey's "hate crime enhancement" unconstitutional, because it permitted a judge, acting alone and using only a preponderance standard, to enhance the possible punishment for a crime outside the normal statutory range. The "hate crime enhancement," the high Court found, was not merely a

sentencing factor but an "element of the crime." *Id*. at 477. The Court drew on its earlier statement, in *U.S. v. Jones,* 526 U.S. 227, 243 n.6 (1999), that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." The Court dismissed New Jersey's argument that the hate-crime finding was merely a "sentencing factor" as semantics: "Merely using the label 'sentence enhancement' to describe the [finding] surely does not provide a principled basis" for treating it differently than the substantive elements of the crime. *Id*. at 476.

In *Ring*, the Supreme Court applied *Apprendi* to the capital sentencing context. The court drew a simple rule from *Apprendi*: "If a State makes an increase in a defendant's authorized punishment contingent on a finding of fact, that fact–no matter how the State labels it–must be found by a jury beyond a reasonable doubt." *Ring*, 536 U.S. at 602 (citing *Apprendi*, 530 U.S. at 482-83). This Court accordingly struck down the Arizona statute, which permitted a judge alone to make fact findings essential to the imposition of the death penalty. *Ring*, 536 U.S. at 609. *Apprendi* and *Ring* teach that courts must look not to the "form" but the "effect" of statutory aggravating factors. The *Ring* Court stressed that there was simply no difference between a substantive element of the offense and a "sentencing factor," so long as that sentencing factor served to elevate the maximum permissible punishment. *Id*. at 604-05 (quoting four sections of *Apprendi* opinion to this effect, including a concurring opinion by Justice Thomas). Therefore, a "sentencing factor" which makes the defendant eligible for a more severe punishment than "the maximum authorized by a guilty verdict standing alone" is simply "the functional equivalent of

an element of a greater offense" and, therefore, must be proven in accordance with the procedures developed for ensuring a fair and impartial decision as to the defendant's guilt. *Id*. at 605 (quoting *Apprendi*, 530 U.S. at 494 n.19).

Under *Ring* and *Apprendi*, both of the factual findings set out in TEX. CODE CRIM. PROC. ANN. art. 37.071(2) (Vernon 2008) are not mere sentencing factors.  When a defendant is convicted of capital murder in Texas, the maximum punishment authorized by law is life imprisonment.  The State may announce, before trial, whether it intends to pursue the death penalty.  If it does not, the defendant, upon conviction, simply receives a life sentence identical to what he would have received had the State sought the death penalty unsuccessfully. TEX. CODE CRIM. PROC. ANN. art. 37.071(1) (Vernon 2008). If the State seeks death, it must prove future dangerousness, and must also prove that the defendant's mitigation facts are insufficient to justify a life sentence.  TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(b)(1), (e)(1) (Vernon 2008).

The *Ring* Court noted in passing that Ring raised "no Sixth Amendment claim with respect to mitigating circumstances."  *Id*. at 597 n.4. However, the *Ring* Court cited the following passage in *Apprendi*, which describes a situation in which a mitigation finding could permissibly be made by a judge alone:

> If facts found by a jury support a guilty verdict of murder, the judge is authorized by that jury verdict to sentence the defendant to the maximum sentence provided by the murder statute.  If the defendant can escape the maximum by showing, for example, that he is a war veteran, then a judge that finds the fact of veteran status is neither exposing the defendant to a deprivation of liberty greater than that authorized by the verdict according to statute, nor is the judge imposing upon the defendant a greater stigma than that accompanying the jury verdict alone.

*Ring*, 536 U.S. at 597 n.4 (citing *Apprendi*, 530 U.S. at 490 n.16).  In this example, the jury, as demanded by the Constitution, made all fact-findings necessary to determine the upper limit of

the potential sentence for the defendant.  If the judge afterward decided to reduce the sentence because of mitigation, there is no constitutional barrier to his doing so.  It is permissible for a judge to "ratchet down" the defendant's punishment after the jury has properly made the fact-findings necessary to determine its upper limit; however, it is not permissible for a judge to "ratchet up" the punishment beyond that authorized by the jury's fact-finding.

Thus, a state may require a jury to make a finding of future dangerousness–*immediately* rendering the defendant eligible for the death penalty–then permit a judge to decide whether mitigating evidence was sufficient to "ratchet down" the punishment.

However, Texas did not pursue this course: Under the Texas scheme, the jury must answer the mitigating special issue *to determine the upper range of the punishment* the defendant will receive. Although its subject matter is "mitigation," what is important, as the Supreme Court emphasized, is the "effect" of the fact-finding, not its form.  Functionally, the mitigation special issue operates precisely like an element of the crime—that is to say, it determines what sentence the defendant will receive.  It must be determined by a process that meets relevant Constitutional standards, and *Ring* holds that this includes a jury that is convinced beyond a reasonable doubt.

**B.    Mr. Ripkowski's Fourteenth Amendment Rights Were Violated When The Jury Was Permitted To Find That The Mitigating Evidence Was Insufficient To Warrant A Life Sentence By A Standard Of Less Than "Beyond A Reasonable Doubt".**

The Due Process Clause of the United States Constitution and the corresponding clause of the Texas Constitution require that a jury find, beyond a reasonable doubt, the defendant's guilt of all elements of a criminal offense.  *In re Winship*, 397 U.S. 358, 364 (1970).  Fact-findings that increase a defendant's authorized punishment are in all constitutional respects identical to elements of a crime, and, therefore, such fact-findings must be found by a jury

beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476-77. Because the finding of "insufficient mitigation" required by art. 37.071 determines the upper range of authorized punishment for a Texas capital murder defendant (i.e., whether he will live or die), it must be made by a jury that is instructed under the beyond a reasonable doubt standard.

### C. The Constitutional Requirement Of Heightened Reliability In Capital Sentencing Was Diminished When The Jury Was Permitted To Find That The Mitigating Evidence Was Insufficient To Warrant A Life Sentence By A Standard Of Less Than "Beyond A Reasonable Doubt".

The Eighth Amendment of the United States Constitution, which requires "heightened reliability" in capital sentencing, independently requires this exacting standard. *See, e.g.*, *Lockett v. Ohio*, 438 U.S. 586, 604, (1978) (opinion of Burger, C.J.) (stating that the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed"); *see also Strickland v. Washington*, 466 U.S. 668, 704 (1984) (Brennan, J., concurring in part and dissenting in part) ("[W]e have consistently required that capital proceedings be policed at all stages by an especially vigilant concern for procedural fairness and for the accuracy of fact finding").

Several judges of the Supreme Court have declared that the Eighth Amendment requires jury sentencing in all capital cases. *See, e.g.*, *Ring*, 536 U.S. at 614 (Breyer, J., concurring) ("[J]ury sentencing in capital cases is mandated by the Eighth Amendment."); *Harris v. Ala.*, 513 U.S. 504, 515-526 (1995) (Stevens, J., dissenting) (holding that Eighth Amendment requires jury sentencing in capital cases). Because the Texas capital sentencing scheme permits a jury to make a fact-finding essential to the imposition of the death sentence by a standard of less than a reasonable doubt, it violates the Eighth and Fourteenth Amendments of the United States Constitution; therefore, Mr. Ripkowski's death sentence must be reversed.

## 10.    MR. RIPKOWSKI IS INCOMPETENT TO BE EXECUTED.

Mr. Ripkowski has recently been examined by a psychiatrist, and he is currently incompetent to be executed.  Counsel recognizes that the issue is not timely at present but alerts the court that this is likely to be a continuing concern as the case continues.  During the term of his contact with Mr. Ripkowski, Mr. Ripkowski appears to be deteriorating mentally.

## 11.    MR. RIPKOWSKI WAS NEITHER COMPETENT AT THE GUILT NOR PUNISHMENT PHASE OF HIS TRIAL; HE IS NOT COMPETENT NOW.

Based on his mental illness and the affidavits of his mother and Pam Tsalkalos, it is clear that Mr. Ripkowski was only present in person at his trial.  The trial and conviction of a defendant while mentally incompetent constitutes a denial of due process under the 5th, 6th, 8th, and 14th Amendments.  *Cooper v. Okla.*, 571 U.S. 348, 364 (1996).  Mr. Ripkowski did not meet the minimum constitutional standards of competency as set out in *Dusky*, 362 U.S. at 402 and *Drope*, 420 U.S. at 171-72.  These standards apply to both before, during, and after trial. *Moran*, 509 U.S. at 398, 402.  Mr. Ripkowski is incompetent now, and is incapable of either understanding the process he is going through now, or assisting counsel in the prosecution of his case.  This is particularly prejudicial to his rights in federal habeas as he is the sole reservoir and conduit of much of the available mitigation and other evidence relevant to prosecution of his case.

12.   **MR. RIPKOWSKI'S TRIAL COUNSEL WAS INEFFECTIVE IN NUMEROUS INSTANCES THROUGHOUT THE TRIAL IN VIOLATION OF HIS FIFTH, SIXTH, AND FOURTEENTH AMENDMENTS.**

A.     **THE GENERAL STANDARD.**

Mr. Ripkowski's right to effective assistance of counsel at his trial, *Powell v. Ala.*, 287 U.S. 45 (1932), was adumbrated by his counsel's myriad failures to protect his basic rights.  In order to show ineffective assistance of counsel, a defendant must show that counsel was deficient and that the deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 692.  The *Strickland* standard requires a showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694; *Loyd v. Whitley*, 977 F.2d 149, 159 (5th Cir. 1992), *cert. denied*, 508 U.S. 911 (1993).

The right to assistance of counsel applies to the sentencing phase of a capital trial. *Strickland*, 466 U.S. at 686.  During the punishment phase of a death penalty case, defense counsel bears the responsibility of thoroughly investigating the defendant's background and the State's case.  *See Id.* at 690-91. A jury cannot "perform its function" of weighing the "aggravating and mitigating factors" relevant to the defendant's fate if defense counsel fails in this task. *Loyd*, 977 F.2d at 160.  The Supreme Court reaffirmed that "capital proceedings [must] be policed *at all stages* by an especially vigilant concern for procedural fairness and for the accuracy of factfinding." *Monge v. Cal.*, 524 U.S. 721 (1998) (quoting *Strickland*, 466 U.S. at 704 (Brennan, J., concurring in part and dissenting in part)) (emphasis added).

Death sentencing decisions involve an unpredictable mix of factors; as a result, "the law's sensitivity to failures in the [death] penalty phase is a given." *Hendricks v. Calderon*, 70 F.3d

1032, 1044 (9th Cir. 1995), *cert. denied*, 517 U.S. 1111 (1996).  Texas law requires jurors to agree unanimously to both punishment phase questions in order to hand down a death sentence, and the failure of a jury to reach a unanimous agreement results in the automatic imposition of a life sentence.  *See* TEX. CODE CRIM. PROC. ANN. art. 37.071(2)(g) (Vernon 2008). Therefore, in Mr. Ripkowski's case, the proper prejudice analysis is whether one juror would have chosen to vote "no" to either punishment phase special issue had constitutional error not occurred.  *See, e.g. Motley v. Collins*, 18 F.3d 1223, 1227 n.3 (5th Cir. 1994), *cert. denied*, 513 U.S. 960 (1994) (citing *Landry v. Lynaugh*, 844 F.2d 1117, 1120 (5th Cir. 1988), *cert. denied*, 488 U.S. 900 (1988)).  The harm standard does not require Mr. Ripkowski to demonstrate that the outcome of the sentencing phase of the trial would have been different in the absence of constitutional error; it requires only a showing that the error "undermined confidence in the outcome" of the trial. *Strickland*, 466 U.S. at 693, 694-696 (rejecting this formulation in favor of one that focuses on whether counsel's performance "undermined confidence" in verdict).

  Trial counsel was deficient in all of the following:

    A. Pre-Trial Representation:

     1. By failing to thoroughly investigate Britt Ripkowski's life story;

     2. By failing to investigate the state's victim impact evidence;

     3. By failing to investigate Monica Allen;

     4. By failing to put together a coherent death penalty strategy for both guilt and punishment;

     5. By voir-diring the jury in a manner that left them expecting to be given mitigating evidence about the life of Mr.Ripkowski;

6. By failing to defend this case as an insanity case;

7. By failing to move to quash the charges against Mr. Ripkowski—based on a constitutionally impermissible grand jury;

8. By failing to move to insure that the jury pool was reflective of a fair cross section of the community; and

9. By failing in voir-dire to insure that Mr. Ripkowski had a fair jury, i.e., not striking a juror; not using all of their peremptory strikes and requesting additional peremptory strikes.

B. Trial representation:

1. By not objecting to improper prosecutorial cross examination questions;

2. By not redirecting witnesses to clarify testimony that falsely harmed defendant;

3. By putting on double edged evidence at the guilt phase that could only be given aggravating impact in punishment, without a mitigating special issue;

4. By waiving the first special issue;

5. By not presenting readily available mitigation evidence in the punishment phase;

6. By not requesting a mistrial in closing argument;

7. By not insuring that their client was still not enamored with committing suicide at the time that he was asked to waive his rights to mitigation; and

8. By not objecting to improper closing arguments by the prosecution.

**B.     TRIAL COUNSEL WAS INNEFFECTIVE PRE-TRIAL.**

**Grand Jury.**

Under Texas law, a challenge to the grand jury array must be made when the grand jury is impaneled or, when that is not possible, *before trial commences.  Muniz v. State*, 573 S.W.2d 792, 796 (Tex. Crim. App. 1978).  Trial counsel for Mr. Ripkowski failed to challenge the process whereby Harris County grand juries under-representative of Hispanics and African Americans and, thus, failed to preserve a meritorious claim.

The Texas defense bar has recognized the ability to challenge the grand jury process years prior to Mr. Ripkowski's trial.  *See, e.g., Castaneda v. Partida*, 430 U.S. 482, 492, 500-01 (1977) (successful challenge to grand jury system); *State v. Rousseau*, 855 S.W.2d 666, 688 (1993) (unsuccessful 1989 Collin County challenge based on juror forepersons); *Cerda v. State*, 644 S.W.2d 875, 876-77, 879 (Tex. App. 1982) (successful challenge to Hale County grand jury system); *Flores v. State*, 783 S.W.2d 793, 796 (Tex. App. 1990) (successful 1988 challenge to Ector County grand jury system).

Existing Texas case law and trial counsel's own experiences with the Harris County grand jury system should have indicated that an investigation into the Harris County grand jury system would prove fruitful.  Based upon a review of trial counsel's files, however, it is clear that such a challenge was never investigated nor pursued.  Trial counsel's failure to challenge the discriminatory practices of the Harris County grand jury system deprived Mr. Ripkowski of effective assistance of counsel.  *See Goodwin v. Balkcom*, 684 F.2d 794, 817, 820 (11th Cir. 1982) (ineffective assistance for failing to raise grand jury claim); *Hollis v. Davis*, 912 F.2d

1343, 1350 (11th Cir. 1990) (ineffective assistance in failing to challenge grand jury composition).

Had trial counsel undertaken a minimal investigation, they would have discovered that, despite the growing population of Hispanics in Harris County, their representation as grand jury panelists was appallingly low, as was also the case with African Americans.  A timely challenge to the Harris County grand jury system would have succeeded and Mr. Ripkowski's indictment would have been dismissed.[67]

### Improper Pre-Trial Investigation (Guilt And Mitigation).

Unlike non-capital sentencing, which may involve "informal proceedings and standardless discretion in the sentencer, "capital sentencing in Texas is done by a jury which is guided by the statutory special issues set forth in Texas Code of Criminal Procedure Article 37.071.   Furthermore, capital sentencing is in a category apart from all other sentencing proceedings due to the qualitative difference in the penalty to be imposed.   Thus in a capital case and, more particularly, in one reduced simply to a punishment phase, "the duty to investigate all possible lines of defense is strictly observed."  *Osborn v. Shiilinger*, 861 F.2d 612, 627 (10th Cir. 1988) (quoting *Coleman v. Brown,* 802 F.2d 1227, 1233 (10th Cir. 1986), *cert. denied*, 482 U.S. 909 (1987).

The standards set out by the A.B.A. Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases are instructive:

> The investigation for preparation of the sentencing phase should be conducted regardless of any initial assertion by the client that mitigation is not to be offered. This investigation should comprise efforts to discover all reasonably available

---

[67] A claim of racial discrimination in the grand jury process, moreover, is not subject to harmless error analysis.  *See Rose v. Mitchell*, 443 U.S. 545, 558-59 (1979).

mitigating evidence and evidence to rebut any aggravating evidence that may be
introduced by the prosecutor.

1 ABA STANDARDS FOR CRIMINAL JUSTICE §§ 4-4.1, commentary p. 4-55 (2nd ed. 1980).

The Sixth Amendment inquiry into counsel's performance is "whether counsel's
assistance was reasonable given all of the circumstances." *Strickland*, 466 U.S. at 688.  This
inquiry "must be highly deferential" to counsel's trial-based judgments, for "it is all too tempting
for a defendant to second guess counsel's assistance after conviction or adverse sentence…." *Id*.
at 689.  Accordingly the United States Supreme Court has stated the following:

> A fair assessment of attorney performance requires that every effort be made to
> eliminate the distorting effects of hindsight, to reconstruct the circumstances of
> challenged conduct, and to evaluate the conduct from counsel's perspective at the
> time.  Because of the difficulties inherent in making the evaluation, a court must
> indulge a strong presumption that counsel's conduct fails within the wide range of
> reasonable professional assistance; that is, the defendant must overcome the
> presumption that, under the circumstances, the challenged action "might be
> considered sound strategy."

*Strickland*, 466 U.S. at 689 (quoting *Michel v. La.*, 350 U.S. 91, 101 (1955).  And as the Fifth
Circuit has recognized, "[t]actical decisions must be made in the context of a reasonable amount
of investigation, not in a vacuum." *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990).
Under all the circumstances, there is no reason why defense counsel should have foregone
presenting a mitigation case in punishment.  Since they did not interview various childhood
witnesses, i.e., neighbors or others who knew Mr. Ripkowski as a child, defense counsel was not
in a proper position to decide to omit his mitigation instruction in exchange for the prosecution
not putting on victim impact evidence.  Moreover, without being aware of much of this
information about Mr. Ripkowski first hand, they were unable to intelligently decide whether to
put on such mitigation testimony.

Furthermore, in failing to investigate the backgrounds of the purported victim impact witnesses, the defense counsel was in no position to gauge appropriately whether such witnesses' testimony would have been viewed as credible by a jury.  Furthermore, there was substantial impeachment bias evidence relating to the witnesses that defense counsel could have used to impeach such witnesses had they testified.  Since they did not discover this information, they again could not make a knowing tactical decision to forego presenting the most important part of Mr. Ripkowski's case.

Defense counsel was also ineffective pre-trial in that they voir-dired the jury extensively about mitigation and left them with the implication that they, the jury, would be presented with mitigation evidence and then be given a chance to use such mitigating evidence to undercut a death sentence.  However, when the defense counsel decided to forego the mitigation issue, they precluded any possibility of the jury using the mitigating evidence they presented at trial in a way that would be helpful to Mr. Ripkowski.  Moreover, because of the double edged nature of evidence submitted in Texas cases due to the wording of the special issues, the previously front loaded mitigation evidence could only be given aggravating effect by the jury.  In other words, the pretrial preparation was so diametrically opposed to the final presentation of the case, that it ended up being some of the strongest evidence against Mr. Ripkowski, i.e., his mental illness and drug use being seen as strong indicators of his likelihood to be a future danger.  This problem was exacerbated by the voir-dire of both the prosecutor and the defense where they both instructed the jury that they would only reach the second mitigation question after finding Mr. Ripkowski eligible for death under the first special issue.

## C.    DURING TRIAL.

Trial counsel was ineffective at trial by way of the following:

1. By not redirecting witnesses to clarify testimony that falsely appeared harm to the defendant;

2. By putting on double edged evidence at the guilt phase, that could only be given aggravating impact in punishment, without a mitigating special issue;

3. By waiving the first special issue;

4. By not presenting readily available mitigation evidence in the punishment phase;

5. By not requesting a mistrial in closing argument;

6. By not insuring that their client was still not enamored of committing suicide at the time that he was asked to waive his rights to mitigation;

7. By misunderstanding the *Mosley* case;

8. By not appreciating the difference between the admission of mitigating evidence at guilt and punishment;

9. By not understanding the requirements of *Penry*;

10. By not advising client fully about the effect of waiving his mitigation issue on the evidence he had already presented in the guilt stage; and

11. By not objecting to improper closing arguments by the prosecution.

The prosecutor was able to twist the testimony of two witnesses to such a point that they bore extremely negative consequences. One was Ginger Ripkowski, whose testimony was made to seem as though Mr. Ripkowski had previously threatened the decedent, and the other was Dr.

Quijano, who was made to state generalizations in a way that was directly out of proportion to what he intended. Both witnesses could easily have been rehabilitated on cross or redirect; however, trial counsel failed to do so, leaving the jury with apparently extremely negative evidence about Mr. Ripkowski, which if clarified would have been positive evidence for him. Indeed, Dr. Quijano was so distressed by the impact of the misleading testimony that he wrote defense counsel after the trial to complain of their not rehabilitating his testimony.

As outlined above and below, defense counsel improperly entered into an agreement to waive the jury having the first issue to use in Mr. Ripkowski's case in exchange for the prosecution not putting on victim impact testimony. But defense counsel then went further and failed to present readily available mitigation evidence via his family members and friends present at court, who could have presented the jury with a real picture of Britt Ripkowski's life, mental illness, child abuse, and resultant drug abuse altogether. Several of these witnesses could also have served as rebuttal witnesses to any victim impact evidence. This meant that the jury had almost no mitigation evidence directly related to Mr. Ripkowski in front of them during the punishment phase of the trial. This severely prejudiced Mr. Ripkowski.

Defense counsel was on notice that Mr. Ripkowski had been depressed and suicidal throughout the pre-trial period. They also knew that he was bi-polar and subject to extreme mood swings as a result. They also knew that one of the symptoms of the depression that comes with bi-polar disorder is the desire to commit suicide, a desire that was exacerbated in Mr. Ripkowski because of the remorse, pain, and shame he was feeling due to what had happened. As a result they, like the trial judge, had an obligation to have him examined or to have made sure that he was not acting under the motivation to commit suicide when they called on him to

waive his chance of mitigation.  As a result the waiver, induced by his bi-polar desire to commit suicide, is nothing more than another example of how his diseased mind has destroyed his life.  It was not and cannot be seen as knowing and voluntary.

Furthermore, the advice given by defense counsel did not show Mr. Ripkowski that the Texas statute created a double edged problem to the admission of mitigation evidence and, as such, that the front loaded evidence of mental illness and drug use they used in the guilt stage would actually only be given aggravating weight by his jury if left by the one special issue.  We know that counsel did not do this because they never show in any of their affidavits that they recognize this as a result or consequence of waiving the second special issue.

For all of the reasons above, trial counsel should not have waived the second special issue; in fact, they should have been requesting that the court provide an additional instruction that specifically allowed for the jury's use of mitigation to avoid the death penalty.  It is hard to imagine a more devastating decision by trial counsel in a capital sentencing phase than agreeing to waive the mitigation issue, particularly in a case like Mr. Ripkowski's where the aggravating evidence against him is far from overwhelming, and the client has volumes of mitigating evidence stemming from documented child abuse to severe mental illness.

The prosecution's closing argument was replete with highly inflammatory and prejudicial comments. The prosecutor's comments included name calling, misstatement of facts, misstatements of the law, outlandish accusations of further crimes, ridiculing of the defense, and comments on the defense.  (A more precise list is set out above).

This barrage of prosecutorial misconduct was enacted at the most damaging portion of the trial, a stage where the defense could not respond: right before deliberations.   Defense

counsel did not object to much of the objectionable material and never moved for a mistrial for any of these improper comments.  Simply put, defense counsel abdicated its position as the guardian of Mr. Ripkowski's fair trial rights in allowing all of this conduct to go unchecked. There can be no legitimate reason for defense counsel failing to object.  Since defense counsel knew that it was not going to get another chance to speak to the jury, it was incumbent upon defense counsel to take one of the two legitimate responses to this conduct that it had.  Either counsel should have objected immediately, or failing that, if it thought that the prosecutor's argument was egregious, it should have moved for a mistrial.  Instead of taking one of these two courses to try to clear up the misstatements of law and fact and inflammatory comments of the prosecutor, defense counsel just sat mute.

According to the record and Mr. Ripkowski, counsel Pat McCann was frequently absent from the proceedings. Since McCann had an active role in the trial, his absences are the equivalent of the sleeping lawyer from the *Burdine* case, where the U.S. Supreme Court held that a sleeping lawyer is not effective.  Mr. Burdine's counsel, Mr. Cannon, fell asleep during the murder trial effectively removing himself from the proceedings.  Like Mr. Ripkowski, Burdine had other counsel.

Moreover, defense counsel was also deficient in its reading of *Mosley*.  It is clear that counsel did not understand the implications of that case at the time that it waived the most important issue in Mr. Ripkowski's case.  Once Mr. Ripkowski's statements came in, guilt was a foregone conclusion. Given the nature of the crime and the fact that he had also killed the child's mother in the same transaction, there was little doubt that in order to avoid death, Mr. Ripkowski would have to rely on the presentation of compelling mitigating evidence and the jury being able

to act on that evidence.  He had such evidence from his traumatic brain damaged life.  But the defense decided to forego that evidence at punishment and, moreover, to forego giving the jury the opportunity to give such evidence any mitigating value.  As a result, they left Mr. Ripkowski in an unwinnable situation.  This can not have been a favorable trade no matter the benefit offered by the prosecution, short of an agreement not to press for death.  They were giving up his only hope of survival for information that they knew very little about and given by witnesses that they had not properly investigated; this cannot pass constitutional muster.

Trial counsel now readily admits that it would not exchange mitigation for victim impact evidence, nor can it under the law, but, as stated by several national and local capital experts, such a tactic shows a naïve understanding of the nature of the reasons for the punishment phase and the double edged nature of any evidence under the Texas statute.  Simply put, whatever the cause of trial counsel's decision to waive the first special issue, it shows on its face that they did not fully understand their and the jury's responsibilities and obligations under the Texas capital scheme.

### D.    MR. RIPKOWSKI WAS PREJUDICED BY HIS COUNSEL'S DEFICIENT PERFORMANCE.

Each one of the omissions or errors pointed out above are critically damaging to Mr. Ripkowski's trial rights in that they singly undermine any confidence in the verdict.  Some of the issues raised above are so prejudicial that they are almost outcome determinative.  For example, when your own expert implies that you are going to be a future danger, that can, in and of itself, swing the outcome of the trial completely in the opposite direction.  Particularly, if this is not even the type of expert that the evidence and facts of the case show is needed.  Failure to properly investigate facts and issues, even mental health ones, is also oftentimes an outcome

determinative event.  Failure to object to the vitriolic and inflammatory closing remarks of the prosecutors, at a time when defense counsel can do nothing else to ameliorate the prejudice, can also be outcome determinative.  Failure to raise the right pre-trial objections can also mean that a case that could have been dismissed or have gotten a life-plea ends up being lost.  And finally, what can be more devastating than implicitly telling the jury that you, the defendant's guardian, his protector, his advocate, that you yourself see nothing mitigating in him or his conduct and that not even God will be able to forgive him on judgment day; what can be more prejudicial than that?  Even a sleeping lawyer, would be better than one who affirmatively destroys any hope of mitigation.

Under any scenario, Mr. Ripkowski's counsel was deficient, and many of those deficiencies were in and of themselves so harmful as to be outcome determinative.  However, the standard for finding prejudice is not that high, all the court has to find is that the deficiencies "undermined confidence in the outcome" of the trial.  *Strickland*, 466 U.S. at 693, 694-696. As a result, the court must find that there was ineffective assistance of counsel and grant a new sentencing hearing.

Counsel also incorporates word for word the arguments and authority of direct appeal and habeas counsel in regards to the ineffectiveness of trial counsel.

## 13.    THE TEXAS CAPITAL SENTENCING STATUTE VIOLATES THE FIFTH, EIGHTH, AND FOURTEENTH AMENDMENTS.

Former United States Supreme Court Justice Blackmun recently concluded that the death penalty as currently administered is unconstitutional.  *See Callins v. Collins*, 510 U.S. 1141 (1994) (Blackmun, J., dissenting).   Justice Blackmun wrote at length about his reasons for arriving at his decision:

…Twenty years have passed since this Court declared that the death penalty must be imposed fairly, and with reasonable consistency, or not at all, see *Furman* v. *Georgia*, 408 U.S. 238 (1972), and, despite the effort of the States and courts to devise legal formulas and procedural rules to meet this daunting challenge, the death penalty remains fraught with arbitrariness, discrimination, caprice, and mistake. This is not to say that the problems with the death penalty today are identical to those that were present 20 years ago. Rather, the problems that were pursued down one hole with procedural rules and verbal formulas have come to the surface somewhere else, just as virulent and pernicious as they were in their original form. Experience has taught us that the constitutional goal of eliminating arbitrariness and discrimination from the administration of death…can never be achieved without compromising an equally essential component of fundamental fairness--individualized sentencing. See *Lockett* v. *Ohio*, 438 U.S. 586 (1978).

It is tempting, when faced with conflicting constitutional commands, to sacrifice one for the other or to assume that an acceptable balance between them already has been struck. In the context of the death penalty, however, such jurisprudential maneuvers are wholly inappropriate. The death penalty must be imposed "fairly, and with reasonable consistency, or not at all." *Eddings* v. *Oklahoma*, 455 U.S. 104, 112 (1982).

To be fair, a capital sentencing scheme must treat each person convicted of a capital offense with that "degree of respect due the uniqueness of the individual." *Lockett* v. *Ohio*, 438 U. S., at 605 (plurality opinion). That means affording the sentencer the power and discretion to grant mercy in a particular case, and providing avenues for the consideration of any and all relevant mitigating evidence that would justify a sentence less than death. Reasonable consistency, on the other hand, requires that the death penalty be inflicted evenhandedly, in accordance with reason and objective standards, rather than by whim, caprice, or prejudice. Finally, because human error is inevitable, and because our criminal justice system is less than perfect, searching appellate review of death sentences and their underlying convictions is a prerequisite to a constitutional death penalty scheme.

On their face, these goals of individual fairness, reasonable consistency, and absence of error appear to be attainable: Courts are in the very business of erecting procedural devices from which fair, equitable, and reliable outcomes are presumed to flow. Yet, in the death penalty area, this Court, in my view, has engaged in a futile effort to balance these constitutional demands, and now is retreating not only from the *Furman* promise of consistency and rationality, but from the requirement of individualized sentencing as well. Having virtually conceded that both fairness and rationality cannot be achieved in the administration of the death penalty, see *McCleskey* v. *Kemp*, 481 U.S. 279, 313, n.

37 (1987), the Court has chosen to deregulate the entire enterprise, replacing, it would seem, substantive constitutional requirements with mere aesthetics, and abdicating its statutorily and constitutionally imposed duty to provide meaningful judicial oversight to the administration of death by the States.

From this day forward, I no longer shall tinker with the machinery of death. For more than 20 years I have endeavored--indeed, I have struggled--along with a majority of this Court, to develop procedural and substantive rules that would lend more than the mere appearance of fairness to the death penalty endeavor. Rather than continue to coddle the Court's delusion that the desired level of fairness has been achieved and the need for regulation eviscerated, I feel morally and intellectually obligated simply to concede that the death penalty experiment has failed. It is virtually self evident to me now that no combination of procedural rules or substantive regulations ever can save the death penalty from its inherent constitutional deficiencies. The basic question--does the system accurately and consistently determine which defendants "deserve" to die?--cannot be answered in the affirmative. It is not simply that this Court has allowed vague aggravating circumstances to be employed, see, *e. g.*, *Arave* v. *Creech*, ___ U. S. ___ (1993), relevant mitigating evidence to be disregarded, see, *e. g.*, *Johnson* v. *Texas*, ___ U. S. ___ (1993), and vital judicial review to be blocked, see, *e. g.*, *Coleman* v. *Thompson*, 501 U. S. ___ (1991). The problem is that the inevitability of factual, legal, and moral error gives us a system that we know must wrongly kill some defendants, a system that fails to deliver the fair, consistent, and reliable sentences of death required by the Constitution.

*Id.* at 1143-46 (some citations and footnotes omitted).  Justice Blackmun then chronicled the

state's unsuccessful attempts to obey the dictates of *Furman v. Ga.*, 408 U.S. 238 (1972).  His

remarks are as follows:

In the years following *Furman*, serious efforts were made to comply with its mandate. State legislatures and appellate courts struggled to provide judges and juries with sensible and objective guidelines for determining who should live and who should die. Some States attempted to define who is "deserving" of the death penalty through the use of carefully chosen adjectives, reserving the death penalty for those who commit crimes that are "especially heinous, atrocious, or cruel." Other States enacted mandatory death penalty statutes, reading *Furman* as an invitation to eliminate sentencer discretion altogether. Still other States specified aggravating and mitigating factors that were to be considered by the sentencer and weighed against one another in a calculated and rational manner.

Unfortunately, all this experimentation and ingenuity yielded little of what *Furman* demanded. It soon became apparent that discretion could not be eliminated from capital sentencing without threatening the fundamental fairness due a defendant when life is at stake. Just as contemporary society was no longer tolerant of the random or discriminatory infliction of the penalty of death, …evolving standards of decency required due consideration of the uniqueness of each individual defendant when imposing society's ultimate penalty. See *Woodson*, 428 U. S., at 301 (opinion of Stewart, Powell, and Stevens, JJ.) referring to *Trop*, 356 U.S. at 101 (plurality opinion).

This development in the American conscience would have presented no constitutional dilemma if fairness to the individual could be achieved without sacrificing the consistency and rationality promised in *Furman*. But over the past two decades, efforts to balance these competing constitutional commands have been to no avail. Experience has shown that the consistency and rationality promised in *Furman* are inversely related to the fairness owed the individual when considering a sentence of death. A step toward consistency is a step away from fairness.

*Id.* at 1148-49 (some citations omitted).  Justice Blackmun next discussed and recognized the heightened need for fairness in the administration of death and the way in which this necessitates individualized sentencing in capital cases:

Yet, as several Members of the Court have recognized, there is real "tension" between the need for fairness to the individual and the consistency promised in *Furman*. See *Franklin* v. *Lynaugh*, 487 U.S. 164, 182 (1988) (plurality opinion); *California* v. *Brown*, 479 U. S., at 544 (O'Connor, J., concurring); *McCleskey* v. *Kemp*, 481 U. S., at 363 (Blackmun, J., dissenting); *Graham* v. *Collins*, __ U. S. ___, ___ (1993) (Thomas, J., concurring). On the one hand, discretion in capital sentencing must be "'controlled by clear and objective standards so as to produce non discriminatory [and reasoned] application.'" *Gregg*, 428 U. S., at 198. On the other hand, the Constitution also requires that the sentencer be able to consider "any relevant mitigating evidence regarding the defendant's character or background, and the circumstances of the particular offense." *California* v. *Brown*, 479 U.S. 538, 544 (1987) (O'Connor, J., concurring). The power to consider mitigating evidence that would warrant a sentence less than death is meaningless unless the sentencer has the discretion and authority to dispense mercy based on that evidence. Thus, the Constitution, by requiring a heightened degree of fairness to the individual, and also a greater degree of equality and rationality in the administration of death, demands sentencer discretion that is at once generously expanded and severely restricted.

> This dilemma was laid bare in *Penry* v. *Lynaugh*, 492 U.S. 302 (1989). The defendant in *Penry* challenged the Texas death penalty statute, arguing that it failed to allow the sentencing jury to give full mitigating effect to his evidence of mental retardation and history of child abuse. The Texas statute required the jury, during the penalty phase, to answer three "special issues"; if the jury unanimously answered "yes" to each issue, the trial court was obligated to sentence the defendant to death. Tex. Code Crim. Proc. Ann., Art. 37.071(c) (e) (Vernon 1981 and Supp. 1989). Only one of the three issues--whether the defendant posed a "continuing threat to society"--was related to the evidence Penry offered in mitigation. But Penry's evidence of mental retardation and child abuse was a two edged sword as it related to that special issue: "it diminish[ed] his blameworthiness for his crime even as it indicate[d] that there [was] a probability that he [would] be dangerous in the future." 492 U. S., at 324. The Court therefore reversed Penry's death sentence, explaining that a reasonable juror could have believed that the statute prohibited a sentence less than death based upon his mitigating evidence. *Id*., at 326.
>
> After *Penry*, the paradox underlying the Court's post-*Furman* jurisprudence was undeniable. Texas had complied with *Furman* by severely limiting the sentencer's discretion, but those very limitations rendered Penry's death sentence unconstitutional.

*Id.* at 1151-52 (some citations omitted). The dissent then discussed the initial "narrowing" of death-eligible offenders according to objective, fact-bound criteria, and the jury's subsequent discretion to consider relevant mitigating evidence. *Id.* at 1152. Justice Blackmun stated that, over time, he had come to conclude that the procedure simply reduced, rather than eliminated the number of people subject to arbitrary sentencing. *Id.* at 1152 n.4 (citing Stephen Gillers, *Deciding Who Dies*, 129 U. PA. L. REV. 1, 27-28 (1980) (inherent arbitrariness of death penalty only magnified by post-*Furman* statutes that allow jury to choose among similarly situated defendants)).

Consistent with Justice Blackmun's allegations, and as discussed elsewhere in this writ application, the capital sentencing scrutiny afforded by the Court of Criminal Appeals is characterized by an inability, or unwillingness, to adhere to any principled guidelines in

weighing the punishment evidence; this clearly violates the constitutional mandate of individualized sentencing, *see Penry*, 492 U.S. at 319, and "reduces [the appellate court's] review to a mere recital of 'historical fact.'" *Wilkerson v. State*, 881 S.W.2d 321, 330 (Tex. Crim. App. 1994) (Baird, J., dissenting) (quoting majority opinion). Indeed those very inequities have recently been recognized by the American Bar Association, which, in a resolution and lengthy report, has called for a moratorium on executions until such times as jurisdictions committed to a death penalty adopt policies and procedures to insure (1) that death penalty cases are administered fairly and impartially and in accordance with due process and (2) minimize the risk that innocent persons may be executed. *See* The American Bar Association Resolution and Report at 107. As a result, this Court should grant Mr. Ripkowski's request for habeas corpus relief and hold that the Constitution prohibits the imposition of the death penalty until either the Texas Legislature or the Court designs a scheme to eliminate the sentencer's unbridled discretion to inflict death while simultaneously permitting them unrestricted consideration of mitigating evidence. Justice Blackmun's observations are particularly relevant in this case. Apart from his counsel's error, forced or not, there is nothing in Mr. Ripkowski's life, prior to the death of Monica Allen and Nikki Frome, that would set him aside as someone worthy of death, and there has been nothing since the juries finding that would support their conclusion that he would be a future danger.

Moreover, given the relatively non-heinous manner of death, and since he was acting under the influence of his mental illness and cocaine addiction, there is nothing that sets him out as being in the minority of persons for whom the death penalty is supposed to be reserved.

**14.  THE MANY VARIED AND INDEPENDENT CAPITAL CHARGING PROCEDURES EMPLOYED BY THE STATE'S DIFFERENT PROSECUTORS,**

**IN DETERMINING FOR WHOM TO SEEK THE DEATH PENALTY AND FOR WHAT OFFENSES, VIOLATE MR. RIPKOWSKI'S RIGHTS UNDER THE TEXAS CONSTITUTION AND THE EQUAL PROTECTION CLAUSE OF THE U.S. CONSTITUTION.**

A.        **EQUAL PROTECTION PRINCIPLES OF *BUSH V. GORE*.**

Under the Equal Protection principle announced by the Supreme Court in *Bush v. Gore*, 531 U.S. 98, 106 (2000), current Texas law is unconstitutional because it fails to set forth uniform standards as to when a prosecutor should seek the death penalty in a potential capital case. The intense reactions which greeted the *Bush* opinion in the fall of 2000 notwithstanding, the Supreme Court's holding in that case is quite simple: When fundamental rights are involved, the Equal Protection Clause of the Fourteenth Amendment requires that there be "uniform" and "specific" standards to prevent the arbitrary and disparate treatment of similarly situated people. *Id.* at 106. Because the Florida Supreme Court did not set forth such standards in its opinion ordering a recount but instead announced only that ballots should be counted according to a vague "intent of the voter" standard, the recount would not respect the "equal dignity owed to each voter." *Id.* at 104.

The Texas death penalty system concerns a right even more fundamental than the right to vote, that is, the right to life. As was true in the Florida recount, in Texas, the lack of statewide standards to guide prosecutors in determining which cases warrant seeking the death penalty inevitably leads to the disparate treatment of similarly situated people accused of potential capital offenses. While the Supreme Court stated that its holding in *Bush* was limited to the facts of that case, the principles it announced are sound and must be subject to respect as precedent. Those principles require that the method used by prosecutors in deciding which defendants will face the death penalty should be subject to at least as much scrutiny as the process of counting

votes.  The need for equality and non-arbitrariness when the state seeks to deprive a citizen of his life outweighs any benefits of unbridled prosecutorial discretion.

> **1.    Because The Right To Life Is A Fundamental Right Which Must Be Subject To At Least The Same Constitutional Protections As The Right To Vote, The State Must Establish Safeguards To Ensure That It Does Not Treat Its Citizens In A Disparate And Arbitrary Manner.**

If anything, courts must require additional safeguards to ensure the equal treatment of all persons in the context of death penalty prosecutions than in that of an election recount.  Whereas the right to vote is "fundamental" because of historical trends and legislative decisions, the right to life that is at stake in Texas's system of capital punishment is the most fundamental of all rights and, accordingly, is found in the very text of the United States Constitution.

In *Bush*, the Supreme Court recognized that "the individual citizen has no federal constitutional right to vote for electors for the President of the United States."  *Bush*, 531 U.S. at 104.  However, "[h]istory has favored the voter," and since every state now chooses its electors through a statewide election, "the right to vote as the legislature has prescribed is fundamental."  *Id.*

In contrast to the implied Constitutional right to vote, the right to life is contained in the text of the Constitution.  The Fifth and Fourteenth Amendments provide that neither the federal government nor the states shall deprive any person of "life, liberty, or property" without due process of law.   U.S. Const. amend. V; amend. XIV, §1.   The Supreme Court has long recognized the fundamental nature of the right to life, particularly in the context of the death

penalty.  *See Furman*, 408 U.S. at 359 ("because capital punishment deprives an individual of a fundamental right (i.e., the right to life), . . . the State needs a compelling interest to justify it").

Because the right to life is fundamental, when a state implements a death penalty system, it must establish mechanisms to ensure that the system values the lives of all of its citizens equally. As the Supreme Court noted with respect to voting, "[h]aving once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush*, 531 U.S. at 104-05.  By the same reasoning, since the Constitution has ensured both the right to life and to the equal protection of the laws, a state may not, by arbitrary and disparate treatment, value one person's life over that of another.  In the brief period since *Bush* was handed down, several commentators have taken notice of this result; *see* Laurence Benner et. al., *Criminal Justice in the Supreme Court: An Analysis of United States Supreme Court Criminal and Habeas Corpus Decisions (October 2, 2000 - September 30, 2001)*, 38 CAL. W. L. REV. 87, 91 (forthcoming 2001) ("Certainly the *Bush v. Gore* equal protection principle ought to be no less applicable when a state permits 'disparate treatment' of death eligible defendants because county prosecutors use differing standards for electing which defendants they will seek to execute"); Michael P. Seng, *Commentary:  Reflections on when "We, the People" Kill*, 34 J. MARSHALL L. REV. 713, 717 (2001) ("Certainly, if a state or its courts cannot arbitrarily dilute or deny a person's right to vote because of the Equal Protection clause, then human life must also be given equal protection"); Cass R. Sunstein, *Symposium: Bush v. Gore:  Order Without Law*, 68 U. CHI. L. REV. 757, 758 (2001) (noting that the *Bush* holding might require that "methods be in place to ensure against the differential treatment of those subject to capital punishment").

Texas's lack of standards to ensure non-arbitrary treatment with regard to the fundamental right to life is enough in itself to establish an Equal Protection violation; a showing of intentional discrimination against a protected class is not required. *See Bush*, 531 U.S. at 106. While in traditional claims of discrimination against individuals, courts require evidence of discriminatory intent by a state actor in that particular case, *see, e.g., McCleskey v. Kemp,* 481 U.S. 279, 292 (1987), in *Bush* the Court did not require any such showing. Unlike these traditional Equal Protection claims of intentional discrimination against a protected class, claims like this one and the one in *Bush* are not based on an individual act of discrimination but rather challenge a system in which unchecked official discretion makes arbitrary and unequal treatment inevitable.

The Texas death penalty prosecution system must be subject to the same Equal Protection constraints. If the Equal Protection clause requires rules to ensure that localities do not treat "identical types of ballots used in identical brands of machines and exhibiting identical physical characteristics" differently, *Bush*, 531 U.S. at 134 (Souter, J., dissenting) (agreeing with per curium that the lack of standards for the statewide recount violated the Equal Protection Clause but disagreeing as to the proper remedy), then it must require rules to ensure that localities do not treat similarly situated offenders committing the same types of crimes differently with respect to their lives. While the *Bush* opinion declares that its "consideration is limited to the present circumstances," *Id.* at 109, and, therefore, suggests that the principle announced might not apply to any other situations, the fundamental nature of the right to life requires that the principle also apply, as logically appropriate, to the death penalty system.

The per curium opinion in *Bush* explains the narrow scope of its holding by distinguishing the somewhat unusual situation of a court-ordered statewide recount from an ordinary election.  In ordinary elections, the Court says, the Equal Protection Clause does not prohibit counties from developing "different systems for implementing elections."  *Bush*, 531 U.S. at 109.  One reason for this distinction is that once ballots have been cast, the "factfinder confronts a thing, not a person," and thus "[t]he search for intent can be confined by specific rules designed to ensure uniform treatment."  *Id.* at 106.  Also, individual counties may have "expertise" that justifies letting them choose their own methods of conducting elections.  *Id.* at 109.  Another explanation is that "local variety [in voting machines and procedures] can be justified by concerns about cost, the potential value of innovation, and so on" whereas a "different order of disparity" occurs when, after ballots have been cast, physically identical ballots are hand-counted according to different rules.  *Id.* at 134 (Souter, J., dissenting).  Finally, of course, voting is different than capital punishment, and arguably the differences between the two might justify different constitutional analyses.

However, these explanations do not diminish the relevance of the *Bush* Equal Protection rule to Texas's death penalty system.  Just as Florida counties can use different voting machines in their elections, Texas counties can certainly have separate prosecutors and can structure those prosecutors' offices differently; this allows the flexibility demanded by limited budgets and justified by local expertise and takes into account the potential for innovation inherent in a system of local control.  With regard to the Court's distinction between a "thing" and "person," although it is true that prosecutors charged with deciding when to seek the death penalty confront people and not things, this does not diminish the Equal Protection Clause's requirement of non-

arbitrariness. While it might be easier to design standards about whether to count "hanging chads" as legal votes, it is certainly not impossible to write standards to guide prosecutors in the decision making process with regards to when the death penalty should be sought. *See, e.g., United States Attorneys' Manual* § 9-10.010 et. seq. (1995) (laying out "federal protocol" for capital cases); U.S. Department of Justice, *The Federal Death Penalty System: Supplementary Data, Analysis and Revised Protocols for Capital Case Review,* http://www.usdoj.gov/dag/pubdoc/deathpenaltystudy.htm 6 (2001). It is true that elections and capital punishment are different, but the fact remains that both involve a fundamental right and therefore should be subject to the same "minimum requirement for non-arbitrary treatment," *Bush*, 531 U.S. at 105. The Fourteenth Amendment protections required in an election recount do not derive from the candidates' right to have all the votes for them counted correctly, but from the "equal dignity owed to each voter," *Id.* at 104. Surely the equal dignity owed to each person's life requires no less.

> 2. **The Lack Of Standards To Guide Local Prosecutors In Their Decisions As To Whether To Seek The Death Penalty Inevitably Leads To The Arbitrary And Disparate Treatment Of Similarly Situated Defendants.**

The disparities in the process for deciding who should be charged capitally for what offenses is almost as varied as the 254 different local prosecutors in the state. Texas law provides no standards to guide prosecutors in their decisions as to when to seek the death penalty; instead, prosecutors in each county make such decisions on their own, according to unwritten and widely varying standards. The result is that whether a person charged with a capital crime will face the death penalty depends largely on arbitrary factors such as the county in which the crime occurred and, even more disturbingly, the race of the victim. While under the

*Bush* standard, it is not necessary to show that a standardless system has, or will have, a disparate or discriminatory impact, the evidence of such an impact in Texas underlines the arbitrariness inherent in such a system and the violation of Mr. Ripkowski's rights.  For Mr. Ripkowski, this results in his being sent to death row with no prior evidence of dangerous conduct.

In sum, current Texas law violates the Equal Protection Clause's "minimum requirement for non-arbitrary treatment," *Bush*, 531 U.S. at 105, because it contains no standards as to when local prosecutors should seek the death penalty in a potentially capital case.  While the law contains provisions to limit the class of offenders eligible for the death penalty and allows for individualized sentencing determinations by juries, *see* TEX. PEN. CODE ANN. art. 19.03 (Vernon 2000); TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 2008), there are no standards to guide a prosecutor's decision whether or not to seek the death penalty.  TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 2008).  The Texas statute's definition of capital murder narrows the class of those who are subject to the death penalty, but the statute does not indicate how local prosecutors are to distinguish among those defendants charged with murder to determine who should face a possible death sentence and who should not.

Worse, Texas law does not even provide an "abstract proposition" or a "starting principle," *Bush*, 531 U.S. at 106, as to how local prosecutors ought to make these life-and-death decisions.  In *Bush*, the Florida Supreme Court had at least set forth a general principle regarding how the recount was to proceed.  By contrast, Texas law does not provide any general principles to guide prosecutors in their decision as to when the death penalty should be sought.

The *Bush* Court surveyed examples of the kinds of disparities in vote-counting procedures that the lack of uniform standards created.  *Id.* at 106-09.  The examples were merely

illustrative of the kinds of problems that would result from an Equal Protection Clause violation; a showing of inequality in the treatment of individual voters or protected classes of voters was not required to prove such a violation. *Id.*

Texas's system, or lack of system, for determining who will face the death penalty creates levels of disparity and arbitrariness that dwarf the problems addressed by the Supreme Court in the Florida election recount. As in the Florida recount, standards vary from county to county, and even within a county, the standards may change dramatically when a new district attorney takes office. Whether a life-and-death decision is made according to legally relevant criteria, financial considerations, moral judgments, or by whim is often impossible to determine, since there are generally no written standards for prosecutors to consult as a guide to making such a decision. Mr. Ripkowski's counsel's attempts to informally and formally discover disclosure of the Collin County capital charging procedures have not been fruitful to this point. However, those efforts will continue with the filing of this petition, and, if disclosed, the procedure will be added to this claim.

On the other hand, not all prosecutors have been so enigmatic about their procedures—or lack thereof. During his tenure, longtime Harris County District Attorney John Holmes admitted, "The decision [whether to seek the death penalty] is mine unilaterally." Armando Villafranca, *A Man of Conviction: For Securing Death Penalty, Offering Blunt Views, Few Top District Attorney*, HOUSTON CHRONICLE, Nov. 29, 1998, at A1. Additional disclosure has shown the differing systems of different counties. In Travis County, committees of assistant prosecutors assist the district attorney when making decisions in potentially capital cases. Richard Willing, *Prosecutor Often Determines Which Way A Case Will Go*, USA TODAY, Dec.

20, 1999, at 1A. Meanwhile, in Dallas County, for many years the District Attorney's first assistant, Norman Kinne, made the decisions himself. Holly Becka, *Vance Retiring With Legacy Of Helping Crime Victims; Attorneys Note Ethical Standards Set by DA, Assistant*, DALLAS MORNING NEWS, Dec. 31, 1998. The defense has sought and will continue to seek through discovery the process by which such decisions are made in Collin County.

When each District Attorney decides who will face the death penalty, the importance of that person's personal philosophy can not be underestimated. "Indeed, the willingness of the local prosecutor to seek the death penalty seems to play by far the most significant role in determining who will eventually be sentenced to death." Richard Willing and Gary Fields, *Geography of the Death Penalty*, USA TODAY, Dec. 20, 1999, at 1A. When John Holmes retired as District Attorney of Harris County, a debate between the two candidates competing to succeed him revealed the utter lack of consensus as to how life-and-death decisions should be made. Chuck Rosenthal, Holmes's hand-picked successor and the now former District Attorney for Harris County, stated that the county's system of seeking and obtaining death sentences (unilateral decision by the D.A.) "works great." Rosenthal's opponent Jim Dougherty, however, was more circumspect. Dougherty questioned both the eagerness with which the Harris County District Attorney's office seeks the death penalty and the arbitrariness underlying that decision, saying, "[w]e need to be conscious of the fact that there is great disproportionality in the system" and that "[i]f you push hard enough you can get the death penalty in most of these cases, but is it the right thing to do every time?" Julie Mason, *Candidates for D.A. Draw Differences; Pair Disagree on State's Death-Sentence System*, HOUSTON CHRONICLE, Oct. 26, 2000, at A27.

Indeed Harris County, with its lack of standards for determining which individual defendants will face death, provides a most glaring example of the resultant disparities in Texas's system.   The approach of District Attorneys Holmes and Rosenthal has been not to consider criteria such as the relative moral culpability of the defendant or the heinousness of the crime, but rather, as Rosenthal says, to seek the death penalty whenever prosecutors judge there is a "better than average chance" of a jury returning a death sentence.   Mike Tolson and Steve Brewer, *Harris County is a Pipeline to Death Row*, HOUSTON CHRONICLE, Feb. 4, 2001, at A1. This approach has been roundly criticized, not only by defense attorneys and death penalty advocates but also by other prosecutors and judges.   As state District Judge Doug Shaver, himself a former prosecutor, said in regard to Harris County, "[i]t seems to me that there are cases going through that are not necessarily death cases.   It is no longer reserved for the special cases it ought to be reserved for."  *Id.*    Former District Attorney Holmes acknowledged but dismissed the fact that different counties employ different standards in deciding whether or not to seek the death penalty commenting, "I'd rather be tried for horse theft in Houston than in West Texas, where I'm going to get a harsher sentence, but what does that prove?"   Willing and Fields, *supra*.   What it proves is that when it comes to capital punishment, which, unlike horse theft, involves the fundamental right to life, the lack of statewide standards as to when prosecutors should seek the death penalty has led to a system lacking the "minimum requirement for non-arbitrary treatment," *Bush*, 531 U.S. at 105, that the Equal Protection Clause demands.

As was the case in the Florida recount, the lack of standards in Texas's death penalty prosecution system leads to glaring disparities in the number of people sent to death row in different counties.   Just as the more lenient standards for counting ballots in Broward County as

compared to Palm Beach County led to a "markedly disproportionate" number of new votes being discovered in Broward County, *Bush*, 531 U.S. at 107, the different standards employed by prosecutors in Texas's 254 counties leads to people being sentenced to death at rates markedly disproportionate to their counties' populations and murder rates.  For instance, in 1999, Harris County had 140 people on death row, while Dallas County, whose population is about two-thirds that of Harris County's, had only 37.  This is despite the fact that Dallas County's murder rate is higher than Harris County's.[68]  Willing and Fields, *supra*, at 6A.  Indeed, if Dallas County and Bexar County were combined into one, they would have a population greater than Harris County's, but would have less than half the number of people on death row.[69]  While Harris County had 26% of the state's murders from 1988-1997, it was responsible for 31% of the people on death row in the state.  Dallas County, with 19% of the state's murders, was responsible for contributing only 9% to the population on death row.  *Id.*  Meanwhile, 138 (more than half) of Texas's 254 counties have never sentenced anyone to death.  Tolson and Brewer, *supra*.

Even more disturbing than the differences among county prosecutors' approaches to deciding whether to seek the death penalty are the racial disparities evident in those decisions. Those racial disparities, described and complained of more fully, immediately below,

---

[68] Harris County's average population from 1988 to 1997 was 2,857,978; Dallas County's was 1,917,501.  Harris County had a murder rate of 17.3 per 100,000; Dallas County's was 19.3 per 100,0000. Statistics are from research conducted by USA Today. Willing and Fields, *Geography of the Death Penalty*, USA Today, December 20, 1999, at 6A.

[69] Bexar County's average population from 1988 to 1997 was 1,245,209 and it had 29 inmates on death row in 1999.  Thus, Dallas and Bexar Counties combined had a population of 3,162,710 and 66 inmates on death row (compared to Harris County's population of less than 3 million and 140 death row inmates).  Willing and Fields, *supra*, at 6A.

demonstrate that the general concern of race being a factor in the sentencing decision, in general

and in Mr. Ripkowski's case in particular, are disturbingly real.

### 3.   The Dictates Of *Bush v. Gore* Are Controlling In Death Penalty Jurisprudence.

The circumstances surrounding the 2000 Presidential election and the *Bush* ruling were

certainly unusual, but that cannot diminish the validity of the Court's reasoning or its

applicability to death cases.  The authority of our judicial system depends upon the presumption

that court rulings are based on principles rather than on the personal political viewpoints of

judges.  This is ensured by the principle of s*tare decisis*, which literally means, "to stand by

things decided."  *Black's Law Dictionary*, 1414 (7th ed. 1999).  *Stare decisis* ensures that there

will be stability and predictability in the legal system and that decisions will be made according

to law, not men.  As Robert Bork has written:

> The requirement that the Court be principled arises from the resolution of the
> seeming anomaly of judicial supremacy in a democratic society.  If the judiciary
> really is supreme, able to rule when and as it sees fit, the society is not democratic
> . . . .  [I]t follows that the Court's power is legitimate only if it has and can
> demonstrate in reasoned opinions that it has a valid theory, derived from the
> Constitution . . . .  If it does not have such a theory, but merely imposes its own
> value choices . . . the Court violates the postulates of the Madisonian model that
> alone justifies its power.

Robert H. Bork, *Neutral Principles and Some First Amendment Problems*, 47 IND. L.J. 1, 2-3

(1971).   To write off the *Bush* decision as a politically motivated anomaly or to consider its rule

to be valid one day and not the next would undermine the very foundation upon which the

judicial system rests.

Although some portions of the *Bush* decision are vulnerable to criticism, its core Equal

Protection holding is neither implausible nor unsupportable.   While many judges and

commentators have questioned parts of the ruling, that criticism has focused solely on the Court's remedy. *Bush*, 531 U.S. at 127 (Stevens, J., dissenting); *Id.* at 135 (Souter, J., dissenting); *Id.* at 143 (Ginsburg, J., dissenting); *Id.* at 147 (Breyer, J., dissenting); David A. Strauss, *Symposium: Bush v. Gore: What Were They Thinking?*, 68 U. CHI. L. REV. 737, 739-42 (2001) (noting that the Court's remedy in *Bush v. Gore* "seem[s] indefensible"); Sunstein, *supra,* at 767-68 (labeling the Court's halting of a manual recount a "blunder"). As the per curium opinion noted, seven Justices were in agreement on the basic premise that the Florida Supreme Court's recount order violated the Equal Protection Clause because it lacked standards to ensure the non-arbitrary treatment of voters. *Bush*, 531 U.S. at 111 (referring to Justices Souter and Breyer and the five Justices who signed the per curium opinion). Similarly, even critics who lambasted the decision allowed that the Equal Protection reasoning in the opinion, while not dictated by the Court's prior precedents, was reasonable and even praiseworthy. Thus, erstwhile critics commented that the Court's interpretation of the Equal Protection clause "has considerable appeal," Sunstein, *supra*, at 773, and "can be seen both as an extension of the Warren Court's vision of democracy and as a logical implication of the view, seriously proposed a generation ago, that the Constitution limits the degree to which discretion can be vested in executive officials of both the state and federal governments." Strauss, *supra*, at 740. The closeness of the election and the political implications of the Court's decision do not mean that the principle upon which its ruling was based can be ignored.

To the extent that the Equal Protection principle in *Bush* conflicts with the Court's declaration that the holding only applies to the particular circumstances of the 2000 Presidential election, the principle must take precedence. It is not only appropriate but wise for courts to

limit their holdings to the facts of the particular case with which they are confronted. However, in a legal system based on precedent, a legal principle cannot be valid on one day and not the next. The reasoning of *Bush*, like that of any of the Court's rulings, must apply to all other situations to which it logically extends. The Equal Protection Clause mandates that when a fundamental right is threatened, states must establish standards to ensure that localities do not treat its citizens in an arbitrarily disparate manner. Thus, Texas's death penalty prosecution scheme, which provides no standards to ensure the non-arbitrary treatment of capital offenders by prosecutors, is unconstitutional.

### B. THE EQUAL PROTECTION CLAUSE TRUMPS PROSECUTORIAL DISCRETION.

No argument for prosecutorial discretion can justify a system that contains no safeguards to ensure that the lives of similarly situated offenders are treated with equal dignity. Because the right to life is fundamental, if Texas is to maintain such a system, its justifications for that system would have to pass strict scrutiny. *Skinner v. Okla.*, 316 U.S. 535, 541 (1942) (reversing an order to sterilize a felon because the law allowing for sterilization did not pass strict scrutiny, as it treated larceny and embezzlement differently despite their being essentially the same crime). In order to pass strict scrutiny, the state would have to show that allowing prosecutors the unbridled discretion to decide when to seek the death penalty is necessary to achieve a compelling governmental interest. Our constitutional structure does not bar courts from evaluating the Constitutionality of the system by which prosecutors decide whether or not to seek the death penalty. Neither do the arguments in favor of prosecutorial discretion that have been made over the years justify the arbitrary seeking of death.

The separation of powers doctrine does not bar courts from requiring some restraint on prosecutorial discretion.  Courts can and do evaluate particular prosecutorial decisions for Equal Protection violations. *See, e.g., U.S. v. Armstrong*, 517 U.S. 456, 470-71 (1996) (declining to allow discovery on defendant's selective prosecution claim but acknowledging that such discovery would be allowed if petitioner had shown that the Government declined to prosecute similarly situated persons of other races); *Wayte v. U.S.*, 470 U.S. 598, 608 (1985) (reviewing the prosecution of a man for refusing to register with the Selective Service System under a "selective prosecution" Equal Protection analysis); *U.S. v. Batchelder*, 442 U.S. 114, 125 (1979) (noting that while it is broad, prosecutorial discretion is nonetheless "subject to constitutional constraints"); *Bordenkircher v. Hayes*, 434 U.S. 357, 365 (1977) (same); *Oyler v. Boles*, 368 U.S. 448, 456 (1962) (same); *Yick Wo*, 118 U.S. at 374 (1886) (ordering the release of Chinese petitioners who were prosecuted and jailed for operating laundries without a permit while similarly situated Caucasian laundry operators were not prosecuted).  In selective-prosecution and vindictive prosecution cases, courts are deferential to prosecutorial decisions and require "clear evidence" to rebut the presumption that prosecutors have acted legally.  *Armstrong*, 517 U.S. at 464 (quoting *U.S. v. Chem. Found.,* 272 U.S. 1, 14-15 (1926)).  Because of separation of powers concerns, courts refuse to force district attorneys and U.S. Attorneys to prosecute particular offenders, as doing so would "encroach[] on the prerogatives of another department of the Government." *U.S. v. Shaw*, 226 A.2d 366, 368 (D.C. 1967); *see also Newman v. U.S.*, 382 F.2d 479, 482 (D.C. Cir. 1967); *U.S. v. Cox*, 342 F.2d 167, 171 (5th Cir. 1965).  However, "there is an enormous difference between, on the one hand, forcing a prosecutor to charge or stripping him of authority to charge and, on the other, regulating that authority. . . ."  James Vorenberg,

*Decent Restraint of Prosecutorial Power,* 94 HARV. L. REV. 1521, 1546 (1981) (discussing separation-of-powers concerns between judicial power and prosecutorial discretion). This analysis is neither attacking a particular decision of an individual prosecutor as vindictive or selective nor is it asking the courts to force prosecutors to file charges in particular cases. Rather, it is alleging that the laws of Texas violate the Equal Protection Clause by failing to establish standards by which prosecutors are to decide whether to seek the death penalty in a potential capital case. "The law has long recognized the distinction between judicial usurpation of discretionary authority and judicial review of the statutory and constitutional limits to that authority." *Nader v. Saxbe*, 497 F.2d 676, 680 n.19 (D.C. Cir. 1974). After conducting such a review, courts can only conclude that Texas's lack of a system to guide prosecutors in the decision whether certain offenders will face the death penalty violates the Constitutional guarantee of equal protection.

As the Court noted in *Bush*, despite the "limits on judicial authority" imposed by the Constitution, when Constitutional violations are brought to the attention of the courts, "it becomes our unsought responsibility to resolve the federal and constitutional issues the judicial system has been forced to confront." *Bush,* 531 U.S. at 111. When faced with a Constitutional violation, courts cannot wait for the Legislature to take action.

The frequently cited reasons for allowing prosecutors broad discretion as to what charges to bring cannot justify a system which allows some defendants' lives to be arbitrarily valued less than others'. Because of the fundamental nature of the right to life, such rationale would have to pass strict scrutiny. *Skinner*, 316 U.S. at 541. The primary justification for judicial noninterference with prosecutorial decision-making is that judicial review of individual

prosecutorial decisions would be difficult or inefficient. *Wayte*, 470 U.S. at 607.  One reason that courts may have difficulty reviewing prosecutors' decisions as to whether to seek the death penalty is that there are no clearly articulated, uniform standards by which those decisions are made.  If such standards were in place, judicial review would be much more feasible.  Further, the existence of statewide standards would not mean that courts would have to begin micro-managing prosecutors' offices; they could remain fairly deferential to prosecutors' decisions so long as prosecutors are able to justify their decisions according to the standards. *See Vorenberg, supra*, at 1546-47.  Concerns about the increased burden on courts and prosecutors that could result from statewide standards cannot justify ignoring a constitutional mandate.  Standards to guide a prosecutor's discretion as to when to seek the death penalty would not constitute a mandatory death penalty, nor would they completely eliminate a prosecutors' discretion or ability to consider the individual circumstances of each case.  Statewide standards would simply provide "some assurance that the rudimentary requirements of equal treatment and fundamental fairness are satisfied." *Bush*, 531 U.S. at 109.

Other rationales for broad prosecutorial discretion are similarly unable to excuse the disparities and arbitrariness of Texas's current system.  Such considerations as the need for flexible use of prosecutorial resources based on changing enforcement priorities, or the loss of deterrence which might result from revealing prosecutorial motives, are not "compelling governmental interests" sufficient to overcome the need for non-arbitrariness when the state decides whether to seek to take a defendant's life.  While such considerations may justify broad discretion in the criminal justice system in general, they are incapable of justification when life is at stake.  Allowing the decision whether to seek the death penalty to be made based on an

individual prosecutor's feeling that one particular type of crime needs to be deterred more than another allows an unconstitutional degree of arbitrariness, inconsistency, and unpredictability. Further, even if the reasons for allowing broad prosecutorial discretion were "compelling" by themselves, they cannot justify the risk that life-or-death decisions might be made on the basis of mere caprice or, worse, racial prejudice.

### C. THE EIGHTH AMENDMENT DICTATES ON THE NON-ARBITRARINESS OF CAPITAL PROCESS ALSO REQUIRE STANDARD PROSECUTORIAL CAPITAL CHARGING GUIDELINES.

In 1972 the Supreme Court invalidated the death penalty in part on the grounds that the standardless death penalty statutes then in effect allowed the ultimate punishment to be applied "wantonly and freakishly," *Furman*, 408 U.S. at 310 (Stewart, J., concurring), and that, in practice, there was no meaningful basis for distinguishing between the cases in which it was applied and those in which it was not. *Id.* at 313 (White, J., concurring). Four years later, when the court approved revised death penalty statutes, it held that state legislatures confronted these problems by drafting statutes that provided the sentencer with guidance in determining the appropriate sentence and narrowed the sentencer's discretion to impose the death penalty. *Jurek,* 428 U.S. at 270; *Gregg*, 428 U.S. at 195. The new statutes did not, however, require states to provide standards to guide prosecutors' decisions as to whether to seek the death penalty in the first place. *See* TEX. CODE CRIM. PROC. ANN. art. 37.071 (Vernon 2000). As Justice Brennan has pointed out:

> . . . discrimination and arbitrariness at an earlier point in the selection process nullify the value of later controls on the jury. The selection process for the imposition of the death penalty does not begin at trial; it begins in the prosecutor's office. His decision whether or not to seek capital punishment is no less

> important than the jury's.  Just like the jury, then, where death is the consequence,
> the prosecutor's "discretion must be suitably directed and limited so as to
> minimize the risk of wholly arbitrary and capricious action." . . . The prosecutor's
> choices are subject to no standards, no supervision, no controls whatever . . . ; if
> the price of prosecutorial independence is the freedom to impose death in an
> arbitrary, freakish, or discriminatory manner, it is a price the Eighth Amendment
> will not tolerate.

*DeGarmo v. Tex.*, 474 U.S. 973, 975 (1985) (Brennan, J., dissenting from denial of cert.)
(quoting *Gregg*, 428 U.S. at 189.  The Eighth Amendment's prohibition on imposing the death
penalty on a freakishly and randomly selected subset of those who commit murder*, see Furman*,
408 U.S. at 310 (Stewart, J., concurring), is directly implicated in the many varied processes at
play in Texas where prosecutors choose, without any standards whatsoever, what subset of those
accused of capital murder will face the death penalty.

In light of the new Equal Protection analysis of *Bush*, the Supreme Court's previous
approval of Texas's system for selecting which defendants should face the death penalty must be
revisited.  The Court has reasoned that such unbounded prosecutorial discretion does not violate
the Eighth Amendment because a prosecutor's decision not to seek the death penalty when the
law allowed him to do so involved the "decision to afford an individual defendant mercy" rather
than the unconstitutional decision to impose the death penalty on a "capriciously selected group
of offenders." *Gregg*, 428 U.S. at 199.  The decision to show a particular defendant mercy is an
invalid reason for allowing prosecutorial discretion because, as noted by Justice Blackmun in his
dissent in *Furman*, "the power to be lenient is the power to discriminate." *McCleskey*, 481 U.S.
at 312.  While statutes channeling the discretion of the jury can reduce the dangers of arbitrary
jury decisions in a particular case, they cannot change the arbitrariness inherent in a system in
which the decision of who will be chosen to face that sentencing jury is guided by nothing more

than one person's personal philosophy.  Put another way, if local prosecutors decide to "afford

mercy," that is, decline to seek the death penalty, based on vastly different standards, or racially

discriminatory standards, or no standards at all, the resulting system remains arbitrary and

capricious, and thus, unconstitutional.  The insight of the *Bush* Equal Protection reasoning is that

arbitrariness can exist not just when an individual defendant (or ballot) is subjected to a

judgment that is unguided by any standards but also when an entire system lacks consistent

standards so that defendants (or ballots) in each locality may be subjected to vastly differing

penalties.

The evidence that individual prosecutors do, indeed, use vastly different standards to

decide whether to seek the death penalty also requires a re-evaluation of the Supreme Court's

approval of unbounded prosecutorial discretion.  In a concurrence in *Gregg*, Justice White

expanded on the reasons why he thought unbounded prosecutorial discretion did not violate the

Eighth Amendment, writing that "absent facts to the contrary" he would not assume that

prosecutors will "exercise [their] power in a standardless fashion."  *Gregg*, 428 U.S. at 225

(White, J., concurring).  Justice White assumed the following:

> [T]he standards by which [prosecutors] decide whether to charge a capital felony
> will be the same as those by which the jury will decide the questions of guilt and
> innocence.  Thus defendants will escape the death penalty through prosecutorial
> charging decisions only because the offense is not sufficiently serious; or because
> the proof is insufficiently strong.

*Id.*   In fact, as discussed above, under the current system many prosecutors do not seek the death

penalty in every death-eligible case if they think that a jury would not return a death sentence.

Some decide not to seek the death penalty upon request by the victim's family, *see Jury Process

in Zamora Murder Trial to Start Jan. 20*, DALLAS MORNING NEWS, Dec. 6, 1997, or because

the defendant hires an experienced defense attorney, Texas Civil Rights Project, *The Death Penalty In Texas* 22 (2000), http://www.texascivilrightsproject.org, or, as discussed above, possibly because the victim of the crime is not white.  Taking into consideration all of these facts, the assumption that it is unnecessary to channel a prosecutors' discretion is illogical and misguided.

Noting the constitutional problems inherent in a system where prosecutors enjoy unchecked freedom and widely varying standards when deciding whether to seek the death penalty, the New Jersey Supreme Court, prior to the governor abolishing the death penalty statewide in 2007, has called for standards to "instill uniformity in charging and prosecuting practices throughout the state." *State v. Marshall*, 613 A.2d 1059, 1112 (N.J. 1992).  That court acknowledged the fact that courts should not usurp the decision-making function of prosecutors but argued that in light of the "need to promote uniformity in the administration of the death penalty," statewide standards were warranted.  *State v. Koedatich*, 548 A.2d 939, 955 (N.J. 1988).  These recommendations were made on the basis of the Eighth Amendment requirements of reliability and non-arbitrariness in capital proceedings.  Combined with the Equal Protection Clause's requirement that standards be in place to ensure equality with regards to fundamental rights, such standards are not simply advisable, they are constitutionally required.

## 16.   MR. RIPKOWSKI'S PROLONGED STAY ON DEATH ROW VIOLATES HIS RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AMENDMENT OF THE UNITED STATES CONSTITUTION.

Mr. Ripkowski has now spent almost 10 years on death row for a crime for which, because of his mental condition, he may be innocent of the death penalty.  Mr. Ripkowski's continued incarceration under a death sentence violates both the United States Constitution as

well as International Law, and this Court should give full consideration to his substantial claims of constitutional violations.

The question of whether the prolonged incarceration of an individual prior to their execution violates the Eighth Amendment is not a new issue. Over 100 years ago, the Supreme Court of the United States granted a writ of habeas corpus to an individual awaiting execution in Colorado based upon the conditions under which he was imprisoned. *In re Medley*, 134 U.S. 160, 172-73 (1890) (holding uncertainty and delay in execution, along with the infliction of solitary confinement amounted to an *ex post facto* violation). The Supreme Court, in *Medley*, recognized the anguish which an individual suffers awaiting an uncertain execution, stating that:

> [W]hen a prisoner sentenced by a court to death is confined in the penitentiary awaiting the execution of the sentence, one of the most horrible feelings to which he can be subjected during that time is the uncertainty during the whole of it, which may exist for the period of four weeks, as to the precise time when his execution shall take place.

*Id*. at 173.

Furthermore, the Court recognized that forcing a prisoner to await his execution in solitary confinement was an "additional punishment of such a severe kind that it is spoken of…as 'a further terror and peculiar mark of infamy' to be added to the punishment of death." *Id.* at 170 (citation omitted).

The issue has also been debated in both international human rights tribunals and foreign courts. In several cases, such courts have found long periods of confinement prior to execution to be incompatible with rights which are almost identical to those protected by the Eighth Amendment.

The Inter-American Commission on Human Rights has found that the confinement of a prisoner on death row for 18 years, coupled with repeated execution dates and a conviction and sentence by a "tainted" jury, violated Article XXVI of the American Declaration of the Rights and Duties of Man, which guarantees that "[e]very person accused of an offense has the right…not to receive cruel, infamous or unusual punishment". *Andrews v. U.S.*, Case 11.139, December 6, 1996.

The European Court of Human Rights in *Soering v. U.K.*, 11 EHRR 439 (1989) similarly decided "the very long time spent on death row in such extreme conditions, with the ever present and mounting anguish of awaiting execution of the death penalty," in conjunction with the age and mental state of the defendant, constituted a violation of Article 3 of the European Convention on Human Rights, which prohibits "inhuman or degrading treatment or punishment". In that case, the Court considered a confinement of only six to eight years.

The United Kingdom's Privy Council has described a delay of 14 years between sentencing and execution as "shocking" and "wholly unacceptable" and held that it amounted to a breach of section 17(1) of the Jamaican Constitution, which assures that "[n]o person shall be subjected to torture or to inhuman or degrading punishment or other treatment." The Court held that "in any case in which execution is to take place more than five years after sentence there will be strong grounds for believing that the delay is such as to constitute 'inhuman or degrading punishment or other treatment'". *Pratt, et al. v. Att. Gen. for Jam. et al.,* [1994] 4 All ER 769.

In the United States, the Supreme Court raised a new debate in the courts regarding this issue in the memorandum respecting the denial of *certiorari* in *Lackey v. Tex.*, 514 U.S. 1045 (1995) (Stevens, J., mem., respecting denial of *certiorari*). In *Lackey*, Justices Stevens (Justice

Breyer agreed as to the importance of the issue) recognized the merit of claims that the inordinate delays in the execution of sentence in capital cases violated the Eighth Amendment of the United States Constitution and invited the "state and federal courts to 'serve as laboratories in which the issue receives further study before it is addressed by [the Supreme Court].'" *Id.* at 1047 (quoting *McCray v. N.Y.*, 461 U.S. 961, 963 (1983)).

Following *Lackey*, prisoners who have spent many years on Death Row have asserted two types of Eighth Amendment claims.  First, that confinement on Death Row for such an extended period of time itself constitutes cruel and unusual punishment because awaiting execution for an extended period of time subjects the inmate to extraordinary psychological duress and extreme physical and social restrictions inherent in confinement on Death Row. Second, that, after a sufficient amount of time has elapsed since a prisoner's conviction, the execution would violate the Eighth Amendment because the retributive and deterrent effects of actually carrying out the execution are dramatically diminished. Although the Supreme Court found the death penalty does not breach the Eighth Amendment as it serves valid social purposes of, *inter alia,* retribution and deterrence, *Gregg*, 428 U.S. at 183, such justification all but disappears after years of delay.  Both of these claims are valid in Mr. Ripkowski's case.

 The torturous effects of the "death row phenomenon"—that is, the psychologically devastating effects of a lengthy stay on death row—have been widely noted by jurists during the last three decades.[70]  Similar views have been expressed by legal commentators and mental health experts.[71]

---

[70] *See, e.g.*, *Elledge v. Fla.*, 525 U.S. 944, 945 (1998) (Breyer, J., dissenting from denial of certiorari); *Lackey*, 514 U.S. at 1045-47 (opinion of Stevens, J., respecting denial of certiorari) (citing cases); *Free v. Peters*, 50 F.3d 1362, 1363 (7th Cir. 1995)*, cert. denied*, 514 U.S. 1034

(1995) (Cudahy, J., dissenting) (citing cases); *Coleman v. Balkcom*, 451 U.S. 949, 952 (1981) (Stevens, J., concurring in the denial of certiorari) (recognizing that the mental pain suffered by a condemned prisoner awaiting execution "is [a] significant form of punishment" that "may well be comparable to the consequences of the ultimate step itself [*i.e.*, the actual execution]"); *Solesbee v. Balkcom*, 339 U.S. 9, 14 (1950) (Frankfurter, J., dissenting) ("In the history of murder, the onset of insanity while awaiting execution of a death sentence is not a rare phenomenon."); *Furman*, 408 U.S. at 288-89 (Brennan, J., concurring) ("[W]e know that mental pain is an inseparable part of our practice of punishing criminals by death, for the prospect of pending execution exacts a frightful toll during the inevitable long wait between the imposition of sentence and the actual infliction of death."); *People v. Anderson*, 493 P.2d 880, 894, 6 Cal.3d 628, 649 (Cal. 1972) ("The cruelty of capital punishment lies not only in the execution itself and the pain incident thereto, but also in the dehumanizing effects of the lengthy imprisonment prior to the execution during which the judicial and administrative procedures essential to due process of law are carried out.  Penologists and medical experts agree that the [protracted] process of carrying out a verdict of death is often so degrading and brutalizing to the human spirit as to constitute psychological torture."), *cert. denied*, 406 U.S. 958 (1972); *Suffolk County Dist. Att. v. Watson*, 411 N.E.2d 1274, 1289-95 (Mass. 1980) (Liacos, J., concurring) (vivid and detailed description of the type of psychological pain and torture that a condemned person experiences while awaiting execution); *Id.* at 1287 (Braucher, J., concurring) (arguing that capital punishment is unconstitutional under Massachusetts Constitution in part because "it will be carried out only after agonizing months and years of uncertainty"); *Commonwealth v. O'Neal*, 339 N.E.2d 676, 680-81 (Mass. 1975) (Tauro, C.J., concurring) ("The convicted felon suffers extreme anguish in anticipation of the extinction of his existence."); *State v. Richmond*, 886 P.2d 1329, 1994 WL 699008, at *3 (Ariz. Dec. 15, 1994); *Hopkinson v. State*, 632 P.2d 79, 209-11 (Wyo. 1981) (Rose, C.J., dissenting in part), *cert. denied*, 455 U.S. 922 (1982) (recognizing "the dehumanizing effects of long imprisonment pending execution"); *State v. Ross*, 646 A.2d 1318, 1379 (Conn. 1994) (Berdon, J., dissenting) (same), *cert. denied*, 513 U.S. 1165 (1995); *Soering v. U.K.*, 11 Eur. Hum. Rts. Rep. 439, 28 I.L.M. 1063 (1989) (European Court of Human Rights refused to extradite a German national from UK to Virginia to face capital murder charges because of anticipated time that he would have to spend on death row if sentenced to death); *Vatheeswaran v. State of Tamil Nadu*, 2 S.C.R. 348, 353 (India 1983) (criticizing the "dehumanizing character of the delay" in carrying out an execution; *Sher Singh et al. v. The State of Punjab*, 2 S.C.R. 582 (India 1983) ("Prolonged delay in the execution of a death sentence is unquestionably an important consideration for determining whether the sentence should be allowed to be executed."); *Catholic Comm'n for Justice & Peace in Zimb. v. Att. Gen.*, No. S.C. 73/93 (Zimb. June 24, 1993) (reported in 14 HUM. RTS. L. J. 323 (1993)).

[71] *See, e.g.*, Schabas, *Execution Delayed, Execution Denied*, 5 CRIM. L. FORUM 180 (1994) [available on WESTLAW]; Lambrix, *The Isolation of Death Row* in FACING THE DEATH PENALTY 198 (M. Radelet ed. 1989); Millemann, *Capital Post-Conviction Prisoners' Right to Counsel*, 48 MD. L. REV. 455, 499-500 (1989) ("There is little doubt that the consciousness of impending death can be immobilizing. . . .  This opinion has been widely shared by [jurists], prison wardens, psychiatrists and psychologists, and writers.") (citing authorities); Mello, *Facing Death Alone*, 37 AMER. L. REV. 513, 552, n.251 (1988) (same) (citing studies); Wood,

## A.   THE   BRITISH   PRIVY   COUNCIL'S   LANDMARK DECISION IN *PRATT & MORGAN.*

Mr. Ripkowski's Eighth Amendment arguments are strongly supported by a recent landmark decision in a capital appeal rendered by the Judicial Committee of the Privy Council of the United Kingdom (the "Privy Council").[72]   See *Pratt & Morgan v. Att. Gen. of Jam.*, 33 I.L.M. 364 (Privy Council Appeal No. 10 of 1993, Nov. 2, 1993) (en banc).

In *Pratt*, in an appeal by two condemned men on Jamaica's death row, the Privy Council, sitting *en banc* for the first time in five decades, unanimously held that carrying out the death sentences of the two men would be "torture," and "inhuman" and "degrading" punishment.  The

_____

*Competency for Execution: Problems in Law and Psychiatry*, 14 FLA. ST. U. L. REV. 35, 37-39 (1986) ("The physical and psychological pressure besetting capital inmates has been widely noted ....  Courts and commentators have argued that the extreme psychological stress accompanying death row confinement is an eighth amendment violation in itself or is an element making the death penalty cruel and unusual punishment.") (citing authorities); Stafer, *Symposium On Death Penalty Issues: Volunteering for Execution*, 74 J. CRIM. L. 860, 861, n.10 (1983) (citing studies); Holland, *Death Row Conditions: Progression Towards Constitutional Protections*, 19 AKRON L. REV. 293 (1985); Johnson, *Under Sentence of Death: The Psychology of Death Row Confinement*, 5 LAW & PSYCHOL. REV. 141, 157-60 (1979); Hussain & Tozman, *Psychiatry on Death Row*, 39 J. CLINICAL PSYCHIATRY 183 (1979); West, *Psychiatric Reflections on the Death Penalty*, 45 AMER. J. ORTHOPSYCHIATRY 689, 694-95 (1975); Gallemore & Parton, *Inmate Responses to Lengthy Death Row Confinement*, 129 AMER. J. PSYCHIATRY 167 (1972); Bluestone & McGahee, *Reaction to Extreme Stress: Impending Death By Execution*, 119 AMER. J. PSYCHIATRY 393 (1962); Note, *Mental Suffering Under Sentence of Death: A Cruel and Unusual Punishment*, 57 IOWA L. REV. 814, 830 (1972); G. Gottlieb, *Testing The Death Penalty*, 34 S. CAL. L. REV. 268, 272, n.15 (1961); A. Camus, *Reflections on the Guillotine* in RESISTANCE, REBELLION & DEATH 205 (1966) ("As a general rule, a man is undone waiting for capital punishment well before he dies."); F. Dostoyevsky, THE IDIOT 47-48 (D. Magarshack trans. 1955); Duffy & Hirshberg, EIGHTY-EIGHT MEN AND TWO WOMEN 254 (1962) ("One night on death row is too long, and the length of time spent there by [some inmates] constitutes cruelty that defies the imagination.  It has always been a source of wonder to me that they didn't all go stark, raving mad.") (quoting former warden of California's San Quentin Prison).

[72]  The Privy Council is the highest appellate court for Commonwealth nations.  The jurists who sit on the Privy Council are likewise members of England's highest domestic appellate court, the House of Lords ("the Law Lords").

Privy Council did not hold that capital punishment was cruel and unusual *per se*, but instead focused on the fact that the condemned men had been on death row for a protracted period of time (fourteen years). The Privy Council stated:

> There is an instinctive revulsion against the prospect of [executing] a man after he has been held under sentence of death for many years. What gives rise to this instinctive revulsion? The answer can only be our humanity; we regard it as an inhuman act to keep a man facing the agony of execution over a long extended period of time.

*Id.* at 380.

*Pratt* also surveyed the history of English common law regarding the subject of lengthy imprisonment of a condemned man on death row and the repeated setting of execution dates in a single case. The Privy Council concluded that neither practice was condoned historically at common law. *See*, e.g., *Id.* at 367 ("It is difficult to envisage any circumstance in which in England a condemned man would have been kept in prison for years awaiting an execution."); *Id.* at 369 (noting the "common law practice that execution followed as swiftly as practical after sentence"); *see also Riley v. Att. Gen. of Jam.*, 1 AC 719, 3 All ER 469 (Privy Council 1983) (Lord Scarman, dissenting, joined by Lord Brightman) ("[T]here is a formidable case for suggesting that execution after inordinate delay would have infringed the prohibition against cruel and unusual punishment to be found in Section 10 of the Bill of Rights of 1689….") (Majority opinion overruled by *Pratt & Morgan*).[73] *See also Lackey*, 514 U.S. at 1045 (a delay of 17 years, "if it ever occurred, certainly would have been rare in 1789, and thus the practice of the Framers would not justify the denial of petitioner's claim"). *Pratt*, along with U.S. and

---

[73]  As Justice Scalia has recognized, "[t]here is no doubt" that Section 10 of the English Bill of Rights of 1689 "is the antecedent" of the cruel-and-unusual-punishments clause of our Eighth Amendment. *See Harmelin v. Mich.*, 501 U.S. 957, 966 (1991) (opinion of Scalia, J.).

international authorities discussed herein, offers a firm legal basis for Mr. Ripkowski's Eighth

Amendment claim challenging the State's right to execute the death sentence in this case.[74]

### B.   EIGHTH   AMENDMENT   AUTHORITY   SUPPORTING   MR. RIPKOWSKI'S CLAIM.

Mr. Ripkowski's almost 10 year stay on death row violates the Eighth Amendment under

both the standards in place in 1789 and under modern standards.  Recent Eighth Amendment

decisions have, as a threshold matter, focused on whether a challenged punishment was

considered unacceptable at the time of the adoption of our Bill of Rights.  *See,* e.g., *Stanford*, 492

at 368 (in rejecting claim that the execution of 16 and 17 year olds is cruel and unusual, the

Court noted that the punishment was not "'one of those modes or acts of punishment that had

been considered cruel and unusual at the time that the Bill of Rights was adopted'") (quoting

*Ford*, 477 U.S. at 405).  If a punishment was considered cruel and unusual in 1789, then the

Court's Eighth Amendment analysis goes no further; it is cruel and unusual today.  *See Ford*,

477 U.S. at 405-06.  Unquestionably, the Framers of the Constitution considered long delays

between sentencing and execution cruel and unusual.  *Elledge*, 525 U.S. at 944-45 (Breyer, J.,

dissenting from denial of certiorari) (collecting sources, including petition seeking commutation

of a death sentence in part because of a lengthy five-month delay).

The Privy Council's review of English common law establishes that a protracted stay on

death row would never have been tolerated at common law under any circumstances.  Likewise,

---

[74]  Hundreds of American courts and jurists have been guided by the decisions of the Privy Council, the highest expositor of law in the United Kingdom, whose common law has greatly shaped our own law.  *See, e.g.*, *U.S. v. Raddatz*, 447 U.S. 667, 679 (1980) (citing a Privy Council decision with approval); *Kilbourn v. Thompson*, 103 U.S. 168, 186 (1881) (same); *see also Fisher v. U.S.*, 328 U.S. 463, 486-88 (1946) (Frankfurter, J., dissenting) ("This Court in

in the United States in the eighteenth and nineteenth centuries, executions routinely took place within one year of conviction. *See* Dwight Arons, *Can Inordinate Delay Between a Death Sentence and Execution Constitute Cruel and Unusual Punishment*, 29 SETON HALL L. REV. 147, 179-81 (1998). Although elaborate appeals in capital cases (leading to frequent re-trials) are a relatively recent phenomenon – largely a function of the Supreme Court's post-*Furman* Eighth Amendment capital jurisprudence—the necessary delay occasioned by such appeals cannot constitutionally extend to the point where the State keeps a person on death row for well over a decade solely because of delay in adjudicating ordinary appeals.[75]  Such an inordinate delay— which would never have been permitted at common law—is by itself a sufficient reason to prohibit the State of Texas from carrying out Mr. Ripkowski's scheduled execution. *See Ford*, 477 U.S. at 405 ("There is now little room for doubt that the Eighth Amendment's ban on cruel and unusual punishment embraces, at a minimum, those modes or acts of punishment that had been considered cruel and unusual at the time that the Bill of Rights was adopted").

Assuming that a particular type of punishment was permitted at the time that the Bill of Rights was adopted—or, in this case, assuming that the post-*Furman* requirement of meaningful appellate review in capital cases somehow alters the common law requirement described above—a second, more difficult question arises: whether a punishment that may have been acceptable to the Framers of the Constitution nonetheless now violates modern society's

---

reviewing a conviction for murder . . . ought not be behind . . . the Privy Council ....") (discussing Privy Council decisions).

[75]  Relying on other international law cases, the Privy Council in *Pratt* held that even if an inordinate delay between trial and execution is attributable to *discretionary* appeals filed by the condemned person, the government nevertheless has no right to carry out an execution if the delay resulted from legitimate, non-frivolous appeals. *See, e.g.*, *Pratt*, 33 I.L.M. at 380-84 (discussing cases).

civilized standards. *See*, e.g., *Campbell v. Wood*, 18 F.3d 662, 682-83 (9th Cir. 1994) (en banc), *cert. denied*, 511 U.S. 1119 (1994) (hanging not a cruel and unusual punishment). The Supreme Court has interpreted the reach of the Amendment in a "flexible and dynamic manner." *Gregg*, 428 U.S. at 171; *see also Weems v. U.S.*, 217 U.S. 349, 373 (1910) ("a principle, to be vital, must be capable of wider application than the mischief which gave it birth"). In recent times, the Supreme Court has recognized that "the Eighth Amendment's proscriptions are not limited to those practices condemned by the common law in 1789." *Ford*, 477 U.S. at 406. Rather, the Amendment "must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." *Trop*, 356 U.S. at 101. As the concepts of dignity and civility evolve, so too do the limits of what is considered cruel and unusual. Such factors include the practices among the majority of the states in this country and international practices. *See, e.g., Stanford*, 492 U.S. at 369; *Coker v. Ga.*, 433 U.S. 584 (1977); *Enmund v. Fla.*, 458 U.S. 782 (1982).

International law and practice is particularly relevant for purposes of this claim. The weight of international authority—including *Pratt*, a recent unanimous decision by the highest court in a fellow common-law jurisdiction—strongly supports Mr. Ripkowski's contention that his execution would violate the Eighth Amendment.

Other well-established Eighth Amendment principles of broad application also are relevant to this Court's analysis. The Eighth Amendment "embodies broad and idealistic concepts of dignity, civilized standards, humanity and decency'" against which forms of punishment must be measured. *Estelle v. Gamble*, 429 U.S. 97, 102 (1976) (citation omitted). It "expresses the revulsion of civilized man against barbarous acts -- the 'cry of horror' against

man's inhumanity to his fellow man." *Robinson v. Cal.*, 370 U.S. 660, 676 (1962) (Douglas, J., concurring).

The Eighth Amendment's restrictions on the ability of a state to impose certain types of punishment "aim . . . to protect the condemned from [unnecessary] fear and pain . . . or to protect the dignity of society itself from the barbarity of exacting mindless vengeance." *Ford*, 477 U.S. at 410. At its core, the Eighth Amendment stands to safeguard "nothing less than the dignity of man." *Trop*, 356 U.S. at 100. In the particular context of capital punishment—where the infliction of some incidental pain is obviously unavoidable—the Supreme Court's Eighth Amendment analysis of what is "cruel and unusual" turns on whether unnecessary or gratuitous pain is part of the punishment. As the Court stated in *State ex. rel. Francis v. Resweber*, 329 U.S. 459 (1947):

> The traditional humanity of modern Anglo-American law forbids the infliction of *unnecessary pain* in the execution of the death sentence. Prohibition against the wanton infliction of pain has come to our law from the [English] Bill of Rights [of 1689]. . . . Mr. Francis' suggestion is that because he once underwent the psychological strain of preparation for electrocution, now to require him to undergo this preparation again subjects him to a lingering or cruel and unusual punishment.... [The Constitution does not protect against] the *necessary suffering* involved in any method employed to extinguish life humanely. The fact that an *unforeseen accident* prevented the prompt consummation of the sentence cannot, it seems to us, add an element of cruelty to a subsequent execution. There is no purpose to inflict *unnecessary pain* nor any *unnecessary pain* involved in the proposed execution. The situation of the unfortunate victim of this accident is just as though he had suffered the identical amount of mental anguish and physical pain in any other occurrence, such as, for example, a fire in the cell block.

*Id.* at 463-64 (emphasis added).

Mr. Ripkowski has endured a needlessly lingering form of torturous psychological punishment that, if the State has its way, will culminate in a lethal injection. *See Gregg*, 428 U.S. at 170-71 (unnecessarily lingering form of execution is unconstitutional under the Eighth

Amendment) (citing *In re Kemmler*, 136 U.S. 436, 447 (1890)).  Mr. Ripkowski has been given a life sentence and a death sentence.  The fact that Mr. Ripkowski is challenging the lingering *psychological* anguish resulting from his excessively lengthy stay on death row and repeated execution dates—and is not alleging *physical* torture—does not foreclose an Eighth Amendment claim.[76]  It is well-established that the infliction of extreme mental anguish can be a form of unconstitutional torture.[77]

---

[76]  In *Pratt*, the British Privy Council focused exclusively on the *mental* torture inflicted on two condemned men on Jamaica's death row.  *See Pratt*, slip op., at 1-2 (describing "the agony of mind that these men must have suffered as they have alternated between hope and despair in the 14 years that they have been in prison facing the gallows.  It is unnecessary to refer to the evidence describing . . . the *emotional and psychological impact of this experience*, for it only reveals that which is to be expected.").

[77]  *See, e.g.*, *Trop*, 356 U.S. at 102 (expatriation as penalty for desertion "subjects the individual to a fate of ever-increasing fear and distress"); *Hudson v. McMillian*, 503 U.S. 1, 16 (1992) (Blackmun, J., concurring) ("I am unaware of any precedent of this Court to the effect that psychological pain is not cognizable for constitutional purposes [under the Eighth Amendment].  If anything, our precedent is to the contrary."); *Furman*, 408 U.S. at 271-73 (Brennan, J., concurring) ("[T]he Framers also knew []that there could be exercises of cruelty other than those which inflicted bodily pain or mutilation."); *see also Smith v. Aldingers*, 999 F.3d 109, 110 n.4 (5th Cir. 1993) (collecting recent cases holding that mental or psychological torture can violate the Eighth Amendment); *cf. Medley*, 134 U.S. at 172 (recognizing the "immense mental anxiety" that a condemned man experiences when the authorities intentionally refuse to inform him of the precise date of his scheduled execution, and referring to it as "one of the most *horrible feelings* to which he can be subjected") (emphasis added).

*Medley* was an *ex post facto* case, its century-old recognition of the "immense" and "horrible" *mental* anguish that a condemned man feels when he does not know the date of his execution – which the Supreme Court recognized as a form of "punishment" implicating the *ex post facto* clause – is instructive here.  *See Lackey*, 514 U.S. at 1045-46.  Mr. Ripkowski does not allege that particular type of mental anxiety caused by his confinement on Texas's death row; however, he does contend that the mental anguish that he has faced has been equally or more "immense" and "horrible."  Therefore, to permit the State to carry out an execution after requiring Mr. Ripkowski to endure such torturous conditions would unquestionably violate the Eighth Amendment.

Additionally, the conditions under which Mr. Ripkowski has been incarcerated in the administrative segregation units have been found to violate the Eighth Amendment. In *Ruiz v Johnson*, 37 F.Supp.2d 855 (S.D. Tex. 1999), the United States District Court for the Southern District of Texas stated that:

> *The administrative segregation units of the Texas prison system deprive inmates of the minimal necessities of civilized life...* even those inmates who must be segregated from general population for their own or others' safety retain some constitutional rights. *Texas' administrative segregation units violate those rights through extreme deprivations which cause profound and obvious psychological pain and suffering. Texas' administrative segregation units are virtual incubators of psychoses-seeding illness in otherwise healthy inmates and exacerbating illness in those already suffering from mental infirmities.*

*Id.* at 906 (emphasis added). The District Court concluded that:

> Texas prison inmates continue to live in fear-a fear that is incomprehensible to most of the state's free world citizens. More vulnerable inmates are raped, beaten, owned, and sold by more powerful ones. Despite their pleas to prison officials, they are often refused protection. Instead, they pay for protection, in money, services, or sex. Correctional officers continue to rely on the physical control of excessive force to enforce order. Those inmates locked away in administrative segregation, especially those with mental illnesses, are subjected to extreme deprivations and daily psychological harm. Such practices and conditions cannot stand in our society, under our Constitution.

*Id.* at 940.

This case was focused extensively on expert opinions of the conditions in prison units including the Polunsky Unit—the current death row. *Id.* at 911. Thus the length of Mr. Ripkowski's incarceration, together with the conditions under which he has been held in the administration unit, constitutes a clear violation of the Eighth Amendment and international law.

C.    **MR. RIPKOWSKI'S EXECUTION AFTER NEARLY 10 YEARS ON DEATH ROW WOULD HAVE NO DETERRENT OR RETRIBUTIVE EFFECT AND WOULD THEREFORE SERVE NO PENOLOGICAL PURPOSE, THUS CONSTITUTING A BREACH OF THE EIGHTH AMENDMENT.**

In *Gregg*, the Supreme Court found that the death penalty did not in itself violate the Eighth Amendment for two reasons.  First, the death penalty was considered permissible by the Framers.  Second, the Court held that the death penalty might serve two principal social purposes: retribution and deterrence.  *Gregg,* 428 U.S. at 177, 183.  If, therefore, a particular execution does not serve those purposes, the constitutional justification for such execution is removed.

Drawing upon the Supreme Court's previous judgment in *Furman*, 408 U.S. at 312 (White, J., concurring) and *Gregg*, 428 U.S. at 183, that "[t]he sanction imposed cannot be so totally without penological justification that it results in the gratuitous infliction of suffering", Justice Stevens in *Lackey* stated that when the death penalty does not serve the purposes of deterrence or retribution, it violates the Eighth Amendment.  *Lackey*, 514 at 1046.  In the case of a prisoner who had spent 17 years on Death Row, he stated that "the acceptable state interest in retribution has arguably been satisfied by the severe punishment already inflicted" and that "the additional deterrent effect from an actual execution now, on the one hand, as compared to 17 years on death row followed by the prisoner's continued incarceration for life, on the other, seems minimal*." Lackey*, 514 U.S. at 1045-46.

In *Knight*, Justice Breyer, dissenting in the Court's denial of *certiorari*, agreed with Justice Stevens in *Lackey*, 514 at 1046, stating that "the longer the delay, the weaker the justification for imposing the death penalty in terms of punishment's basic retributive or deterrent purposes."  *Knight v Fla.*, 528 U.S. 990, 995 (1999) (Breyer, J., dissenting respecting denial of *certiorari*).

In a Ninth Circuit case, *Ceja v Stewart,* 134 F.3d 1368 (9th Cir. 1998)*,* Judge Fletcher (dissenting) questioned whether imposing the death penalty upon an inmate who had been incarcerated for 23 years would serve any penological purpose. He stated that:

> At the very least, after such an extraordinary length of time, the State must demonstrate that its interest in securing stability and harmony to the community through the exaction of this most extreme form of retribution continues to have effect and force.

*Id.* at 1374, and that:

> [T]here can be no doubt that Ceja has brought a substantial challenge, of precisely the kind that the [Supreme] Court envisioned in *Gregg*, to the continuing sufficiency of deterrence as a justification for carrying out his execution.

*Id*. at 1376.

Mr. Ripkowski has now spent almost 10 years on Death Row. This period of delay is sufficient to reduce any deterrent and retributive effect that his execution would have. This is particularly the case when coupled with the credible doubt as to whether Mr. Ripkowski should have gotten a death sentence; the penological benefit of such execution would be so minimal as to constitute a breach of the Eighth Amendment.

## 16. THE TEXAS CONTEMPORANEOUS OBJECTION RULE IS INHERENTLY A *DISCRETIONARY* RULE OF PROCEDURE.

Our contemporaneous objection rule is an inherently *discretionary* rule whose waiver is not subject to any articulated standards, TEX. R. APP. PROC. 52 (codifies the contemporaneous objection rule), and is not a legislative enactment but instead is a court-made rule. As the Court of Criminal Appeals explained in *Marin v. State*, 851 S.W.2d 275, 278 (Tex. Crim. App. 1993):

"Rule 52(a) is not an act of the Legislature" but "'is plainly a rule of procedure and does not affect the substantive rights of a criminal defendant.'" *Id.* at 278.[46]

As further explained, the Court of Criminal Appeals is not required to apply the contemporaneous objection rule as a matter of state-law jurisdiction and may excuse non-compliance with the rule in any case (and frequently does so). *See Carter v. State*, 656 S.W.2d 468, 469 (Tex. Crim. App. 1983) ("Once jurisdiction…is invoked, exercise of [a Texas court's] reviewing functions *is limited only by its own discretion*….") (emphasis added); *Rezac v. State*, 782 S.W.2d 869, 870 (Tex. Crim. App. 1990). Notably, *Carter* was cited by the Court of Criminal Appeals in *Barney v. State*, 698 S.W.2d 114 (Tex. Crim. App. 1985), as authority for waiving the contemporaneous objection rule in that case. In *Barney*, the court stated, "[a]t trial, appellant failed to [raise the claim raised on appeal]. Thus, nothing is preserved for review…. *We nevertheless proceed to its review in the interest of justice*." *Id.* at 122-23 (citing *Carter*, 656 S.W.2d at 469) (emphasis added) (citations omitted). Mr. Ripkowski therefore, requests that the Court rule on all of his issues on the merits of the claims.

## 18.   THE COURT SHOULD LOOK AT ALL OF MR. RIPKOWSKI'S CLAIMS ON THE MERITS, AND NOT RELY ON THE CONTEMPORANEOUS OBJECTION RULE FOR PROCEDURAL DEFAULT.

---

[77]  The Texas Rules of Appellate Procedure were promulgated by the Texas Supreme Court and Texas Court of Criminal Appeals, effective September 1, 1986. The Rules were not enacted by the Texas Legislature.

During the last decade or so there have been at least three dozen *published* cases in which the Texas Court of Criminal Appeals has, without any consistent reason, excused a criminal defendant's non-compliance with Texas's contemporaneous objection rule. This number does not include the countless number of *unpublished* cases in which non-compliance with the procedural rule was excused.[44]  Nor does this number include the many decisions rendered by the intermediate Texas appellate courts in which the procedural rule was waived.[45]

Mr. Ripkowski contends that this sizeable number of cases in which Texas courts have failed to follow the contemporaneous objection rule eliminates the rule as an independent and adequate state procedural ground, because it demonstrates that the rule is not "strictly and regularly" followed. *Hicks v. Scott*, ___ F.3d ___, 1994 WL 525551 at *3 (5th Cir. Oct. 13, 1994).

The Texas court in each case indeed noted that no contemporaneous objection was made at trial; however, rather than addressing the merits of the otherwise defaulted claims only in the alternative (while also denying relief on procedural grounds), *the court reached the merits and refused to deny relief based on a lack of contemporaneous objection. See, e.g., Burks v. State*,

---

[44] *See, e.g., Richardson v. State*, No. 70,743, unpublished slip op. at 4 (Tex. Crim. App. Dec. 1, 1993); *Rudd v. State*, No. 70,851, unpublished slip op. at 29 n.13 (Tex. Crim. App. Sept. 22, 1993); *Jones v. State*, No. 70,740, unpublished slip op., (Tex. Crim. App. Sept. 16, 1992); *see also id*. (White, J., dissenting) (majority addressed merits of claim despite procedural default).

[45] *See, e.g., Mock v. State*, 848 S.W.2d 215, 222 (Tex.App.--El Paso 1993); *Little v. State*, 1992 WESTLAW 43934 at *1 (Tex.App.--Houston March 5, 1992); *Golden v. State*, 1992 WESTLAW 1938 (Tex.App.--Dallas January 3, 1992); Ardion v. State, 1992 WESTLAW 133777 at *2 (Tex.App.--Houston June 18, 1992); Price v. State, 1992 WESTLAW 360170 at *4 (Tex.App.--Dallas Nov. 19, 1992); Rodriguez v. State, 1992 WESTLAW 5554 at *3 (Tex.App.--Houston Jan. 16, 1992); *State v. Johnson*, 1992 WESTLAW 314359 at *2 (Tex.App. Oct. 29, 1992); *Burns v. State*, 835 S.W.2d 733, 737 (Tex.App.--Corpus Christi 1992); *Ray v. State*, 1991 WESTLAW 202754 at *1 (Tex.App.--Houston Oct. 10, 1991); *Watts v. State*, 1990 Tex.App. LEXIS 1384, at *6 (Tex.App.--Houston 1990).

876 S.W.2d 877, 903, 908 (Tex. Crim. App. 1994) ("We find that appellant did not make the same objection at trial that he makes in his brief. Consequently, we find that no error is preserved. *However, in the interests of justice we will address his argument.*") (emphasis added); *Butler v. State*, 872 S.W.2d 227, 236, 237 (Tex. Crim. App. 1994) ("Appellant's trial counsel never stated that he believed that Appellant's physical condition at the time of the [confession] raised the issue that force was used to obtain the confession. A timely and reasonably specific objection is required to preserve error for appellate review. TEX. R. APP. P. 52(a).... *Although we find that he failed to preserve error, we will address his argument in the interests of justice*.") (emphasis added); *Harris v. State*, 790 S.W.2d 568, 583, n.13 (Tex. Crim. App. 1989) (after addressing merits of claim, court noted in footnote that "[w]e also observe that appellant did not object"; court did not alternatively hold that claim was defaulted; *Stoker v. State*, 788 S.W.2d 1, 16 n.10 (Tex. Crim. App. 1989) (after finding no trial objection, court held, "*[h]owever, in the interest if justice and due to the severity of the attending punishment we addressed appellant's claim*.") (emphasis added); *Barnard v. State*, 730 S.W.2d 703, 716 (Tex. Crim. App. 1988) ("This court has repeatedly held that a general objection such as the type used here presents no error for review....*Nevertheless, we will examine the merits of Appellant's complaint*.") (emphasis added); *Hogue v. State*, 711 S.W.2d 9, 28 (Tex. Crim. App. 1986) ("Because Appellant's objection at trial varied from the ground he now urges on appeal, we are not mandated to consider his argument....*Nevertheless, we will address the merits of Appellant's complaint*.") (emphasis added); *Barney*, 698 S.W.2d at 123 ("At trial, appellant failed to [object]....Thus, nothing is preserved for review....*We nevertheless proceed to review [the claim] in the interest of justice*.") (emphasis added).

It is readily apparent that the Texas court in these cases did not rely on the procedural default as an "alternative" basis for denying relief.  Rather, after noting that the claim was not made at trial and, thus, did not comply with the ordinary preservation requirements, the court— "nevertheless"  or "in the interest of justice"—excused a defendant's non-compliance with the procedural default rule and proceeded to reach the merits of an otherwise defaulted claim.  Under such circumstances, the state court did not rely on a procedural default as a basis for denying relief.  *See Harris v. Reed*, 489 U.S. 255, 266 (1989).

## PRAYER FOR RELIEF

Mr. Ripkowski's trial was deeply flawed through a combination of ineffective assistance of counsel, judicial error, and prosecutorial misconduct.  As a result Mr. Ripkowski was deprived of fundamental constitutional rights, and this Court can have no confidence in the outcome of Mr. Ripkowski's trial.  Mr. Ripkowski is therefore asking the court to grant his Application, and reverse for a new trial.

WHEREFORE, Applicant Britt Allen Ripkowski asks and hereby Petitions that this Court:

1. Issue a writ of habeas corpus that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death.

2. Grant him further discovery and an evidentiary hearing at which he may present evidence in support of these claims, and allow him a reasonable period of time subsequent to any hearing this Court determines to conduct, in which to brief the issues of fact and of law raised by this petition or such hearing.

3. Order that due to his incompetence from his Bi-Polar disorder, that he be given a new "Original" State Habeas process.

4.  If this Court chooses to dismiss this petition for failure to exhaust state remedies for any issue presented herein, protect the Petitioner's right to meaningful federal habeas review either by entering an order specifically holding this cause in abeyance pending exhaustion and/or entering an order specifically finding that the federal statute of limitations contained in the Antiterrorism and Effective Death Penalty Act will be equitably tolled for the entire duration of the time it takes Petitioner to prepare and file a petition for writ of habeas corpus in state court.

5.  Grant such other relief as law and justice require.

Respectfully submitted,

/s/ **ANTHONY S. HAUGHTON**

State Bar No. 09234150

**HAUGHTON & ASSOCIATES**
D'VINCI BUILDING
3013 FOUNTAIN VIEW, SUITE 145
HOUSTON, TX 77057
Tel: (713) 995-7776
Fax: (713) 953-7482
ASHaughton@aol.com

**Attorney for Applicant**
**Britt Allen Ripkowski**

FILED: July 7, 2007

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this document and its supporting material was filed by electronic filing and/or first class mail on the above date on counsel for Respondent, Attorney General, Post conviction division.  PO Box, 12548, Capitol Station, Austin TX, 78711

/S/ Anthony S. Haughton

## **Verification**

I certify that I am familiar with the facts asserted herein and that they are true and correct to my personal knowledge.

Signed under pain and penalty of perjury

S/  Anthony S. Haughton