IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRITT ALLEN RIPKOWSKI, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 4:07-4097 |
| | § | |
| RICK THALER, Director, | § | |
| Texas Department of Criminal | § | |
| Justice-Correctional Institutions | § | |
| Division, | § | |
| | § | |
| Respondent. | § | |

## MEMORANDUM AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Petitioner Britt Allen Ripkowski is a Texas death row inmate. This case is before the Court on Ripkowski's Second Amended Petition for Writ of Habeas Corpus (Doc. # 30), and Respondent Rick Thaler's Motion for Summary Judgment (Doc. # 41). Having carefully considered the Petition, the Summary Judgment Motion, all the arguments and authorities submitted by counsel, and the entire record, the Court is of the opinion that Thaler's Motion for Summary Judgment must be **granted**, and Ripkowski's Second Amended Petition for Writ of Habeas Corpus should be **denied**.

## I.    BACKGROUND[1]

Ripkowski and Monica Allen dated, but had a stormy relationship. Ripkowski lived with Allen at various times in Salt Lake City, Utah and in Houston, Texas. At the time of the

---

[1]    The facts of the case are drawn largely from the opinion of the Texas Court of Criminal Appeals ("TCCA") affirming Ripkowski's conviction and sentence. *See Ripkowski v. State*, 61 S.W.3d 378 (Tex. Crim. App. 2001). Where this opinion diverges from, or expands upon, the TCCA's recitation of facts, such difference will be noted by a specific citation to the record.

events giving rise to this case, they were living apart, with Ripkowski in Houston and Allen in Salt Lake City.   Allen had a two-year-old daughter, Dominique "Nikki" Frome, from a prior relationship.

On December 22, 1997, a young woman's body was found by the side of a road near Monticello, Utah. The body was not identified at that time. On December 30, a missing persons report was filed on Allen and her daughter. The FBI and the Salt Lake City Police Department ("SLCPD") began an investigation of the disappearances. Detective Kelly Kent of the SLCPD was one of the officers assigned to investigate. On January 15, 1998, the body found in Utah was identified as Allen's.

The following day, Special Agent Gary Steger of the Houston Division of the FBI contacted Ripkowski at his apartment in Houston.  Steger and another FBI agent introduced themselves and told Ripkowski that they were investigating the disappearance of Allen and her child. They talked with Ripkowski, received his permission to search the apartment, and conducted a search that found nothing significant, though Special Agent Steger saw a crack pipe in the apartment. That same day, Ripkowski called Detective Kent, with whom he had past dealings. He told Kent that he, Allen, and Nikki left Salt Lake City together but parted ways at St. George, Utah on December 21.  Ripkowski called Kent again on January 19. This time he told her that he took Nikki to Houston and that a friend took her to Mexico.

On January 20, Ripkowski called Kent and told her that he had been in contact with the FBI and he believed that they were following him. That same day, the FBI searched his apartment pursuant to a federal search warrant. Ripkowski told Special Agent Steger the

revised story of taking Nikki to Houston and a friend taking her to Mexico. Ripkowski said that he used Allen's van to drive from Salt Lake City to Houston, and told FBI agents where the van was located. The van was seized by the FBI and Steger returned Ripkowski to his apartment.

On January 22, federal agents arrested Ripkowski. Special Agent Eric Johnson read Ripkowski his *Miranda* warnings and transported him to the Houston FBI office. Johnson testified that he did not threaten Ripkowski or make any promises. Johnson denied that Ripkowski was disoriented. During transit, Ripkowski told officers that he should have made them kill him.

Ripkowski was turned over to Steger at the Houston FBI office. Steger noticed that Ripkowski had some scratches on his face and an injury to his wrist. The wrist injury consisted of a one-sixth of an inch deep slash across the wrist. Ripkowski told Steger that he tried to slit his wrists the previous night. Steger took him to a nurse for medical treatment. Afterwards, Ripkowski was placed in an interrogation room for questioning. Also present in the interrogation room were Steger, Kent, and Charles Oliver, a homicide investigator for SLCPD. Steger read Ripkowski his *Miranda* warnings. Oliver testified that Steger read each warning individually, and after each one, Steger asked Ripkowski if he understood his rights. Ripkowski appeared to understand his rights and appeared to knowingly, intelligently, and voluntarily waive them. Oliver further testified that Ripkowski did not appear to be under the influence of drugs or alcohol. When asked questions, he responded coherently and appropriately.

Kent also testified that Ripkowski appeared to understand the warnings. She observed that Ripkowski read the waiver of rights form aloud and appeared to voluntarily, knowingly, and intelligently waive his rights.  No promises, threats, or abuse of any kind occurred before or during the interrogation. According to Kent, Ripkowski did not appear to be under the influence of drugs or alcohol, and he appeared to understand what was going on.  He responded appropriately when asked questions.

This first interview by Kent was not electronically recorded. During the interview Ripkowski admitted killing both Monica and Nikki.  He related that, on December 24, he killed Nikki, put her body in a suitcase, and buried the suitcase in an undeveloped area near the Sheldon Reservoir in northeast Harris County.  Ripkowski agreed to help locate Nikki's body.  He went with law enforcement agents to the area he described and they attempted to find the body, but the terrain was swampy and covered with underbrush, and Ripkowski was confused about the body's location. Several law enforcement agents testified that they believed Ripkowski was honestly trying to help locate the body but was unsuccessful. He informed officers that the body could be about a half mile up the same road.

After this failed attempt to find the body, Steger took Ripkowski to the homicide division of the Houston Police Department.  Ripkowski was placed in an interview room with Detective Kent and Houston Police Officer Robert King. King testified that he read Ripkowski the required warnings and Ripkowski nodded his head after each individual warning was read.  Both King and Kent testified that Ripkowski appeared to understand his rights and appeared to waive those rights voluntarily. Kent then conducted a videotaped

interrogation. Kent and King both testified that Ripkowski did not appear to be under the influence of drugs or alcohol during the interrogation and he responded appropriately to questions. During the interrogation Ripkowski again described how he killed Monica and Nikki and again described how he disposed of Nikki's body. He also stated that he used cocaine extensively up to and just prior to his arrest, that he recently attempted suicide by trying to slit his wrists, and that he tried to kill himself by taking an overdose of pills shortly before his arrest. After the taping ended, Ripkowski was shown a map, and he pointed out the area on the map where Nikki's body was located.

On January 23, armed with this information, law enforcement agents found Nikki's body. The same day, Ripkowski submitted physical samples for toxicological testing, which later revealed the presence of cocaine in his system.

At a hearing on Ripkowski's motion to suppress evidence, Ripkowski presented expert testimony from Dr. Paula Lundberg Love that a combination of stressful conditions, bipolar disorder, and cocaine binging rendered him incompetent to understand and waive his rights. After hearing the evidence, including the testimony by Dr. Lundberg Love and law enforcement officers, the trial court found that Ripkowski knowingly, intelligently, and voluntarily waived his rights. *Ripkowski v. State*, 61 S.W.3d 378, 382 -384 (Tex. Crim. App. 2001). The jury found Ripkowski guilty of capital murder for murdering Nikki, a child under six years old. 17 Tr. at 25-26; 15 Tr. at 6.[2]

At the beginning of the penalty phase of the trial, Ripkowski's counsel, Robert Morrow

---

[2]    "Tr." refers to the transcript of Ripkowski's trial.

and Patrick McCann, made a motion to exclude victim impact evidence.  They argued that the availability of such evidence placed them in the untenable situation of choosing between presenting mitigating evidence and opening the door for victim impact evidence, or not presenting mitigating evidence at all.  The trial court denied the motion.  As a result, Ripkowski waived the mitigation special issue in an effort to preclude victim impact testimony, leaving as the only special issue the question of whether Ripkowski presented a future danger to society.  18 Tr. at 3-12.

Denise Arroyo testified that she met Ripkowski when they worked together in 1995. They had a sexual relationship for a few months.  At about the same time, Arroyo met another man.  After meeting the other man, Arroyo told Ripkowski that she no longer wanted to pursue a romantic or sexual relationship with him.  She moved in with her boyfriend, but Ripkowski continued to call her and come to her house in the middle of the night.  Arroyo asked Ripkowski to stop, but he continued to come to her house, even after she changed jobs. He also left letters for her.

Arroyo eventually moved, but Ripkowski continued to show up at her new addresses. When confronted by Arroyo's roommate, Ripkowski almost hit him with his car, and drove at Arroyo, almost hitting her.  *Id.* at 15-33.  Ripkowski eventually pled guilty to stalking Arroyo.  *Id.* at 80-81.  Another witness testified that she met Ripkowski at work, and that Ripkowski stalked her when she made clear that she did not want a romantic relationship with him.  *Id.* at 114-17.

A police officer from Murray City, Utah testified that Monica Allen called the police

after receiving letters, videotapes and pictures from Ripkowski in December 1996. When the officer contacted Ripkowski, Ripkowski stated that he would have no further contact with Allen. *Id.* at 53-60. Allen eventually sought and received a protective order against Ripkowski. *Id.* at 86-87.

The State also established that Monica Allen was murdered, and that Ripkowski stalked her from Utah to California. *Id.* at 90-108. Numerous pieces of evidence linked Ripkowski to Allen's murder. *Id.* at 156-71; 19 Tr. at 7-27. Ripkowski also contacted members of Allen's family during his trial. *Id.* at 30-31.

Ripkowski presented testimony by an employee of the TDCJ Parole Division. He testified about the methods used to determine if an offender is a good candidate for parole, and that the Division's primary concern is protecting society. He also testified that, if sentenced to life, Ripkowski would have to serve 40 years in prison before becoming eligible for parole. 20 Tr. at 4-22.

Dr. Walter Quijano, a psychologist, testified that TDCJ engages in a detailed diagnostic and evaluation system to place inmates in an appropriately secure setting. TDCJ also takes measures to restrain unruly inmates. *Id.* at 40-71.

Based on this evidence, the jury found beyond a reasonable doubt that there is a probability that Ripkowski would commit future criminal acts of violence constituting a continuing danger to society. *Id.* at 39-41. Accordingly, the trial court sentenced Ripkowski to death. *Id.* at 41-42.

The TCCA affirmed Ripkowski's conviction and sentence, *Ripkowski v. State*, 61

S.W.3d 378 (Tex. Crim. App. 2001), *cert. denied sub nom. Ripkowski v. Texas,* 539 U.S. 916 (2003), and denied his state application for a writ of habeas corpus, *Ex Parte Ripkowski*, No. 65,238-01 (Tex. Crim. App., Nov. 22, 2006).   On November 22, 2007, Ripkowski filed his first federal petition for a writ of habeas corpus.  He amended the petition on April 17, 2009, and again on July 7, 2009.  Thaler moved for summary judgment on July 24, 2009.

## II.    **APPLICABLE LEGAL STANDARDS**

### A.    **The Anti-Terrorism and Effective Death Penalty Act**

This federal petition for habeas corpus relief is governed by the applicable provisions of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA").  *See Lindh v. Murphy*, 521 U.S. 320, 335-36 (1997).  Under the AEDPA, federal habeas relief based upon claims that were adjudicated on the merits by the state courts cannot be granted unless the state court's decision (1) "was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States" or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d); *Kitchens v. Johnson*, 190 F.3d 698, 700 (5th Cir. 1999).

For questions of law or mixed questions of law and fact adjudicated on the merits in state court, this Court may grant habeas relief under 28 U.S.C. § 2254(d)(1) only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established [Supreme Court precedent]."  *See Martin v. Cain*, 246 F.3d 471, 475 (5th Cir.), *cert. denied*, 534 U.S. 885 (2001).  Under the "contrary to" clause, this Court may afford habeas relief only if "'the state court arrives at a conclusion opposite to that reached by . . .

[the Supreme Court] on a question of law or if the state court decides a case differently than

. . . [the Supreme Court] has on a set of materially indistinguishable facts.'" *Dowthitt v.

*Johnson*, 230 F.3d 733, 740-41 (5th Cir. 2000) (quoting *Williams v. Taylor*, 529 U.S. 362, 406

(2000)), *cert. denied*, 532 U.S. 915 (2001)).

The "unreasonable application" standard permits federal habeas corpus relief only if

a state court decision "identifies the correct governing legal rule from [the Supreme Court]

cases but unreasonably applies it to the facts of the particular state prisoner's case" or "if the

state court either unreasonably extends a legal principle from [Supreme Court] precedent to

a new context where it should not apply or unreasonably refuses to extend that principle to

a new context where it should apply." *Williams*, 529 U.S. at 406. "In applying this standard,

we must decide (1) what was the decision of the state courts with regard to the questions

before us and (2) whether there is any established federal law, as explicated by the Supreme

Court, with which the state court decision conflicts." *Hoover v. Johnson*, 193 F.3d 366, 368

(5th Cir. 1999). A federal court's "focus on the 'unreasonable application' test under Section

2254(d) should be on the ultimate legal conclusion that the state court reached and not on

whether the state court considered and discussed every angle of the evidence." *Neal v.

Puckett*, 239 F.3d 683, 696 (5th Cir. 2001), *aff'd*, 286 F.3d 230 (5th Cir. 2002) (en banc), *cert.

denied* 537 U.S. 1104 (2003). The focus for a federal court under the "unreasonable

application" prong becomes "whether the state court's determination is 'at least minimally

consistent with the facts and circumstances of the case.'" *Id.* (quoting *Hennon v. Cooper*, 109

F.3d 330, 335 (7th Cir. 1997)); *see also Gardner v. Johnson*, 247 F.3d 551, 560 (5th Cir.

2001) ("Even though we cannot reverse a decision merely because we would reach a different outcome, we must reverse when we conclude that the state court decision applies the correct legal rule to a given set of facts in a manner that is so patently incorrect as to be 'unreasonable.'")

The AEDPA precludes federal habeas relief on factual issues unless the state court's adjudication of the merits was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(2); *Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied*, 532 U.S. 1039 (2001).  The state court's factual determinations are presumed correct unless rebutted by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); *see also Jackson v. Anderson*, 112 F.3d 823, 824-25 (5th Cir. 1997), *cert. denied*, 522 U.S. 1119 (1998).

### B.     The Standard for Summary Judgment in Habeas Corpus Cases

In ordinary civil cases, a district court considering a motion for summary judgment is required to construe the facts of the case in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986) (The "evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor").  "As a general principle, Rule 56 of the Federal Rules of Civil Procedure, relating to summary judgment, applies with equal force in the context of habeas corpus cases."  *Clark v. Johnson*, 202 F.3d 760, 764 (5th Cir.), *cert. denied*, 531 U.S. 831 (2000).  This principle is limited, however; Rule 56 applies insofar as it is consistent with established habeas practice and procedure.  *See Smith v. Cockrell*, 311 F.3d 661, 668 (5th Cir. 2002) (citing Rule 11 of the Rules Governing

Section 2254 Cases). Therefore, § 2254(e)(1) – which mandates that findings of fact made by a state court are "presumed to be correct" – overrides the ordinary summary judgment rule that all disputed facts must be construed in the light most favorable to the nonmoving party. *See id*. Unless the petition can "rebut[ ] the presumption of correctness by clear and convincing evidence" as to the state court's findings of fact, those findings must be accepted as correct. *See id*. Thus, the Court may not construe the facts in the state petitioner's favor where the prisoner's factual allegations have been adversely resolved by express or implicit findings of the state courts, and the prisoner fails to demonstrate by clear and convincing evidence that the presumption of correctness in 28 U.S.C. § 2254(e)(1) should not apply. *See Marshall v. Lonberger*, 459 U.S. 422, 432 (1983); *Sumner v. Mata*, 449 U.S. 539, 547 (1981); *Emery v. Johnson*, 940 F.Supp. 1046, 1051 (S.D. Tex. 1996), *aff'd*, 139 F.3d 191 (5th Cir. 1997), *cert. denied*, 525 U.S. 969 (1998).

## III.   ANALYSIS

Ripkowski's petition raises numerous claims for relief. They are addressed in turn below.

### A.   Mental Illness

Ripkowski contends that he is mentally ill and that this illness renders him constitutionally ineligible for the death penalty. While Ripkowski raises this as his second claim for relief, the resolution of this issue bears on a number of Ripkowski's other claims. Therefore, this claim is addressed first.

Ripkowski relies on two lines of Supreme Court cases from recent years. The first held

11

that the Eighth and Fourteenth Amendments bar the execution of mentally retarded offenders. *See Atkins v. Virginia*, 536 U.S. 304 (2002); *Tennard v. Dretke*, 542 U.S. 274(2004). The second held that the Eighth and Fourteenth Amendments bar the execution of offenders who were under the age of 18 at the time of the offense. *See Roper v. Simmons*, 543 U.S. 551 (2005).

Ripkowski claims that he suffers from severe bipolar disorder, as well as other psychotic disorders. He argues that the reasoning of *Atkins* and *Simmons*, finding that both mentally retarded people and juveniles lack, among other things, the ability to appreciate the long term consequences of their actions, applies to mentally ill individuals as well. Notably, Ripkowski does not claim that he is mentally retarded or that he was a juvenile at the time of the murder.

Accepting Ripkowski's claims of mental illness as true for purposes of this analysis, he is not entitled to relief on this claim. The Supreme Court has never held that mental illness, by itself, removes a defendant from the class of those who are constitutionally eligible for a death sentence.[3] Ripkowski cites no case law holding that mental illness, standing alone, renders a death sentence unconstitutional. Rather, he asks this Court to extend the rationale behind *Atkins* and *Simmons* to cases in which the petitioner suffers from mental illness.

A federal court cannot create a new constitutional rule of criminal procedure on habeas review. *Teague v. Lane*, 489 U.S. 288 (1989). The Supreme Court explained that

---

[3] This is distinct from a claim that a defendant is incompetent to stand trial or to be executed. Ripkowski's second claim is not that he is incompetent but that, by virtue of his claimed mental illness, he cannot be sentenced to death.

a case announces a new rule when it breaks new ground or imposes a new obligation on the States or the Federal Government. To put it differently, a case announces a new rule if the result was not *dictated* by precedent existing at the time the defendant's conviction became final.

*Id.* at 301 (emphasis in original). The AEDPA effectively codified the *Teague* non-retroactivity rule "such that federal habeas courts must deny relief that is contingent upon a rule of law not clearly established at the time the conviction becomes final." *Peterson v. Cain*, 302 F.3d 508, 511(5th Cir.), *cert. denied*, 537 U.S. 1118 (2002). Because the rule Ripkowski seeks was not dictated by *Atkins*, which addresses only the issue of mental retardation, or *Simmons*, which addresses only the issue of a defendant's young age, or any other case, this Court cannot grant the relief Ripkowski seeks.

### B.    <u>Procedural Default</u>

Ripkowski failed to present many of his claims to the Texas state courts. In his first claim for relief, Ripkowski argues that his confession was involuntary and coerced because: (1) he was incompetent at the time he gave his confession; (2) the confession was coerced; and (3) he was not permitted to have an attorney present in violation of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Ripkowski raised these claims in his direct appeal. The TCCA dismissed all but the *Miranda* claim as procedurally defaulted for failure to brief the claims. *See Ripkowski v. State*, 61 S.W.3d 378, 381 (Tex. Crim. App. 2001), *cert. denied*, 539 U.S. 916 (2003).

In his fourth claim for relief, Ripkowski argues that changes made to the Texas capital sentencing scheme in the years surrounding his trial render his sentence arbitrary and, thus,

unconstitutional.  In his fifth claim for relief, Ripkowski argues that his sentence is unconstitutional because the jury did not have the option of sentencing him to life without parole.  In his sixth claim, Ripkowski alleges several instances of prosecutorial misconduct. Ripkowski never presented these claims to the Texas state courts.[4]

Ripkowski also presents several claims of trial court error, some of which are unexhausted.  His claims that: (a) the trial court erred in failing to give a sudden passion charge concerning the murder of Monica Allen; (b) the trial court allowed the State to use information obtained in plea negotiations to impeach witnesses;  and ©  the trial court erred in admitting evidence of extraneous offenses during the penalty phase. He also contends that he was incompetent to stand trial, but never presented this claim to the Texas state courts.

Ripkowski raises fourteen separate claims of ineffective assistance of counsel.  All are unexhausted except his claim that counsel rendered ineffective assistance by advising him to waive the mitigation special issue.

Ripkowski also raises two challenges to the Texas death penalty scheme.  First, he argues that the scheme is unconstitutional because it fails to meet the dual requirements of channeling the jury's discretion while also giving the jury free rein to consider all mitigating evidence.  Next, he contends that the scheme is unconstitutional because prosecutorial discretion in seeking the death penalty renders the scheme arbitrary and capricious, in violation of the equal protection clause and the Eighth Amendment.  Both of these claims are

---

[4]    Ripkowski argues in a subclaim that the trial court erred in allowing him to waive the mitigation special issue.  Ripkowski did raise this claim in state court, but the state habeas court expressly found it procedurally barred.  *See* SH at 424-25.

unexhausted.

Ripkowski further contends that the length of his incarceration on death row violates the Constitution and international law. This claim, too, is unexhausted.

The AEDPA requires that a prisoner exhaust his available State remedies before raising a claim in a federal habeas petition.

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a state court shall not be granted unless it appears that (A) the applicant has exhausted the remedies available in the courts of the State; or (B)(I) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C. § 2254(b)(1). As the Fifth Circuit explained in a pre-AEDPA case, "federal courts must respect the autonomy of state courts by requiring that petitioners advance in state court all grounds for relief, as well as factual allegations supporting those grounds. "[A]bsent special circumstances, a federal habeas petitioner must exhaust his state remedies by pressing his claims in state court before he may seek federal habeas relief." *Orman v. Cain*, 228 F.3d 616, 619-20 (5th Cir. 2000); *see* 28 U.S.C. § 2254(b)(1) ("An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State. . . .").

The procedural default doctrine may bar federal review of a claim. "When a state court declines to hear a prisoner's federal claims because the prisoner failed to fulfill a state procedural requirement, federal habeas is generally barred if the state procedural rule is

independent and adequate to support the judgment." *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001). "In all cases in which a state prisoner had defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas review of the claims is barred unless the prisoner can demonstrate [1] cause for the default *and* actual prejudice as a result of the alleged violation of federal law, or [2] demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 750 (1991) (emphasis added). "This doctrine ensures that federal courts give proper respect to state procedural rules." *Glover v. Cain*, 128 F.3d 900, 902 (5th Cir. 1997) (citing *Coleman*, 501 U.S. at 750-51), *cert. denied*, 523 U.S. 1125 (1998); *see also Edwards v. Carpenter*, 529 U.S. 446, 451 (2000) (finding the cause and prejudice standard to be "grounded in concerns of comity and federalism").

A "miscarriage of justice" means actual innocence, either of the crime for which he was convicted or of the death penalty. *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992). "Actual innocence of the death penalty" means that, but for a constitutional error, he would not have been legally eligible for a sentence of death. *Id.*

Ripkowski argues that the State habeas court's failure to afford him a full hearing, that is, a live evidentiary hearing, on his various claims constitutes "cause" for the default. He argues alternatively that the merits of his claims show that he is "actually innocent of the death penalty." Both arguments fail.

### 1.    Cause and Prejudice

A state court's refusal to grant a full hearing might constitute cause for a procedural

16

default based on a petitioner's failure to develop evidence. *See*, *e.g.*, *Williams v. Taylor*, 529 U.S. 420, 432 (2000). In this case, Ripkowski failed either to present, or meaningfully to brief, many of his claims before the state appellate and habeas courts. "Cause" for a procedural default requires a showing that some objective factor external to the defense impeded counsel's efforts to comply with the state procedural rule, or a showing of a prior determination of ineffective assistance of counsel. *Murray v. Carrier*, 477 U.S. 478, 488 (1986); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988). The state court's refusal to grant a hearing accordingly did not impede counsel's ability to present and brief the issues. Indeed, any hearing would have occurred *after* Ripkowski presented and briefed his claims, and would have been limited to the claims presented in Ripkowski's application. Ripkowski therefore fails to demonstrate cause for his default.

Ripkowski does not meaningfully address the issue of prejudice in his petition. On page 23 of his response to the motion for summary judgment, Ripkowski simply claims that prejudice is demonstrated by the merits of his claims. The following analysis of the merits of Ripkowski's claims demonstrates that Ripkowski's contention that his claims have merit also fails.

### 2.      Fundamental Miscarriage of Justice/Actual Innocence of the Death Penalty

Ripkowski alternatively seeks to overcome the procedural default of his claims under the fundamental miscarriage of justice doctrine. He accordingly argues that he is actually innocent of the death penalty. His argument on actual innocence is overbroad. He argues that

"legal ineligibility" for the death penalty means simply that he has a claim that is meritorious. Ripkowski's interpretation of the actual innocence exception to the procedural bar doctrine is not supported by legal authority and would swallow the rule by requiring a full analysis of all defaulted claims on the merits and excusing the default of any meritorious claim simply because it is meritorious.

The fundamental miscarriage of justice exception is limited to the following circumstances: (1) where the petitioner can show that "a constitutional violation has 'probably resulted' in the conviction of one who is 'actually innocent' of the substantive offense," *Dretke v. Haley*, 541 U.S. 386, 393 (2004) (quotation omitted); or (2) in the capital sentencing context, where the petitioner can show " 'by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.'" *Id.* (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)). An individual found guilty of a capital offense in Texas is eligible for the death penalty if a jury answers certain special issues found in Article 37.071, § 2 of the Texas Code of Criminal Procedure, concerning future dangerousness and the existence of mitigating circumstances.

Importantly, the fundamental-miscarriage-of-justice exception applies only where a petitioner supplements a constitutional claim with a colorable showing of factual, as opposed to legal, innocence. *See McCleskey v. Zant*, 499 U.S. at 495 (quoting *Kuhlman v. Wilson*, 477 U.S. 436, 454 (1986)); *accord Schlup v. Delo*, 513 U.S. 298, 327 (1995). More pertinent to the case at bar, the Supreme Court has explained that "[t]he phrase 'innocent of [the] death

[penalty],'" however, "is not a natural usage of those words[.]" *Sawyer v. Whitley*, 505 U.S. 333, 340 (1992). "A prototypical example of 'actual innocence' in a colloquial sense is the case where the State has convicted the wrong person of a crime." *Id.* at 340. This common example applies with difficulty into the capital sentencing context. "Sensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to the innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met." *Id.* at 345. Thus, as the Supreme Court has emphasized, a determination on whether a petitioner is actually innocent of the death penalty "must focus on those elements which render a defendant eligible for the death penalty, and not on additional mitigating evidence that was prevented from being introduced as a result of a claimed constitutional error." *Id.* at 347; *accord Schlup v. Delo*, 513 U.S. 298, 323 (1992).[5] In this context, the Fifth Circuit has held that evidence of a purported mitigating circumstance that does not show that the petitioner was factually innocent "of a death-eligible offense" is insufficient to establish actual innocence of the death penalty and does not overcome the procedural bar. *See Haynes v. Quarterman*, 526 F.3d 189, 195-96 (5th Cir. 2008) (involving a case where it was undisputed that the petitioner murdered a police officer);

---

[5]     To show actual innocence,

> the prisoner must show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after trial, the trier of the facts would have entertained a reasonable doubt of his guilt.

*Kuhlmann v. Wilson*, 477 U.S. 436, 455 n.17 (1986).

*see also Carty v. Quarterman*, 345 F. App'x 897, 911 (5th Cir. 2009) (repeating in a death penalty case that "[m]itigation evidence cannot be the basis of a claim of a fundamental miscarriage of justice.") (citing *Sawyer*, 505 U.S. at 347).

Ripkowski thus must demonstrate some fact that shows that he is factually innocent, *i.e.*, that no reasonable juror could find him guilty, before even a meritorious demonstration of error can bring him within the "miscarriage of justice" exception to the procedural default rule. The Fifth Circuit emphasizes this point:

> "[T]he Supreme Court consistently has employed the cause and prejudice test, even for 'constitutional claims that call into question the reliability of an adjudication of guilt,' expressing its confidence that the cause and prejudice standard is adequate to protect against miscarriages of justice."

*United States v. Shaid*, 937 F.2d 228, 236 (5th Cir. 1991) (en banc), *cert. denied*, 502 U.S. 1076 (1992) (quoting *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986)). If the "miscarriage of justice" exception was not reserved "for [only] 'an extraordinary case, where a constitutional violation has *probably* resulted in the conviction of one who is actually innocent,'" federal courts would "undermine the proper finality of criminal convictions" and "eviscerate the cause prong of the cause and prejudice test . . . ." *Id.* (quoting *Carrier*, 477 U.S. at 496) (emphasis added).

Ripkowski does not contend that he is factually innocent or that he did not commit the crime. He argues that he is "actually innocent of the death penalty" in that his alleged mental illness removes him from the class of death eligible defendants under the reasoning of *Atkins* and *Simmons*. Ripkowski thus fails to establish actual innocence. Moreover, as discussed

above, there is no law supporting Ripkowski's proposed extension of *Atkins* and *Simmons*. Therefore, Ripkowski fails to demonstrate that this Court's failure to review his defaulted claims on the merits would constitute a miscarriage of justice.

Because Ripkowski demonstrates neither cause and prejudice, nor actual innocence, this Court cannot grant relief on the procedurally defaulted claims. In the interests of a full analysis, however, the Court nevertheless discusses below each of Ripkowski's claims.

### C.    Analysis of the Merits of Ripkowski's Other Claims

#### 1.    Ripkowski's Confession

Ripkowski contends in his federal petition (as amended) that he did not knowingly and voluntarily waive his *Miranda* rights. While the TCCA held that Ripkowski waived most of his confession-related claims, this Court nonetheless addresses the merits of each. The only portion of this claim that is exhausted is Ripkowski's contention that his confession violated his right under *Miranda* to have counsel present during the interview. As noted below, Ripkowski cites nothing in the record supporting his contention that he asked the police to stop the interview or requested counsel.

To constitute a valid waiver of *Miranda* rights, a waiver must be voluntary and knowing. A waiver is voluntary if "it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). A waiver is knowing if it is made "with a full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it." *Id.* The determination whether a waiver was knowing and voluntary must be made under the totality of the

circumstances. *Id.*

The state trial court record establishes that the law enforcement officers who arrested Ripkowski advised him of his *Miranda* rights. Detective King asked Ripkowski if he understood his rights and if he wanted to speak to the police. King testified at trial that Ripkowski nodded in response as each warning was read. Nothing in the record supports Ripkowski's contention that he was coerced into speaking to the police, or that he asked to stop the interview or asked for an attorney. The state court also received and considered expert testimony from both parties concerning Ripkowski's mental status. Based on this record, the trial court found the State's evidence more credible. The state court concluded that Ripkowski was competent to waive his *Miranda* rights, and the TCCA agreed.

> [T]he trial court was clearly within its discretion in finding that appellant understood his rights and the effect of waiving those rights. Various law enforcement officials testified that appellant appeared to comprehend the warnings and the questions asked during interrogation, that appellant was coherent and gave appropriate answers to questions, and that appellant did not appear to be intoxicated by alcohol or under the influence of any drugs. Although appellant presented expert testimony that conflicted with that of the State's witnesses, the trial court was entitled to believe the State's witnesses rather than appellant's expert.

*Ripkowski v. State* 61 S.W.3d 378, 384 (Tex. Crim. App. 2001).

A DVD of Ripkowski's taped confession is part of the record in this case. The DVD shows that Officer Kent and Detective King were polite and solicitous toward Ripkowski. They asked him if he wanted anything to drink. Rather than trying to coerce or intimidate Ripkowski, they, especially Officer Kent, made a clear effort to empathize with him. The DVD corroborates the testimony that Detective King read Ripkowski his *Miranda* warnings,

and Ripkowski nodded after each portion of the *Miranda* warnings.   While some of

Ripkowski's answers to questions are terse or monosyllabic, especially early in the interview,

others are more expansive narratives.   Notably, his answers are appropriate and responsive

to the questions asked.   In short, nothing in the DVD contradicts the testimony of the law

enforcement officers, or supports Ripkowski's claim that his *Miranda* waiver was in any way

involuntary, unknowing, or coerced.

Ripkowski displayed a somewhat flat affect, and was tearful, through portions of the

interview.   It is not clear whether this conduct was due to bipolar disorder, as Ripkowski now

claims, or to remorse over his crimes or to other factors.   Being sad or depressed, however,

does not mean that a statement is involuntary.

Ripkowski does not show by clear and convincing evidence that the findings of the

TCCA were unreasonable.   These findings are therefore entitled to deference under the

AEDPA.   In light of these findings, and the record before this Court, Ripkowski fails to

demonstrate that he did not knowingly and voluntarily waive his *Miranda* rights.

### 2.    Vagueness of Terms in the "Future Dangerousness" Special Issue

In his third claim for relief, Ripkowski contends that the future dangerousness special

issue is an aggravating factor and the terms "probability," "criminal acts of violence," and

"continuing threat to society" used in that special issue are unconstitutionally vague.   The

Fifth Circuit has repeatedly rejected these arguments.   *See, e.g., West v. Johnson*, 92 F.3d

1385, 1406 (5th Cir. 1996), *cert. denied*, 520 U.S. 1242 (1997) (rejecting claim that the Texas

capital sentencing scheme special issues work as aggravating factors and therefore require

detailed definitions of the terms employed therein); *Woods v. Johnson*, 75 F.3d 1017, 1033-34 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996) (rejecting argument that the terms used in the special issues are "aggravating factors" and unconstitutionally vague absent definition); *James v. Collins*, 987 F.2d 1116, 1120 (5th Cir.), *cert. denied*, 509 U.S. 947 (1993) (holding that the terms "deliberately," "probability," "criminal acts of violence," and "continuing threat to society," "have a common-sense core of meaning that criminal juries should be capable of understanding") (citation omitted); *Milton v. Procunier*, 744 F.2d 1091, 1095-96 (5th Cir. 1984) ("deliberately," "probability," and "criminal acts of violence" "have a plain meaning of sufficient content that the discretion left to the jury" is "no more than that inherent in the jury system itself").   Accordingly, Ripkowski is not entitled to relief on this claim.

### 3.    Changes to the Texas Capital Sentencing Scheme

Ripkowski argues that changes made to the Texas capital sentencing scheme around the time of his trial render his sentence unconstitutionally arbitrary.  Ripkowski attempts to frame this issue as one arising from the use of multiple capital sentencing schemes within the State of Texas.   In fact, however, Ripkowski's argument boils down to a complaint that decisional law and legislative enactments have modified the Texas capital sentencing scheme over time.  While Ripkowski correctly notes that Supreme Court precedent holds that death sentences may not be arbitrarily imposed, *see*, *e.g.*, *Furman v. Georgia*, 408 U.S. 238 (1972), he points to no authority holding that an appellate court decision clarifying a point of law relevant to a constitutionally valid sentencing scheme, or legislative modifications to a constitutionally valid sentencing scheme, suddenly render the scheme unconstitutional.  If

accepted, Ripkowski's argument would hamstring courts and legislatures by laying down a rule that any change made to the capital sentencing scheme invalidates all previously imposed sentences. No authority supports this radical proposition; indeed, it is contrary to longstanding Fifth Circuit precedent. "The prisoner's contention that the enactment of the new Code and the repeal of the old Code section entitles him to relief from his sentence is palpably without merit." *Colvin v. Estelle*, 506 F.2d 747, 748 (5th Cir. 1975). Ripkowski is not entitled to relief on this claim.

### 4.      Life Without Parole

Ripkowski argues his sentence is unconstitutional because Texas enacted a life without parole option for capital sentencing juries after his conviction and after he filed his initial state habeas petition. It is well-established in the Fifth Circuit that changes to existing constitutionally valid criminal laws do not render the prior version of those laws unconstitutional. *See*, *e.g.*, *Colvin*, 506 F.2d at 748.

Ripkowski also argues that the lack of a life without parole option violates the rule of *Beck v. Alabama*, 447 U.S. 625 (1980). *Beck* held that due process requires a jury charge "on a lesser included offense if the evidence would permit a jury rationally to find [the defendant] guilty of the lesser offense and acquit him of the greater," *i.e.*, "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense - but leaves some doubt with respect to an element that would justify conviction of a capital offense . . . ." 447 U.S. at 635, 637 (citing *Keeble v. United States*, 412 U.S. 205, 208 (1973)). Under these circumstances, "the failure to give the jury the . . . option of convicting on a lesser

included offense would seem inevitably to enhance the risk of an unwarranted conviction. Such a risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck*, 447 U.S. at 637. A lesser included offense charge is required under these circumstances to avoid presenting the jury with a false dichotomy: Either convict a defendant who is guilty of a serious non-capital crime (but not a capital crime) on the capital charge, or acquit him so as to avoid convicting him of the more serious offense. *See, e.g., Hopper v. Evans*, 456 U.S. 605, 611 (1982). "[I]f the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, [the state] is constitutionally prohibited from withdrawing that option from the jury in a capital case." *Beck*, 447 U.S. at 638.

There is no issue in this case of denying the jury the option of a lesser included offense. Ripkowski's jury had the option to impose a lesser sentence of life imprisonment with parole eligibility after 40 years. The jury elected not to do so.

Ripkowski also relies on *Simmons v. South Carolina*, 512 U.S. 154 (1994), but *Simmons* is of no assistance here. At the time of Simmons' conviction, South Carolina allowed for a sentence of life in prison without the possibility of parole upon conviction of a capital offense. In *Simmons*, the defense sought an instruction informing the jury that life imprisonment would carry no possibility of parole, but the trial court refused. The Supreme Court held that when "the alternative sentence to death is life without parole . . . due process plainly requires that [the defendant] be allowed to bring [parole ineligibility] to the jury's attention by way of argument by defense counsel or an instruction from the court." *Simmons*, 512 U.S. at 169 (citing *Gardner v. Florida*, 430 U.S. 349, 362 (1977)).

26

The *Simmons* court reasoned that when a state imposes the death penalty on the premise that the convicted individual poses a danger to society, the fact that the defendant may receive life without possibility of parole "will necessarily undercut the State's argument regarding the threat the defendant poses to society." *Simmons*, 512 U.S. at 169. To hold otherwise would create a "false dilemma by advancing generalized argument regarding the defendant's future dangerousness while, at the same time, preventing the jury from learning that the defendant will never be released on parole." *Id.* at 171.

*Simmons* addresses very specific circumstances: (1) When the state seeks the death penalty at least in part on the grounds that the defendant will be a future danger to society; and (2) when the alternative to a sentence of death is a sentence of life imprisonment without the possibility of parole. Even under those circumstances, *Simmons* only holds that the defendant has a right to inform the jury about parole eligibility. Nothing in *Simmons* requires a state to offer a jury the option of sentencing a defendant to life without parole in a capital case. While the State did seek a death sentence in the case at bar on the basis that Petitioner Ripkowski would pose a continuing threat, the jury was given the right to impose an alternative, a parole-eligible life sentence. This alternative was sufficient. *See id.* at 168 n.8.

Ripkowski further argues that the subsequent change by the Texas legislature to add a life without parole option, as well as what he describes as a national trend to offer life without parole as an option, shows that his sentence is contrary to evolving standards of decency in violation of the Eighth Amendment. There is no authority for the argument Ripkowski asserts, which boils down to the concept that his sentence is unconstitutional

because the state legislature has changed the law concerning an alternative sentence. The death penalty is now and to date consistently has been held constitutional. The Supreme Court has never held that a state must offer life without parole as an option in capital murder cases.[6]

### 5. Class of People Eligible for the Death Penalty

The Supreme Court has held that a capital sentencing scheme must meaningfully narrow the class of defendants who are eligible for the death penalty. *See*, *e.g.*, *Godfrey v. Georgia*, 446 U.S. 420, 427 (1980). Ripkowski argues that this Court cannot be confident that he is among the limited class of people eligible for the death penalty because of the lack of a mitigation special issue.

The Texas capital sentencing scheme has a mitigation special issue, as well as other mechanisms to narrow the class of death-eligible defendants. The State had to prove both that Ripkowski's crime fit the statutorily narrowed definition of capital murder, in this case because he murdered a child under the age of six, and that Ripkowski posed a future danger to society. Proof of these two things places Ripkowski within the narrow class of death-eligible defendants. *See, e.g.*, *Jurek v. Texas*, 428 U.S. 262, 268-72 (1976); *Woods v. Johnson*, 75 F.3d 1017, 1033 (5th Cir.), *cert. denied*, 519 U.S. 854 (1996).

Further, the Texas scheme is not deficient. Texas law provides for a mitigation special issue. That special issue was available only after the State proved that Ripkowski was a

---

[6]    In addition, this lack of Supreme Court authority means that Ripkowski's claim is *Teague*-barred.

member of another narrow class of defendants, those that murdered children under age six. The fact that the mitigation special issue arguably could have been used to further narrow the group, but Ripkowski chose not to exercise this right for tactical reasons, does not render the Texas scheme constitutionally infirm. Ripkowski's argument that he may not be among a limited class of people eligible for the death penalty is not persuasive.

### 6.    Prosecutorial Misconduct

Ripkowski next alleges several instances of prosecutorial misconduct. He claims that the prosecutor engaged in improper closing argument, used information obtained during plea negotiations to impeach witnesses, took advantage of the allegedly unconstitutional phrasing of the future dangerousness special issue, and failed to disclose evidence that victim impact witnesses had criminal records.

With the exception of the closing argument claim, Ripkowski cites nothing in the record to support any of these claims. Conclusory allegations are insufficient to raise a valid claim for relief, *see*, *e.g.*, *Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), *cert. denied*, 531 U.S. 849 (2000), and all the undeveloped prosecutorial misconduct claims are rejected.

While Ripkowski does reference some of the comments made by the prosecutor in closing argument, he fails to demonstrate a constitutional violation. "To constitute a due process violation, the prosecutorial misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Greer v. Miller*, 483 U.S. 756, 765 (1987) (quoting *United States v. Bagley***,** 473 U.S. 667, 676 (1985) (quoting *United States v. Agurs*, 427 U.S. 97**,** 108 (1976))). "'A trial is fundamentally unfair if there is a reasonable

probability that the verdict might have been different had the trial been properly conducted.'" *Barrientes v. Johnson*, 221 F.3d 741, 753 (5th Cir. 2000) (quoting *Foy v. Donnelly*, 959 F.2d 1307, 1317 (5th Cir. 1992)), *cert. dismissed*, 531 U.S. 1134 (2001).  The Fifth Circuit has observed that a "prosecutor's improper [conduct] will, in itself, exceed constitutional limitations in only the most egregious cases." *Menzies v. Procunier*, 743 F.2d 281, 288-89 (5th Cir. 1984).  "[I]t is not enough that the prosecutor's remarks were undesirable or even universally condemned." *Barrientes*, 221 F.3d at 753 (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).

Under Fifth Circuit doctrine, this court must apply a two-step analysis in reviewing claims of prosecutorial misconduct.  *See United States v. Wise*, 221 F.3d 140, 152 (5th Cir. 2000), *cert. denied*, 532 U.S. 959 (2001); *United States v. Lankford*, 196 F.3d 563, 574 (5th Cir. 1999), *cert. denied*, 529 U.S. 1119 (2000).  First, the Court must determine whether the prosecutor made an improper remark.  *Wise*, 221 F.3d at 152.  "If an improper remark was made, the second step is to evaluate whether the remark affected the substantial rights of the defendant." *Id.*

Under Texas law, a prosecutor may present argument to the jury on four types of issues: (1) summation of the evidence; (2) reasonable deductions from the evidence; (3) responses to opposing counsel's argument; and (4) pleas for law enforcement.  *Moody v. State*, 827 S.W.2d 875, 894 (Tex. Crim. App.), *cert. denied sub nom. Moody v Texas*, 506 U.S. 839 (1992).

Ripkowski complains that the prosecutor used terms such as "terrorist," "killer" and

"evil" in closing argument. The evidence showed that Ripkowski not only murdered his ex-girlfriend, but also her two year old daughter. The prosecutor's rhetoric referred to the evidence and pled for law enforcement. While the prosecutor's use of the term "terrorist" was somewhat of an overstatement, and was undesirable, use of the term did not render Ripkowski's trial fundamentally unfair and did not affect his substantial rights. *Barrientes*, 221 F.3d at 753; *Wise*, 221 F.3d at 152.

### 7. Trial Court Error

Ripkowski raises several defaulted claims of trial court error.

### a. Jury Instructions

Ripkowski claims that the trial court failed to give several requested jury instructions, but only discusses one. To the extent Ripkowski raises in passing but does not detail his argument on requested jury instructions, the unbriefed arguments are rejected.

Ripkowski elaborates on his trial request for a "sudden passion" charge regarding the murder of Monica Allen.[7] Errors in jury instructions do not state a claim for relief unless the error resulted in "prejudice of constitutional magnitude." *Sullivan v. Blackburn*, 804 F.2d 885, 887 (5th Cir. 1986), *cert. denied*, 481 U.S. 1019 (1987). The habeas petitioner must demonstrate that the error "had a substantial and injurious effect or influence on the determination of the jury's verdict." *Mayabb v. Johnson*, 168 F.3d 863, 868 (5th Cir.), *cert.*

---

[7] "Sudden passion" is an affirmative defense that, if successful, reduces a defendant's criminal liability. A defendant shows "sudden passion" by proving by a preponderance of the evidence that he "caused the death under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE § 19.02(d).

*denied*, 528 U.S. 969 (1999).  In a habeas proceeding, the burden of demonstrating that an erroneous jury instruction violates the petitioner's due process rights is "greater than the showing required to establish plain error on direct appeal."  *Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).

As a preliminary matter, Ripkowski cites no law in support of his claim that he was entitled to such a charge.  While he argues that "[t]here was substantial evidence" supporting a finding that he killed Allen in a fit of sudden passion, he cites to no such evidence in the record.  This claim is, accordingly, conclusory and not persuasive.  Ripkowski does not meet his burden of proving that he is entitled to relief.  *See Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000) ("The burden of proving that a constitutional violation occurred is, of course, on a habeas petitioner").

Further, Ripkowski was not charged with Allen's murder.  He was convicted and sentenced to death for the murder of Nikki Frome, Allen's daughter.  While Allen's murder was introduced as an extraneous offense during the sentencing phase, Ripkowski fails to demonstrate how a sudden passion charge would have helped him.  The only relevance of this murder was on the question of Ripkowski's future dangerousness.  The Court is not persuaded that a jury assessment that he killed Allen in a sudden fit of jealous rage would make it *less* likely that they would answer "yes" on the future dangerousness special issue, especially in light of his subsequent abduction and murder of Allen's two year old daughter.  Therefore, Ripkowski fails to show that any error in the jury instructions "had a substantial and injurious effect or influence on the determination of the jury's verdict."  *Mayabb*, 168 F.3d at 868.

32

**b.    Impeachment**

Ripkowski claims that the trial court erred by allowing the State to cross examine and impeach witnesses with information obtained during plea negotiations.  He does not identify the witnesses involved and cites to nothing in the record showing this allegedly improper impeachment.  These conclusory allegations do not support federal habeas relief.

**c.    Mitigation**

Ripkowski claims that the trial court erred in allowing the sentencing phase to proceed with no avenue for mitigation.  He cites *Penry v. Johnson,* 532 U.S. 782 (2001), for the proposition that a capital sentencing scheme must give the sentencer a means to consider and give effect to mitigating evidence.  This argument lacks support.  The Texas capital sentencing scheme gives the jury the necessary opportunity.  Ripkowski (through counsel) made a strategic decision to waive the mitigation special issue.  It is well-established that a defendant can waive a constitutional right as long as the waiver is knowing and voluntary. *See*, *e.g.*, *Johnson v. Zerbst*, 304 U.S. 458 (1938).  The record indicates that Ripkowski knowingly and voluntarily, and with the advice of his experienced counsel, made this election.

The second prong of Ripkowski's argument is that the trial court erred in denying his motions to exclude victim impact testimony because the denial left his counsel with the unappealing choice of waiving the mitigation special issue or opening the door for victim impact testimony.  In *Payne v. Tennessee*, 501 U.S. 808 (1991), the Supreme Court held that the Eighth Amendment does not bar the admission of victim impact testimony by those affected by a defendant's crime.  The Court reasoned that "consideration of the harm caused

33

by the crime [is] an important factor in the exercise of [sentencing] discretion." *Id.* at 820.
Victim impact testimony is a mechanism by which the sentencer is informed of the degree of
harm caused by the crime. *Id.* at 824-25. The strategic choice forced on counsel by the
possibility of victim impact evidence was no different than the strategic choices counsel make
throughout trial to limit the admission of other damaging evidence. While *Penry* makes clear
that the Constitution requires that there be a mechanism for a capital defendant to present
mitigating evidence, Ripkowski cites no authority, and the Court can find none in *Penry* or
elsewhere, requiring that the mechanism leave the defendant immune from relevant damaging
evidence presented by the State. Ripkowski's claim is without merit.

### d.    Extraneous Offenses

In his final defaulted claim of trial court error, Ripkowski contends that the trial court erred by admitting evidence of his extraneous offenses. Again, he cites no authority in support of his argument. In any event, the Fifth Circuit has squarely rejected this argument. The "admission of unadjudicated offenses in the sentencing phase of a capital trial does not violate the eighth and fourteenth amendments." *Brown v. Dretke* 419 F.3d 365, 376 (5th Cir. 2005) (citations omitted), *cert. denied*, 546 U.S. 1217 (2006).

### 8.    Burden Of Proof During Penalty Phase

In his next claim for relief, Ripkowski, relying on *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000), argues that the absence of a burden of proof on the special issues renders his sentence unconstitutional. It is not clear from his petition whether Ripkowski is referring to the future dangerousness or the mitigation special issue, or both. In any event, the jury did find the future dangerousness issue beyond a reasonable doubt. *See* 21 Tr. at 39. There is no constitutional infirmity in the burden of proof on the future dangerousness special issue.

To the extent that some aggravating circumstance is required before the court may exceed an otherwise-prescribed sentencing range, the State must prove those aggravating circumstances beyond a reasonable doubt. *Apprendi*, 530 U.S. at 477. Under the Texas capital sentencing statute, the statutory maximum sentence in the absence of proof of aggravating circumstances is life imprisonment. The trial court could not sentence Ripkowski to death unless the State proved beyond a reasonable doubt that there is a probability that he

will commit future acts of violence constituting a continuing threat to society. The State met this burden.

On mitigation, the issue is moot because Ripkowski waived submission of that special issue to the jury. The trial court could not assign a burden of proof on a special issue not presented to the jury. Moreover, there is no constitutionally required burden of proof on mitigation. *See Id.* at 491 n.16.[8]

### 9. Competency

In two separately labeled claims, Ripkowski contends that he is incompetent to be executed, was incompetent to stand trial, and is incompetent to proceed with this habeas corpus petition.

### a. Competence To Be Executed

Ripkowski contends that he is incompetent to be executed because he is mentally ill. He acknowledges that this claim is not yet ripe for adjudication. "[T]he issue of sanity is properly considered in proximity to the execution." *Herrera v. Collins*, 506 U.S. 390, 406 (1993).

---

[8]     The Texas sentencing scheme gives a defendant a last opportunity to show that death should not be imposed. The mitigation special issue is, in this sense, analogous to an affirmative defense. The mitigation special issue does not address a factor necessary to increase the maximum sentence; rather, it addresses factors that allow the jury to impose a sentence *less than* the statutory maximum. "[N]o Supreme Court or Circuit precedent constitutionally requires that Texas's mitigation special issue be assigned a burden of proof." *Rowell v. Dretke*, 398 F.3d 370, 378 (5th Cir.), *cert. denied*, 126 S. Ct. 103 (2005). Ripkowski's attack on the Texas sentencing scheme is unavailing.

### b. Competence To Stand Trial

"The test for competence to stand trial . . . is whether the defendant has the present ability to understand the charges against him and communicate effectively with defense counsel." *Cooper v. Oklahoma* 517 U.S. 348, 368 (1996) (citing *Dusky v. United States,* 362 U.S. 402 (1960)). Ripkowski makes reference to affidavits he submitted to the state habeas court by his stepmother and Pam Tsalkalos, a family friend, but does not discuss the contents of these affidavits or direct the Court to any specific portion of them. The Court nevertheless has carefully reviewed these submissions. The two affiants offer their lay opinion that Ripkowski was incompetent to stand trial. Trial counsel, however, submitted an affidavit to the state habeas court stating that Ripkowski "appeared to understand what was going on . . . ." SH at 215. Moreover, the state habeas court made specific findings of fact that Ripkowski was able to consult with counsel and understood the proceedings against him. SH at 414. Ripkowski's arguments and submissions do not demonstrate that the state court findings were unreasonable. Therefore, these findings are entitled to deference under the AEDPA.

### c. Competence To Participate In Habeas Corpus

Ripkowski also contends that he is incompetent to participate in this habeas corpus proceeding and seeks a stay of these federal proceedings. Initially, it is noted that "[n]either the Supreme Court nor [the Fifth Circuit] have determined whether [the right to be competent to participate in a habeas corpus proceeding] exists . . . ." *Mines v. Dretke*, 118 F. App'x 806, 811 (5th Cir. 2004) (granting in part and denying in part request for certificate of

appealability).

In any event, Ripkowski presents no evidence that he presently is incompetent. Accordingly, he has not shown himself entitled to relief on this ground.

### 10.    Ineffective Assistance of Counsel

Ripkowski raises numerous claims of ineffective assistance of counsel. As noted above, all but one of these claims are unexhausted and procedurally defaulted.[9] Procedural defaults notwithstanding, Ripkowski has not shown entitlement to relief on any of these claims on the merits.

To prevail on a claim for ineffective assistance of counsel, Petitioner "must show that . . . counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment," and "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In order to prevail on the first prong of the *Strickland* test, the "deficient performance" prong, Petitioner must demonstrate that counsel's representation fell below an objective standard of reasonableness. *Id.* at 687-88. Reasonableness is measured against prevailing professional norms, and must be viewed under the totality of the circumstances, avoiding the distorting effects of hindsight. Review of counsel's performance is deferential, and counsel enjoy a strong presumption that their conduct is within the bounds of professional norms. *Id.* at 688-90. To prove "prejudice" under the *Strickland* test, there must be a showing that counsel's errors were so serious as to

---

[9]     The lone exhausted claim is Ripkowski's claim that trial counsel rendered ineffective assistance by waiving the mitigation special issue.

deprive the defendant of a fair trial, a trial whose result is reliable. *Id.* at 687.

### a.      Pre-Trial

Ripkowski contends that his attorneys were ineffective in several aspects of their pre-trial work. Each of these claims is unexhausted but the Court reviews them here for the sake of completeness.

**Failure To Develop Coherent Trial Strategy.—** In his first claim of ineffective assistance of counsel, Ripkowski claims that counsel failed to develop a coherent trial strategy. While Ripkowski includes this claim in his long list of alleged defects in counsel's performance, he offers no argument or authority in support. Ripkowski fails to demonstrate that he is entitled to relief on this ground. *See*, e.g., *Lockett v. Anderson*, 230 F.3d 695, 707 (5th Cir. 2000).

**Failure To Raise An Insanity Defense.—** Ripkowski also includes in his list of pretrial omissions a claim that counsel erred by failing to raise an insanity defense. Again, this claim is not briefed, and thus fails to demonstrate the existence of a constitutional violation.

**Grand Jury Selection.—** Ripkowski claims that counsel rendered ineffective assistance by failing to challenge the makeup of the grand jury that indicted him. A defendant has a right to a grand jury drawn from a fair cross section of the community. *See Alexander v. Louisiana*, 405 U.S. 625 (1972). Ripkowski contends that Harris County's system for empaneling grand juries is discriminatory and that the grand jury pool does not reflect the growing Latino population of the county. Ripkowski cites no evidence in support of either

claim that the Harris County grand jury selection process fails to provide a fair cross-section of the community, or that the pool from which his particular panel was drawn failed to do so. This wholly conclusory claim does not satisfy Ripkowski's burden of proving the existence of a constitutional violation.

**Pre-Trial Investigation**.— Ripkowski next claims that counsel failed to investigate his background by interviewing people who knew him as a child, or the backgrounds of potential victim impact witnesses. Ripkowski fails to identify a single such witness, or any information that counsel could have obtained. This claim is wholly conclusory and fails to prove the existence of a constitutional violation.

**Counsel's *Voir Dire*.**— Ripkowski next claims that counsel rendered ineffective assistance during *voir dire* by asking jurors about mitigation and then electing not to present a mitigation case. He cites no specific portion of *voir dire*. Moreover, as the State points out, *voir dire* occurred approximately a month before the beginning of the trial, calling into question whether counsel's comments were fresh enough in the jurors' minds to affect their thinking. In the absence of any citation to the record showing deficient *voir dire* questioning, and with only conclusory allegations of prejudice, Ripkowski fails to demonstrate that counsel rendered constitutionally ineffective assistance.

**Jury Selection.**— In his final claim of pre-trial ineffective assistance, Ripkowski contends that counsel was deficient in not striking a particular juror, not using all their allotted peremptory strikes, and not requesting additional peremptory strikes. Ripkowski points to no juror whom he thinks counsel should have struck but did not, and identifies no venire person

whom counsel should have struck with the additional peremptory strikes he argues were necessary. Ripkowski fails to show he is entitled to relief on this claim.

### b.　　Alleged Trial Errors

**Failure to Object to Cross Examination**.— Ripkowski next claims that counsel were ineffective for failing to object to what he characterizes as improper cross examination questions by the prosecutor. He cites no examples of any such question and cites no authority for his points. This conclusory claim does not merit relief.

**Failure to Clarify Testimony.—** Ripkowski next contends that counsel failed to question "witnesses [on redirect examination] to clarify testimony that falsely appeared to harm the defendant." He cites as an example testimony by his stepmother, Ginger Ripkowski, that he previously had threatened Monica Allen.

Ginger Ripkowski testified under subpoena that Ripkowski talked about setting Allen's apartment on fire and giving Nikki Ex-Lax to make her sick. 19 Tr. at 20. In an affidavit submitted in connection with Ripkowski's state habeas application, Ginger Ripkowski stated that

> Ripkowski did not say that he was going to burn Monica's apartment. Rather, he said he had thought about setting fire to it. In addition, the Ex-Lax in the apartment was used by Monica to help her lose weight.

Pet. Exh. B at 3. Ginger Ripkowski's affidavit in no way contradicts her trial testimony. She did not testify that Ripkowski said he was going to burn the apartment; rather she testified that "[h]e talked of maybe setting it on fire . . .," which is consistent with her later affidavit. Information about why the Ex-Lax was in the apartment is irrelevant to whether Ripkowski

considered using the product to make Nikki sick.  In short, Ripkowski presents no evidence that Ginger Ripkowski's testimony was false or misleading.  He therefore fails to show that there was anything for counsel to clarify, and fails to show that counsel's conduct was deficient in any way.

**Waiver of the Mitigation Special Issue.—** In his lone exhausted ineffective assistance of counsel claim, Ripkowski contends that his attorneys were ineffective for waiving the mitigation special issue.  Ripkowski now argues that waiver of the mitigation special issue left the jury with the ability to use evidence of Ripkowski's mental illness only to strengthen the future dangerousness special issue.

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

*Strickland*, 466 U.S. at 689-690 (citation omitted).

Trial counsel submitted affidavits explaining that they hoped to neutralize the future dangerousness evidence by arguing that Ripkowski's history of violent behavior was directed toward women and was linked to his drug abuse, and that he would not be a threat in the almost entirely male environment of prison where he would not have access to drugs.  SH at 216.  Counsel thus had a cogent strategy to attempt to minimize the damaging effect of the State's future dangerousness evidence without introducing mitigation evidence.  Counsel

decided to waive the mitigation special issue to prevent the State from presenting powerful victim impact testimony that they believed would have a strong emotional impact on the jury. In certain respects, the strategy succeeded – no victim impact evidence was presented. While, in hindsight, one might question counsel's decision, counsel had a viable strategic reason for their decision.

The state habeas court found that counsel conducted thorough legal research on this issue and were aware of the potential victim impact evidence. SH at 407-08. Ripkowski has not demonstrated by clear and convincing evidence that the state court's findings on this issue were unreasonable. In addition, the Court is not persuaded that the state habeas court's finding that he was not prejudiced by counsel's decision was unreasonable. The victim impact evidence could have been extremely powerful. Ripkowski's ineffective assistance of counsel claim relating to the waiver of the mitigation special issue does not entitle Ripkowski to relief.

**Failure to Object to Prosecutor's Comments**.— Ripkowski next claims that counsel rendered ineffective assistance by not objecting to allegedly improper comments made by the prosecutor during closing argument or seeking a mistrial based on those comments. As discussed above in connection with Ripkowski's prosecutorial misconduct claim, Ripkowski fails to demonstrate any such improper comments by the prosecutor.

**Failure To Seek Psychiatric Examination**.— Ripkowski next contends that counsel rendered ineffective assistance by failing to have him examined for competency to waive the mitigation special issue based on his alleged suicide attempts. He also claims that his decision to waive the mitigation special issue was the result of his desire to commit suicide.

As noted above, the state habeas court entered findings of fact supporting its conclusion that Ripkowski was competent to stand trial. The state court considered testimony by two psychiatrists from the Harris County Mental Health Mental Retardation Authority that Ripkowski exaggerated his claims, had not been prescribed any medication for psychiatric disorders and needed no such medication, and was not bipolar. The court also considered affidavits by both of Ripkowski's trial attorneys stating that Ripkowski consulted with them during trial with a reasonable degree of rational understanding, understood the proceedings, and assisted in the preparation of his defense. The court also credited their assertions that no evidence of incompetency arose during trial. SH at 413.

Ripkowski makes no factual showing to this Court that he was, in fact, incompetent at trial, or that a psychiatric examination would have changed the trial court's ruling.[10] Because the record does not establish that Ripkowski was not competent, he fails to demonstrate that he suffered any prejudice from counsel's failure to seek a competency examination in connection with his waiver of the mitigation special issue, or at any other time. Therefore, Ripkowski fails to show by clear and convincing evidence that the state court's

---

[10]    A more detailed discussion of the evidence concerning Ripkowski's competency to stand trial is discussed in connection with the trial court's waiver admonishment in section 13, *infra*.

findings were unreasonable, and this Court must give deference to those findings under the AEDPA. Ripkowski is not entitled to relief on this claim.

**Failure To Understand** *Penry*. — In his final ineffective assistance claim, Ripkowski claims that his counsel were ineffective for failing to understand the requirements of *Penry*. He offers no argument on this claim. It is therefore wholly conclusory and does not entitle Ripkowski to relief.

### 11. Constitutionality of the Texas Death Penalty Scheme

Ripkowski next contends that the entire Texas death penalty scheme is unconstitutional because, in Ripkowski's estimation, it does not simultaneously restrict the jury's discretion to impose a death sentence and give the jury unfettered discretion to consider and give effect to mitigating evidence. The only authority Ripkowski cites in support of this sweeping proposition is a lengthy dissenting opinion by Justice Blackmun in *Callins v. Collins*, 510 U.S. 1141 (1994). A dissenting opinion is not precedent; a majority of the Supreme Court Justices disagreed. Ripkowski does not meet his burden to show himself entitled to relief on this claim.

### 12. Equal Protection/Exercise of Prosecutorial Discretion

Ripkowski next contends that his rights under the equal protection clause were violated because Texas law gives prosecutors too much discretion in deciding whether to seek a death sentence. This claim is without merit.

First, contrary to Ripkowski's assertion, Texas law does guide prosecutorial discretion by both providing a limited definition of capital murder, and requiring the existence of a

specifically enumerated aggravating factor.  *See* TEX. PENAL CODE § 19.03(a) and (b).

Ripkowski's offense fits the statutory definition of capital murder because his victim was

under the age of six.  *See* TEX. PENAL CODE § 19.03(a)(8).  Thus, the basic premise of

Ripkowski's claim is contradicted by the plain language of the Texas capital murder statute.

Moreover, Ripkowski relies on the case of *Bush v. Gore*, 531 U.S. 98 (2000), a voting

rights case, not a criminal case.  The opinion in *Bush v. Gore* expressly states that it is limited

to the specific facts of that case.  *Id.* at 109.  Ripkowski's equal protection argument is

rejected.

### 13.    Admonishment About Waiver of Mitigation Issue

In a non-defaulted claim, Ripkowski argues that the trial court did not adequately

admonish him about the ramifications of waiving the mitigation special issue and did not

determine whether he was competent to waive the issue.  The state habeas court entered

detailed findings of fact as to Ripkowski's competence to waive the special issue.

The state court relied in part on the testimony of Dr. Paula Lundberg-Love, an expert

in pharmacology and psychology who testified on Ripkowski's behalf during the hearing on

Ripkowski's motion to suppress his confession.  She acknowledged that, of the five

psychological tests she administered, one indicated that Ripkowski has no formal dissociative

disorder, and three were invalid, possibly due to efforts by Ripkowski to manipulate the

results.  The habeas court found that bipolar disorder does not necessarily render an individual

incompetent.  The court also noted that Ripkowski graduated from high school and attended

college, worked as a computer programmer, and possessed average intelligence.  The State's

experts testified that Ripkowski had not been prescribed any medication for psychiatric disorders and was not bipolar.

The state habeas court also noted the affidavits of Ripkowski's trial counsel asserting that Ripkowski consulted with counsel with a reasonable degree of understanding, had a rational and factual understanding of the proceedings against him, and was able to assist in the preparation of his own defense. They saw no evidence of incompetency to stand trial or waive the mitigation special issue during trial. Based on this evidence, the state habeas court found that Ripkowski was competent. *See* SH at 412-17. Ripkowski has not rebutted the state court findings with clear and convincing evidence. These findings must be given deference under the AEDPA.

Ripkowski also contends that the trial court failed to properly warn him of the consequences of his waiver. This argument is plainly contradicted by the record. The trial court specifically asked Ripkowski if he wanted to waive the special issue, 18 Tr. at 3-4, and advised Ripkowski that:

> You understand if you do that, they will have just one issue left, and that would be what we call the future dangerousness issue, and then if they answer that in the affirmative, then the Court would assess your punishment at death. Do you understand that?

*Id.* at 4. The trial transcript demonstrates that the trial court informed Ripkowski of the consequences of his waiver, and that the state habeas court's finding that Ripkowski's decision to waive the special issue was knowing, voluntary, and made on the advice of his counsel, *see* SH at 413-17, was not unreasonable.

### 14.    Length of Stay on Death Row

In his final claim for relief, Ripkowski contends that his lengthy stay on death row makes his execution cruel and unusual punishment in violation of the Eighth Amendment. Ripkowski relies mostly on foreign law to support this claim.  While he does cite some decades-and centuries-old case law from United States courts, none of these cases holds that a long stay on death row renders an inmate constitutionally ineligible for execution.  The Fifth Circuit has expressly rejected this claim, s*ee Felder v. Johnson*, 180 F.3d 206, 215 (5th Cir. 1999) (describing similar claim as "border[ing] on the legally frivolous").  This argument provides no basis for habeas relief to Ripkowski.

## IV.    CONCLUSION

For the foregoing reasons, Ripkowski fails to raise a viable claim for habeas relief.  His claim that he is incompetent to be executed will be dismissed without prejudice as unripe.  All of his other claims must be dismissed with prejudice for the reasons stated in this opinion.

## V.    CERTIFICATE OF APPEALABILITY

Ripkowski has not requested a certificate of appealability ("COA"), but this Court may determine whether he is entitled to this relief in light of the foregoing rulings.  *See Alexander v. Johnson*, 211 F.3d 895, 898 (5th Cir. 2000) ("It is perfectly lawful for district court's [sic] to deny COA *sua sponte*.  The statute does not require that a petitioner move for a COA; it merely states that an appeal may not be taken without a certificate of appealability having been issued.")  A petitioner may obtain a COA either from the district court or an appellate court, but an appellate court will not consider a petitioner's request for a COA until the district

48

court has denied such a request.  *See Whitehead v. Johnson*, 157 F.3d 384, 388 (5th Cir. 1988); *see also Hill v. Johnson*, 114 F.3d 78, 82 (5th Cir. 1997) ("[T]he district court should continue to review COA requests before the court of appeals does.").  "A plain reading of the AEDPA compels the conclusion that COAs are granted on an issue-by-issue basis, thereby limiting appellate review to those issues alone." *Lackey v. Johnson*, 116 F.3d 149, 151 (5th Cir. 1997).

A COA may issue only if the petitioner has made a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2); *see also United States v. Kimler*, 150 F.3d 429, 431 (5th Cir. 1998).  A petitioner "makes a substantial showing when he demonstrates that his application involves issues that are debatable among jurists of reason, that another court could resolve the issues differently, or that the issues are suitable enough to deserve encouragement to proceed further." *Hernandez v. Johnson*, 213 F.3d 243, 248 (5th Cir.), *cert. denied*, 531 U.S. 966 (2000).  The Supreme Court has stated that:

> Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c)  is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.  The issue becomes somewhat more complicated where . . . the district court dismisses the petition based on procedural grounds.  We hold as follows: When the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.

*Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  "The nature of the penalty in a capital case is

49

a 'proper consideration in determining whether to issue a [COA], but the severity of the penalty does not in itself suffice to warrant the automatic issuing of a certificate.'" *Washington v. Johnson*, 90 F.3d 945, 949 (5th Cir. 1996) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 (1983)), *cert. denied*, 520 U.S. 1122 (1997).  However, "the determination of whether a COA should issue must be made by viewing the petitioner's arguments through the lens of the deferential scheme laid out in 28 U.S.C. § 2254(d)."  *Barrientes v. Johnson*, 221 F.3d 741, 772 (5th Cir. 2000), *cert. dismissed*, 531 U.S. 1134 (2001).

This Court has carefully considered each of Ripkowski's claims.  The Court finds that each of the claims is foreclosed by clear, binding precedent.  This Court concludes that under such precedents, Ripkowski has failed to make a "substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2). This Court concludes that Ripkowski is not entitled to a certificate of appealability on his claims.

## VI.    <u>CONCLUSION AND ORDER</u>

For the foregoing reasons, it is **ORDERED** as follows:

1.    Respondent Rick Thaler's Motion for Summary Judgment (Doc. # 41) is

      **GRANTED**;

2.    Petitioner Britt Allen Ripkowski's Second Amended Petition for Writ of Habeas

      Corpus (Doc. # 30) is in all respects **DENIED**;

3.    Ripkowski's claim that he is incompetent to be executed is **DISMISSED**

      **WITHOUT PREJUDICE** as unripe;

4.    Ripkowski's other claims for relief are **DISMISSED WITH PREJUDICE;** and

5.    No certificate of appealability shall issue.

The Clerk shall notify all parties and provide them with a true copy of this Memorandum and Order.

SIGNED at Houston, Texas, this 31st day of March, 2010.

Nancy F. Atlas
United States District Judge

51